FILED

UNITED STATES DISTRICT COURT 2004 APR 19 P 4: 20
DISTRICT OF CONNECTICUT

DISTRICT COURT
...TFORD CT

| | | |
|---|---|---|
| W.E. ANDREWS CO., INC.,<br>a Georgia Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 302-CV-00599 (CFD) |
| | ) | |
| PLASTIC DEVELOPMENT, INC.,<br>a Rhode Island Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## JOINT TRIAL MEMORANDUM

The Plaintiff, W.E. Andrews Co., Inc. ("ANDREWS") and the Defendant, Plastic
Development, Inc. ("PDI") hereby submit this memorandum in compliance with the Court's
Trail Memorandum Order and in anticipation of the trial of this action.

1)     **TRIAL COUNSEL**

**For Plaintiff:**

Jeffrey L. Widman
Shaw Gussis Fishman Glantz Wolfson & Towbin LLC
321 N. Clark St., Suite 800
Chicago, IL 60610
Telephone: (312) 541-0151
Facsimile: (312) 980-3888
jlwidman@shawgussis.com

**For Defendant:**

Neil F. Murphy, Jr., ct08381
Murphy, Laudati & Kiel, P.C.
270 Farmington Avenue, Suite 360
Farmington, CT 06032
Telephone: (860) 674-8296
Facsimile: (860) 674-0850
nmurphy.mlk@sbcglobal.net

Margaret Forgarty Rattigan, ct 09616
Murphy, Laudati & Kiel, P.C.
270 Farmington Avenue, Ste. 360
Farmington, CT 06032
Telephone: (860) 674-8296
Facsimile: (860) 674-0850
margaretrattigan@sbcglobal.net

John L. Laudati, ct 00043
Murphy, Laudati & Kiel, P.C.
270 Farmington Avenue, Ste. 360
Farmington, CT 06032
Telephone: (860) 674-8296
Facsimile: (860) 674-0850
jlaudati.mlk@sbcglobal.net

## 2)     **JURISDICTION**

The parties agree that this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because of the diversity of citizenship between Andrews and PDI and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

## 3)     **JURY/NON-JURY**

The case was claimed to a jury by the defendant.

## 4)     **NATURE OF THE CASE**

### Andrews's Claims

Andrews has filed a two count complaint against PDI for breach of contract and goods sold and delivered resulting from PDI's failure to pay Andrews for Press Strips that Andrews manufactured, sold and delivered to PDI pursuant to the parties' contract.  Andrews is entitled to recover on these claims because PDI accepted the goods and, thus must pay Andrews for those goods at the contract rate. Sun Hill Industries, Inc. v. Kraftsman Group, Inc., 27 Conn.App. 688, 694 (Conn. App. 1992)( "The buyer's acceptance of goods, despite their alleged nonconformity, is a watershed.  After acceptance, the buyer must pay for the goods at the contract rate."); General Statutes §42a-2-607(1).

Andrews is also entitled to recover under its claim for prejudgment interest at a rate of 10% per annum pursuant to General Statutes §37-3a.

As to PDI's counterclaim, Andrews contends that PDI is not entitled to recover on its claims for breach of contract or breach of express and implied warranties because the Press Strips were not defective. Moreover, Andrews contends that, even if the Press Strips were nonconforming, PDI is not entitled to recover on these claims because it did not revoke its acceptance under §42a-2-608, nor did it give proper notice of a particular nonconformity as required by §42a-2-607, which Andrews contends is a prerequisite to any recovery by PDI.

### PDI's Claims

As to the complaint, PDI, has agreed that a contract existed between the parties, but has pled that the Andrews is not entitled to damages because it was in breach of the contract, in that it failed to deliver goods which were reasonably fit for the purpose described in the contract and, in a timely fashion, PDI revoked its acceptance when it discovered the defects. PDI has relied upon the authority of common law breach of contract and Conn Gen. Stat. §42a-2-607 and Conn Gen. Stat. §42a-2-608(1).

PDI has also filed a counterclaim in which it claims that PDI and Andrews entered into a contract which provided that Andrews would supply PDI with press sheet strips which were free from defects. In fact, each party had pled that PDI's Purchase Order #36752 dated May 23, 2000, constituted an acceptance of the December 17, 1999 quotation offer from Andrews, therefore, formed the contract between the parties. Notwithstanding, Andrews provided PDI with defective press sheet strips, and the inserts were rejected by the U.S. Mint for scratches and mars, and Andrews was in breach of its contractual obligations to PDI by providing such nonconforming goods.

As to its special defenses, PDI has relied upon Conn Gen. Stat. §42a-2-608(1) which provides that a buyer may revoke acceptance of goods "whose nonconformity substantially impairs its value to him." if such goods were originally accepted either (a) with knowledge of the nonconformity but with reasonable assumption that it would be cured, and it was nonethless not seasonably cured, or (b) without knowledge of the nonconformity if acceptance was based either on the difficulty of discovering such nonconformity or the seller's assurances.

In count one of its counterclaim, PDI claims a breach of contract and has relied upon Stelco Industries, Inc. v. Cohen, 182 Conn. 561, 565 (1980) (delivery of nonconforming goods constitutes a breach of contract).

In count two of its counterclaim, PDI claims a breach of express warranty and has relied upon Web Press Services Corp. v. New London Motors, 203 Conn. 342, 351 (1987), Vezina v. Nautilus Pools, Inc., 27 Conn. App. 810, 816 (1992), Conn Gen. Stat. §42a-2-313(b) provides that an express warranty is created by "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods conform to the description."

A0064458.WPD 2                                3

In count three of its counterclaim, PDI claims a breach of implied warranty of fitness for use and has relied upon Omega Engineering, Inc. v. Eastman Kodak Co., 30 F.Supp2d 226, 249-50 (D.Conn. 1998), ("Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skills or judgment to select or furnish suitable goods, there is unless excluded or modified under section 42a-2-316 an implied warranty that the goods shall be fit for such purpose.") Conn Gen. Stat. §42a-2-315.

In count four of its counterclaim, PDI claims a breach of implied warranty of merchantability and has relied upon Omega Engineering, Inc. v. Eastman Kodak Co., 30 F.Supp2d 226, 249-50 (D.Conn. 1998), Standard Structural Steel v. Bethlehem Steel Corp., 597 F.Supp. 164, 187 (D.Conn. 1984), Conn Gen. Stat. §42a-2-314 sets forth the implied warranty of merchantability, which is implied in any sale of goods by a merchant seller.

In count five of its counterclaim, PDI claims a setoff and has relied upon Conn Gen. Stat. §42a-2-717 ("The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract.")

PDI seeks relief in the form of compensatory damages, including but not limited to, incidental and consequential damages.

### 5 a)    <u>STIPULATION OF UNCONTROVERTED FACTS</u>

1.    At all times relevant, Andrews was and is a Georgia corporation, with its principal place of business in Connecticut.

2.    Andrews is engaged in the business of providing print management services to major corporations in the areas of commercial print, business forms, labels and direct response.

3.    At all times relevant, Plastic Development, Inc. ("PDI") was and is a Rhode Island corporation doing business in Connecticut.

4.    On December 17, 1999, at PDI's request, Andrews sent quotation #615615 (the "Quotation") to PDI, in which Andrews provided PDI with pricing for the printing and delivery of press sheet strips (the "Press Strips") to be die cut and assembled by PDI into displays for coin sets for the United States Mint (the "Mint").

5.    On May 23, 2000, PDI issued purchase order #36752 for the Press Strips, which references the Quotation.

6.    The December 17, 1999 quotation by Andrews constituted an offer which was accepted by PDI's May 23, 2000 purchase order thereby forming a contract between the parties.

### 5 b)    STIPULATION OF UNCONTROVERTED LAW

The parties agree that the contract and litigation is governed by common law breach of contract and the Uniform Commercial Code as codified in Conn. Gen. Stat. §42a-1-101 et seq., and as supplemented by general principles of law Conn. Gen. Stat. §42a-1-103.

### 6)    ANDREWS's CONTENTIONS

The Complaint seeks recovery from PDI for $131,028.46, broken down as follows: $119,280.00 for the Press Strips, $1,191.93 for shipping on the Press Strips, $6,204.28 for the Press Proofs, $2,053.00 for a change of specifications on the Press Proofs, and $1,759.25 for freight on the Press Proofs, plus interest (1-½% per month) and attorneys' fees, pursuant to the Contract. Discovery has revealed that Andrews's claims with respect to freight, attorneys' fees and contractual interest are unsupported and, therefore, Andrews does not seek said amounts at trial. Andrews will amend its Complaint to withdraw those claims if the Court deems it necessary.

Andrews contends that the facts at trial will show that Andrews produced and shipped Press Strips without incident to PDI that conformed to the requirements of the contract, that PDI accepted and used the Press Strips in the ordinary course of its business, that PDI did not revoke acceptance of the Press Strips, that PDI did not provide notice to Andrews of the latent defect alleged by PDI to exist in the coating, and that any damage caused to the Press Strip in transit from PDI to the U.S. Mint was due solely to faulty packaging by PDI.

### 7)    PDI's CONTENTIONS

PDI contends that under the terms of the contract Andrews's had warranted its product to be free from defects including scratches, hickeys and mars. Additionally, PDI contends that it had apprised Andrews of the rigid specification of the U.S. Mint and, that each, PDI and Andrews could profit from providing inserts to the U.S. Mint through 2008.

While the initial shipments met the Mint's rejection criteria, the August 2000 shipments arrived at the Mint with a significant number of visible scratches and surface blemishes, which were precisely the type of defect against which Andrews has warranted its product.

A0064458.WPD 2                                             5

Therefore, PDI has defended the complaint by contending that is does not owe Andrews because the goods were nonconforming and when the defects were discovered it gave timely notice to Andrews of its revocation of acceptance.

In its five count counterclaim, PDI seeks consequential damages including lost profit in excess of 8.3 million dollars with a setoff of any monies Andrews is found to be entitled to under its complaint.

**8)    LEGAL ISSUES**

Generally the parties agree that legal issues include interpretation of the pertinent sections of the Uniform Commercial Code as codified in the Conn. Gen. Stat. §42a-1-101 et seq., and as supplemented by general principles of law Conn. Gen. Stat. §42a-1-103.

Specifically the parties anticipate issues to include acceptance, revocation of acceptance, expressed and implied warranties.

The parties also anticipate issues with regard to the measure of damages on the counterclaim.

The parties continue to have several distinct disagreements as to the interpretation of <u>Sun Hill Industries, Inc. V. Kraftsman Group, Inc.</u> supra.

**9)            PROPOSED VOIR DIRE QUESTIONS**

Andrews's proposed voir dire questions are attached as JTM Attachment No. 1. PDI's proposed voir dire questions are attached as JTM Attachment No.2.

**10)           LIST OF WITNESSES**

Names and addresses of each witness to be called at trial, except rebuttal and impeachment witnesses, and a brief summary of anticipated testimony:

**Andrews's Witnesses:**

<u>John Vesia, 116 Wall Street, Hebron, CT 06248</u>

Andrews anticipates that Mr. Vesia will testify as to the terms of the contract, Andrews' manufacturing process of the Press Strips, the method in which the coating was applied, Andrews' overall performance of the contract, PDI's notice to Andrews' regarding the Mint's cancellation of its contract with PDI, the cooperative efforts of Andrews and PDI in determining

the cause of the scratches to the coin holders and PDI's requests for Andrews' assistance in making claims against Andrews' insurance carrier.

Bill Sybalsky, c/o W.E. Andrews Co., Inc., 151 Redstone Road, Manchester, CT

Andrews anticipates that Mr. Sybalsky will testify as to the terms of the contract between Andrews and PDI and Andrews' performance thereunder.

Normand Thibaudeau, 219 Central Ave., North Providence, R.I. 02904

Andrews anticipates that Mr. Thibaudeau will testify as an adverse witness regarding Andrews' performance under the contract, PDI's relationship with the U.S. Mint, the cooperative efforts of Andrews and PDI in determining the cause of the scratches to the coin holders and PDI's requests for Andrews' assistance in making claims against Andrews' insurance carrier.

Timothy Pigden c/o Kelstar International, 1050 Taylors Lane, Cinnaminson, NJ 08077

Andrews anticipates that Mr. Pigden will testify as to Kelstar's specifications for coat weight and application of the aqueous coating at issue. Mr. Pigden may also testify as to Andrews' coating process.

Jeff Jacobs c/o Kelstar International, 1050 Taylors Lane, Cinnaminson, NJ 08077

Mr. Jacobs is expected to testify as to Kelstar's specifications for coat weight and application of the aqueous coating at issue.

Sam Savage c/o U.S. Mint, 801 9th Street, N.W., Washington, D.C. 20220

Mr. Savage is expected to testify regarding the U.S. Mint's state quarter program and the amount of coin holders that the Mint has and expects to order in the future.

Robert Campbell c/o U.S. Mint, 801 9th Street, N.W., Washington, D.C. 20220

Mr. Campbell is expected to testify regarding the U.S. Mint's state quarter program and the amount of coin holders that the Mint has and expects to order in the future.

Nancy Plowman, 30-32 Ray Ave., Burlington, MA 01890

Ms. Plowman is Andrews's expert witness on the issue of transit markings. She is expected to testify on rebuttal that the opinions reached by PDI's expert witnesses, Neal Kelly and Mary McCann are unreliable, inaccurate and not based on generally accepted methods. Ms.

Plowman will further testify that the transit markings which were present on some of the completed coin holders upon arrival at the U.S. Mint resulted from the poor packaging job by PDI. Ms. Plowman's curriculum vitae is attached as JTM Attachment No. 3.

Andrews reserves the right to call and examine those witness proposed by PDI during Andrews's case-in-chief and/or rebuttal.

### PDI's Witnesses:

Normand Thibaudeau, Executive Vice President., Plastic Development, Inc., 21    Sabin Street,Pawtucket, RI 02904

Mr. Thibaudeau, as Executive Vice President of PDI, will testify that he was involved in all aspects of providing coin inserts to the U.S. Mint including planning, engineering, production, purchasing and marketing. He will testify that after extensive research, he located Andrews and inquired about their ability to print on styrene, in order to prepare the top and bottom printed protective layers of the inserts. Mr. Thibaudeau will testify, that after assurances by Andrews that they could perform the job, the parties entered into a contract, which contract consisted of a one (1) page quotation dated December 17, 1999, provided by Andrews, which constituted the offer and PDI's purchase order dated May 23, 2000, constituted acceptance. The contract specifically provided that Andrews's product would be free and clear from scratches, hickeys, and mars. Mr. Thibaudeau will testify that product which was not visibly defective was processed by PDI in order to make the inserts in a process was identical to the successful process of 1999. He will testify that the inserts appeared to be fine when shipped from PDI and that mirror smudges and blemishes were discovered at the U.S. Mint in San Francisco. He will testify that he brought back defective product from the U.S. Mint in San Francisco and the next day showed the defective product to John Vesia. He will testify that his attempts to rectify the problem and salvage the contract with the U.S. Mint were unsuccessful and that after PDI was sued by Andrews, he located and retained an expert whose efforts uncovered the precise cause of the defect and led to PDI's claim of breach of contract by Andrews. He will also testify that PDI retained an accountant and economist to calculate the extent of the damages sustained by PDI as a result of the breach by Andrews based upon data that he and other individuals within PDI provided those experts.

Robert Campbell, c/o U.S. Mint, 801 9th Street, N.W., Washington, D.C. 20220

Mr. Campbell, will testify with respect to the following general subject areas: his personal history, his knowledge of the U.S. Mint's state quarter program, his knowledge of the contracts between the U.S. Mint and PDI, and his knowledge of the orders placed by the U.S. Mint to the two vendors, including the vendor that replaced PDI and the number of coin inserts ordered in

the years 1999 - 2004 and expectations of future orders by the U.S. Mint. He will testify that had there not been a problem with the product, PDI could have reasonably expected to continue as a vendor through the life of the project.

Sam Savage, c/o U.S. Mint, 801 9th Street, N.W., Washington, D.C. 20220

Mr. Savage, Chief Procurement Officer, will testify with respect to the following general subject areas: his personal history, his knowledge of the U.S. Mint's state quarter program, his knowledge of the contract between the U.S. Mint and PDI, and his knowledge of the orders placed by the U.S. Mint to the two vendors, including the vendor that replaced PDI, and the amount of the coin inserts that the U.S. Mint as and expects to order in the future. He will also testify that he was the only contact person at the U.S. Mint that directly communicated with Normand Thibaudeau and John Vesia during the research and development between PDI and Andrews. He will testify that had there not been a problem with the product, PDI could have reasonable expected to continue as a vendor through the life of the project.

Neal F. Kelly, Consultant, 42 Independence Drive, Woburn, MA 01801

Mr. Kelly is PDI's expert witness on the issues of chemistry, adhesive and coatings. He will testify with respect to the following general subject areas: his personal history, his review, investigation, testing and observations made while analyzing the surface coating defects on the coin inserts, as well as the insufficient quality control performed by the Andrews. He will also testify on rebuttal opinion reached by the Andrews's expert witness, Nancy Plowman. He will be testify that Nancy Plowman's testing methods unacceptable, inaccurate and unreliable. Mr. Kelly's curriculum vitae is attached hereto as JTM Attachment No. 4.

Mary A. McCann, Microscopist, 151 Clafin Street, Belmont, MA 02478

Ms. McCann is PDI's expert witness on the issue of microscopy . She will testify with respect to the following general subject areas: her personal history, her review, testing and observations made with regard to the surface coating defects on the coin inserts including photographs of them. She will also rebut the opinion of Ms. Plowman in the area of microscopy. She has photographed the defects and will testify as to what the microscopic photographs depict. Ms. McCann's curriculum vitae is attached hereto as JTM Attachment No. 5.

Theresa Renner, CPA, CVA, Magdefrau, Renner & Ciaffaglione, LLC, 70 Keynote Drive, Vernon, CT 06066

Ms. Renner is PDI's expert in the area of accounting. She will testify with respect to the following general subject areas: her personal history, and her knowledge, training and professional experience as a certified public accountant and certified valuation analyst. Ms.

A0064458.WPD 2                                             9

Renner will also testify with regard to the following subject areas: the damages sustained by PDI, including the profit lost from the value of the Mint contract which opinion was based in part on a review of the overall operations of PDI and its financial records and after collaborating with Mr. Derek Johnson, an economist, she agreed upon a final figure based upon discount rates and interest rates. Ms. Renner's curriculum vitae is attached hereto as JTM Attachment No. 6.

> **Derek M. Johnson, Economist, University of Connecticut, 341 Mansfield, Road, Storrs, CT**

Mr. Johnson is PDI's expert in the area of economy. He will testify with respect to the following general subject areas: his personal history, and his knowledge, training and professional experience as an economist. Mr. Johnson will testify with regard to the following subject areas: the damages sustained by the PDI, including the profit lost from the value of the Mint contract and as to the appropriate interest rate and discount rate on said profits based upon his review of PDI's financial information and calculations of lost profits claimed by PDI. Mr. Johnson's curriculum vitae is attached at JTM Attachment 7.

PDI reserves the right to call and examine those witnesses proposed by the Andrews during PDI's case-in-chief and/or rebuttal.

**11.**      **EXHIBITS**

Andrews's List of Exhibits is attached as JTM Attachment 8. PDI's List of Exhibits is attached as JTM Attachment 9.

The parties agree that the actual number of red and blue inserts which have been ordered by the U.S. Mint are the best evidence, and, as such, will substitute exhibits which contain quantities that are current through the date of trial. The parties agree that when Mssrs. Campbell and Savage testify they will introduce the most current figures through that point in time. Furthermore, PDI reserves the right to provide up to date exhibits reflecting figures in the testimony of Theresa Renner and Derek Johnson.

Both parties also reserve the right to use at trial any exhibit designated by the Andrews or the PDI in their disclosures. In addition, consistent with the Joint Trial Memorandum Order, the both parties reserve the right to use such additional exhibits, witnesses or evidence as may be necessary for rebuttal or impeachment.

**12)**      **DEPOSITION TESTIMONY**

**Andrews's Position**

A0064458.WPD 2            10

Andrews anticipates that two witness, Timothy Pigden and Jeff Jacobs, may be testifying on its behalf by deposition.

### PDI's Position

PDI does not anticipate the need for testimony by deposition and intends to call at trial those witnesses referenced in no. 10 above. Moreover, either side may call for at trial on its behalf Mssrs. Timothy Pigden and Jeff Jacobs.

Finally, as no trial date has been set as of the date of the filing of this motion, either party may find it necessary to depose witnesses in lieu of trial testimony if they are unable to attend the trial and if this becomes necessary will seek relief from the court.

### 13)      JURY INSTRUCTIONS AND VERDICT FORMS

Each party has attached a requested jury instruction, special interrogatories and verdict forms as JTM Attachment 10 and 11, respectively. While some of the instructions and interrogatories appear to be duplicate, nuances of the interpretation of the Uniform Commercial Code and the pleadings, particularly the special defenses, have left the parties without complete agreement at this time. For instance, Andrews objects to any PDI instruction that contains a reference to "offered evidence" of an element that supports any given claim in that it lacks a proper foundation. Furthermore, reference may be had to Section 8, supra, with regard to the disagreement regarding the legal issues in this matter. Notwithstanding, the parties have agreed on almost all of the jury instructions, special interrogatories and verdict forms but hereby request a telephone conference with the court in order to, hopefully, achieve an overall agreement.

### 14)      ANTICIPATED EVIDENTIARY PROBLEMS

#### Andrews's Position

Andrews attaches motions *in limine* to bar the testimony of PDI's experts, Mary McCann (JTM Attachment 12), Neal Kelly (JTM Attachment 13), Theresa Renner (JTM Attachment 14) and Derek Johnson (JTM Attachment 15). Andrews also attaches a motion *in limine* to bar any evidence of certain future lost profits (JTM Attachment 16).

#### PDI's Position

PDI attaches a motion *in limine* to bar the testimony of Andrews's expert, Nancy Plowman. (JTM Attachment 17.) PDI also attached a motion *in limine* to

### 15)      PROPOSED FINDINGS AND CONCLUSIONS

A0064458.WPD 2                                  11

Not applicable.

**16)**       <u>**TRIAL TIME**</u>

Andrews estimates 1 day for its case; PDI estimates 4 days for its case, for an estimated total of 5 days.

**17)**       <u>**FURTHER PROCEEDINGS**</u>

The parties do not anticipate further proceedings prior to trial other than rulings on issues raised in or arising out of this Trial Memorandum.

**18)**       <u>**ELECTION FOR TRIAL BY MAGISTRATE**</u>

The parties do not agree to trial by magistrate judge.

**19)**       <u>**STATEMENTS IN LIEU OF OPENING STATEMENTS**</u>

Andrews's statement in lieu of opening statement is attached as JTM Attachment 18. PDI's statement in lieu of opening statement is attached as JTM Attachment 19.

RESPECTFULLY SUBMITTED,

THE PLAINTIFF
W.E. ANDREWS CO., INC.

By: _____

      Jeffrey L. Widman
      Shaw Gussis Fishman Glantz
        Wolfson & Towbin LLC
      321 N. Clark St., Suite 800
      Chicago, IL 60610
      Telephone: (312) 541-0151
      Facsimile: (312) 980-3888
      jlwidman@shawgussis.com


      - ITS ATTORNEYS -

THE DEFENDANT
PLASTIC DEVELOPMENT, INC.

By: _____

      Neil F. Murphy, Jr., ct08381
      Murphy, Laudati & Kiel, P.C.
      270 Farmington Avenue, Suite 360
      Farmington, CT 06032
      Telephone: (860) 674-8296
      Facsimile: (860) 674-0850
      nmurphy.mlk@sbcglobal.net

      - ITS ATTORNEYS -

### Plaintiff's Proposed Voir Dire:

1.     Have you ever been in a jury selection process before? If so please describe.

2.     Have you ever sat in a jury case before? Is so, what kind of case? Did your case end in a verdict?

3.     Have you or anyone in your family ever been a defendant or a plaintiff in a civil or criminal court case? If so, please describe the circumstances.

4.     Is there anything about the nature of this case or about the parties involved in it that makes you hesitate to be a juror here?

5.     To your knowledge, do you know anyone employed by either of the parties?

6.     Do you know anyone employed by Polaroid?

7.     Do you know any of the following individuals? John Vesia, Bill Sybalsky, Nancy Plowman, Normand Thibaudeau, Neal Kelly, Mary McCann, Theresa Renner, or Derek Johnson?

8.     Do you know any of the attorneys in the courtroom?

9.     The parties each have filed claims against each other. Is there anything in your experience or perspective that would prevent you from awarding one party, and not the other, damages if the evidence supported such a result?

10.    Do any of you believe there are too many frivolous lawsuits in the courts today and that certain types of cases should never be allowed to reach the light of day in an open court room?

11.    Do each of you understand that the parties have an absolute, legal right to be here and to have you fairly, fully and objectively consider all of the evidence before you?

12     Have any one of you ever been party to a lawsuit, either as a plaintiff or a defendant, involving a breach of contract? If so, please describe.

13.    This case will probably take one full week to be heard, sometime during this month. Is there anything at home, work or anywhere else which will prevent you from devoting your clear and focused attention on the evidence before you?

14.    What do you do for a living?

A0062363.WPD

15.    Do any of you work or have experience in the printing or coating industry?

16.    Has anyone ever broken a contract with you? Describe the circumstances.

17.    Have you ever broken a contract with anyone? Describe the circumstances.

**Defendant's Proposed Voir Dire:**

A0062363.WPD

2

**PDI submits the following voir dire questions.**

1.    By reason of your religious teachings and beliefs, or for any other reason at all, do you have convictions which might prevent or unduly affect your rendering an impartial verdict on the issues to be decided; and, if the evidence so warrants, on the damages you award?

2.    Is there anyone on the panel who feels that a person injured by someone else' conduct should not be sued for damages as a result of those injuries?

3.    Do you have any feelings regarding awarding a substantial verdict in a case?

4.    Have you heard anything or read anything that has influenced in any way your feelings about the Court System, law suits in general or the size of jury verdicts?  If so, what have you heard or read and what are your feelings.

5.    Have you, your spouse, any member of your family or close friend worked for an insurance company or an insurance adjusting company?  If so, the name of your employer and the job you performed.

6.    Have you, your spouse or any member of your family or close friend ever been sued or brought a claim of any kind?  If so, what was the lawsuit about and what was the result?

7.    Have you had any prior jury service?  If so, on what types of cases?  Did it go to a verdict?  Was there anything from that experience which colored your view of the court process?

8.    Are you or any member of your family or anyone close to you involved with collecting coins?  If so, what is the involvement.

9.    Do you have any engineering, technical or printing training?

10.    Are you involved in any fashion in the court system or related services?

11.    Do your or any family member or anyone close to you own your own business? Explain.

12.    The court procedures require the plaintiff to put on its case first and for the defendant to wait and to put on its evidence afterward. Would you have any problem listening carefully to both sides and keeping an open mind and waiting until all evidence is heard before you make a final decision on the case?

13.    Have you ever had any contact with any U.S. Government Agency, particularly, the U.S. Mint?

3



**NANCY PLOWMAN** ASSOCIATES, INC.

Nancy Plowman Associates, Inc.                    Attachment #2
30-32 Ray Avenue
Burlington, MA 01890
Tel: 1-888-672-8378 (USA only)
Fax: 781-273-1820

nancy_plowman@npatest.com
www.npatest.com

July 10, 2003

## CURRICULUM VITAE

Nancy Plowman Sandreuter, President of Nancy Plowman Associates, Inc., Burlington Massachusetts, (NPA) and Graphic Arts Testing Equipment, Inc. (GATE) located in Winchester, Massachusetts.

Incorporated in 1986, NPA is a graphic arts testing and consulting service specializing in handling print production related problem, including analysis of all components of the offset printing process. Examples of these include inks, papers, aqueous and UV coatings, adhesives, fountain solutions, blankets and chemical additives to the printing system.

NPA is developing and selling its own line of print testing equipment. We work with and assist major paper companies in setting up new in-house testing facilities and procedures to test ink and paper in a production environment. This type of work has expanded in 1994 to suppliers of paper mills, such as Chemical and Pigment manufacturers.

I graduated from the University of Maine with a Bachelor of Science degree in Mathematics, and a minor in Chemistry. My first employment was with the S. D. Warren Paper Company, a Printing Paper Subsidiary of Scott Paper Company, based in Philadelphia, PA, USA. I began working for Warren in 1969. I entered the University of Maine in 1971 and continued working at Warren on full time status and graduated from U of M in April 1976. During my career at Warren, I spent a total of 17 years in their Research & Development facility, with 9 years devoted to paper coating technology and chemistry. This training enables me to identify materials found in an analysis that are paper related and to establish any cause and affect relationships between materials in the paper and a particular problem in a printing job.

*Left margin, rotated:* 30-32 RAY AVENUE  BURLINGTON, MA 01803  (781) 272-7410  FAX (781) 273-1820

*Left margin, rotated:* www.npatest.com

In 1978 I moved from the Fundamental Coating group to the Graphic Arts Research group where we ran print analyses on inks, paper and other materials submitted to the company for claims in a complaint from a customer. The work in this group included tests in the laboratory as well as on press. Other responsibilities included assisting Marketing and Manufacturing in attempts to being new paper products to the market. In the capacity of Assistant Manager of the department, my responsibilities included running tests and coordinating chemical analyses being run in our Analytical department, which included Infra Red Spectroscopy, Gas Chromatography, Scanning Electron Photomicroscopy, and X-ray analysis on specimens taken from press, or on samples submitted after the fact, from printing runs.

I resigned from S.D. Warren and moved to Boston in 1985. In January of 1985, I joined Acme Printing Company, a commercial web and sheet fed offset printer, currently located in Wilmington, MA. I worked for Acme until November 1985 when I left to organize NPA. While at Acme, I sold printing, and was involved in jobs from pre-press to shipping. I also assisted in quality changes in the pressroom, such as recommending ink and fountain solution chemistry changes to improve all aspects of print quality.

## *Professional Publications and Associations:*

**Contributing Editor - Converting Magazine - Bi-Monthly column since July, 1997, "Print Forum".**

| | |
|---|---|
| Converting Magazine - *Pretest materials to stop problems before they start* | |
| Converting Magazine - *Will reducing the tack of my inks correct surface-picking problems on press?* | July 1997 |
| Converting Magazine - *Water Pick-Up of Offset Inks...How is it Measured?* | August 1997 |
| Converting Magazine - *Taking the Scientific Approach to Printing* | December 1997 |
| Converting Magazine - *Do all Inks set and Dry in the same Way?* | January 1998 |
| Converting Magazine - *Do Conventional Offset Inks Differ in Their Setting And Drying Characteristics?* | February 1998 |
| Converting Magazine - *How Do Conventional Heat Set Web Offset Inks Set and Dry?* | April 1998 |
| Converting Magazine - *Communication - Time and Money* | June 1998 |
| Converting Magazine - *Laminating Problems Part 1 - Adhesion* | July 1998 |
| Converting Magazine - *Laminating Problems Part 2 - Color Changes* | October 1998 |
| Converting Magazine - *What are My Choices for Offset Blankets* | December 1998 |
| | January 1999 |

**Contributing Editor - Graphic Arts Monthly Magazine - Bi-Monthly column since 1988 on the "Printing System"/"Print Clinic"**

| | | |
|---|---|---|
| Graphic Arts Monthly, *Understanding The Printing System* | Sept. 1988 | p 76 |
| Graphic Arts Monthly, *How Offset Blankets Affect Print Quality* | Oct. 1988 | p 156 |
| Graphic Arts Monthly, *A Quality Control Checklist* | Dec. 1989 | p 105 |
| Graphic Arts Monthly, *Ink Tack - Part I: How Is It Measured?* | Feb. 1989 | p 110 |
| Graphic Arts Monthly, *Ink Tack - Part II: Wet Film Thickness* | April 1989 | p 126 |
| Graphic Arts Monthly, *Ink Tack - Part III: Surface Measurement* | June 1989 | p 114 |

| | | |
|---|---|---|
| Graphic Arts Monthly, *Ink Tack - Part IV:  Blanket Release Forces* | | |
| Graphic Arts Monthly, *The Color Story* | Aug. 1989 | p 133 |
| Graphic Arts Monthly, *Wet Ink Trapping* | Oct. 1989 | p 196 |
| Graphic Arts Monthly, *Facts About Fountain Solution* | Dec. 1989 | p 102 |
| Graphic Arts Monthly, *Proper Complaint Documentation* | Feb. 1990 | p 120 |
| Graphic Arts Monthly, *Facts About Quick Release Blankets* | May 1990 | p 156 |
| Graphic Arts Monthly, *The Best Press for Print Testing* | July 1990 | p 124 |
| Graphic Arts Monthly, *Ink And Water:  A Balancing Act* | Sept. 1990 | p 197 |
| Graphic Arts Monthly, *Backtrap Mottle* | Nov. 1990 | p 127 |
| Graphic Arts Monthly, *Water Sensitivity Mottle* | Jan. 1991 | p 125 |
| Graphic Arts Monthly, *Ink Gloss Mottle* | March 1991 | p 124 |
| Graphic Arts Monthly, *Statistical Process Control* | May 1991 | p 122 |
| Graphic Arts Monthly, *Picking, Pick Outs, and Piling* | Aug. 1991 | p 168 |
| Graphic Arts Monthly, *What Is Paper Coating?* | | |
| Graphic Arts Monthly, *Why Coated Paper?* | | |
| Graphic Arts Monthly, *Gloss Calandered Papers* | | |
| Graphic Arts Monthly, *What Creates A Ghost* | March 1992 | p 115 |
| Graphic Arts Monthly, *Exorcising The Varnish Ghost* | May 1992 | p 124 |
| Graphic Arts Monthly, *Ink Setting Vs. Ink Drying* | July 1992 | p 102 |
| Graphic Arts Monthly, *Testing Ink Drying Characteristics* | Sept. 1992 | p 162 |
| Graphic Arts Monthly, *Ink Setting Tests, Part 1* | Nov. 1992 | |
| Graphic Arts Monthly, *Coating Adhesion Problems* | Jan. 1993 | p 89 |
| Graphic Arts Monthly, *Ink Setting Tests, Part 2:  Stain Tests* | March 1993 | p 101 |
| Graphic Arts Monthly, *Defining Volatility* | June 1993 | p 103 |
| Graphic Arts Monthly, *The pH of Fountain Solutions* | July 1993 | p 96 |
| Graphic Arts Monthly, *Are Aqueous Coatings Permeable?* | Sept. 1993 | p 100 |
| Graphic Arts Monthly, *Identifying Print Mottle* | Dec. 1993 | p 88 |
| Graphic Arts Monthly, *Ink, Water, and Paper:  A Delicate Balance* | Feb. 1994 | p 94 |
| Graphic Arts Monthly, *Paper and Ink, Up Close and Personal* | March 1994 | p 104 |
| Graphic Arts Monthly, *Successfully Applying Gloss Coatings* | May 1994 | p 96 |
| Graphic Arts Monthly, *A Call for Standardization* | July 1994 | p 105 |
| Converting Magazine, *Materials Testing Procedures* | Dec. 1994 | p 100 |
| Converting Magazine, *INK TACK:  Will reducing the tack of my inks correct surface picking problems on press?* | July 1997 | |
| Converting Magazine, *What happens to printing tack in the press when ink film thickness is changed?* | August, 1997 | |
| Converting Magazine, *Water Pick-Up Values of Inks; How is this measured?* | October, 1997 | |
| Converting Magazine, *Remember to take the scientific approach* | December, 1997 | |
| Converting Magazine, *Do all inks set and dry in the same way?  Part I* | January, 1998 | |
| Converting Magazine, *Do all inks set and dry in the same way?  Part II* | February, 1998 | |
| Converting Magazine, *How do Heat Set Offset Inks Set and Dry?* | April, 1998 | |
| Converting Magazine, *Lack of Communication costs time, money and materials.* | June, 1998 | |
| The Pressman, *The Color Story* | July, 1998 | |
| The Pressman, *Offset Blankets* | March, 2002 | |
| | April, 2002 | |

Published Paper in the June, 1994 TAPPI Journal " Predicting Print Mottle: A Method of Predicting Three Different Types of Print Mottle."

President, 1994-1995 - The Boston Lithographers Club

Member Printing & Imaging Committee - TAPPI (Technical Association of the Pulp & Paper Industry)

Recognized expert in the printing/paper field, speaking at the following events/organizations:

➔ RIT (Rochester Institute of Technology) Special Presentations and Teaching courses in the T&E Center, Rochester, N.Y.

➔ GATF (Graphic Arts Technical Foundation) Special presentations at Technical Conferences

➔ TAPPI (Technical Assoc. of the Pulp & Paper Industry): Presented:
A Technical Paper in 1994 - 1994 Coating Conference, San Diego, CA
A Technical Paper in 1994 - International Printing & Graphic Arts Conference, Halifax, Nova Scotia, Canada

Moderated a Panel on Printing Technology - 1996 Conference
Instructor - The Printing System at TAPPI Coated Board Short Course, 1992 (Rochester, N.Y.) and 1994 (Akron, OH.).
Instructor/Panel Member - TAPPI - Fall Coating Conference, 1991 in Columbus GA, 1993 in Columbus, OH, 1996 in Columbus, GA.

➔ RPTA : Recycled Paper Trade Association: Speaker and Instructor at Coating Courses and Coating Applications Committee Meetings. in Boston and Chicago.

➔ NAPIM: National Association of Printing Ink Manufacturers: Presented a paper at the 1994 Technical Meeting in Miami, FLA.

➔ TAPPI (Technical Assoc. of the Pulp & Paper Industry):
A Technical Paper in 1996 - International Printing & Graphic Arts Conference, Minneapolis, MN
"The Impact of Aqueous Coatings on Paper Properties."

➔ TAPPI (Technical Assoc. of the Pulp & Paper Industry):
Symposium Planner and Narrator - International Printing & Graphic Arts Conference, Minneapolis, MN
"New Printing Technologies Symposium"



# CURRICULUM VITAE

Neal F. Kelly
42 Independence Drive
Woburn, MA 01801

781-933-1289
781-933-5300 ext.109

nfkelly@juno.com
nkelly@winbro.com

**EDUCATION:**

NORTHEASTERN UNIVERSITY, BOSTON, MA
Batchelor of Science, 1960
Major: Chemistry          Minor: Physics

MBA Program, Evening Courses, 1964 – 1965
Advanced Chemistry, PhD Level,
Evening Courses, 1972 – 1973

**EXPERIENCE:**     Adhesive & Coating Technology          March, 1995 to Present

Self employed, Independent Consultant, providing technical assistance and consultation in the use and application of adhesives and coatings. Analyze manufacturing and coating processes which use adhesives and coatings, and make specific recommendations for improvement. Conduct applied research and development in the formulation of adhesives and coatings used to manufacture products. As a consulting chemist, I have traveled to Europe and to China to help clients with adhesive problems.

Polaroid Corporation, Cambridge, MA          8/70 to 3/95

Senior Principal Engineer, functioning as a company-wide resource in all aspects of adhesives and adhesion. This included sourcing of materials, formulating adhesives and coatings, plus developing test methods, testing equipment and manufacturing processes.

- Directed small groups of professionals and technicians to accomplish specific technical goals.

- Provided technical support to development, research and manufacturing groups throughout the corporation, worldwide.

- Provided expertise in new product development, manufacturing defect analysis, materials specifications and quality control.

Dynatech R/D Corporation, Cambridge, MA          1966 – 1970

Staff Engineer conducting applied research and development programs on a contractual basis for private industry and governmental agencies.

- Conducted projects which required knowledge of elastomers, plastics, epoxies and ceramics used in coatings, adhesives and molded articles.

- A typical contract was the development of oil resistant encapsulating compounds for Gyro Inertial Guidance Systems (Apollo Rocket Program) for the MIT Instrumentation Laboratory.

- This position required the writing of solicited and unsolicited proposals to secure research contracts, the management of the contract progress and its budget.

Bostik Findley Adhesives, Middleton, MA                    1964 – 1966

Development and Technical Service Chemist

- Developed solvent and water based adhesives for a wide range of industrial applications.

- Technical service responsibilities required traveling to customers' plants to analyze adhesive applications, and to make recommendations in the manufacture and assembly of their products.

Dewey And Almy, W.R.Grace and Co., Cambridge, MA          1960 – 1964

Senior Scientist and Project Engineer

- Developed latex compounds, supervised Pilot Laboratory Production, and investigated the aerodynamic properties of meteorological balloons.

- Traveled throughout the U.S. to military bases and Weather Bureau locations to conduct field flight tests.

- Wrote research contract proposals and comprehensive progress reports for both company projects and for government contracts.

PATENTS:     U.S. Patent # 4,303,751, Dec.1, 1981, J.E. Campbell/N.F. Kelly Rupturable Photographic Processing Alkaline Fluid Container. (A vinyl and aluminum pouch, bonded with an adhesive which is not attacked by strongly alkaline photographic developer).

U.S. Patent # 5,066,047, Nov. 19, 1991, D.R. Mailloux/H.A. Smith/N.F. Kelly Process for Incorporating Hologram into Laminar Structure with Photograph. (A secure adhesive laminating system to prevent tampering of a holographic containing ID card, without destroying the security hologram).

U.S. Patent # 5,200,297, April 6, 1993, Neal F. Kelly, <u>Laminar Thermal Imaging Mediums, Containing Polymeric Stress-Absorbing Layer, Actuatable in Response to Intense Imaging- Forming Radiation.</u> (A laser actuated dot matrix imaging system containing a thermoplastic polymeric stress absorbing layer which allows the positive and the negative film layers to be peeled apart and prevents stress induced image defects)

U.S. Patent # 5,342,731, August 30, 1994, Neal F. Kelly/Eugene L. Langlais, <u>Laminar Thermal Imaging Medium Actuatable in Response to Intense Image-Forming Radiation Utilizing Polymeric Hardenable Adhesive Layer that Reduces Tendency for Delamination.</u> (A laser actuated dot matrix imaging system containing an Ultra Violet Light cured, stress absorbing layer which allows the positive and the negative film layers to be peeled apart and prevents stress induced image defects.)

U.S. Patent # 5,426,014, June 20, 1995, Neal F. Kelly/Eugene L. Langlais, <u>Method for Preparing A Laminar Imaging Medium Actuatable in Response to Intense Image-Forming Radiation Including a Polymeric Hardenable Adhesive Layer That Reduces Delamination Tendency</u>. (A process for assembling a dot matrix image, containing a U.V. curing adhesive layer incorporated to absorb stresses during the cutting of the individual images from a roll of images and thereby prevent image defects.)