Mary A. McCann
161 Claflin Street
Belmont MA 02478

**Education:**  1956-1960    Tufts University, College of Engineering
- B. S. in Chemical Engineering
- Graduated Cum Laude
- Elected to Tau Beta Pi, Engineering Honor Society

1962-1966    Massachusetts Institute of Technology
- Courses in Optics, X-Ray Diffraction, Crystallography and Materials Science

**Experience:**  1960-1995    Polaroid Corporation, Research Division
- 1960-1961 Assistant Scientist, Color Film Development Lab
- 1961-1964 Assistant Scientist, Structures & Microscopy Lab
  Used X-Ray Diffraction, Transmission Electron Microscopy and Light Microscopy to study characteristics of development of silver halide emulsions with Polaroid instant developers.
- 1964-1968 Associate Scientist, Structures & Microscopy Lab
- 1969-1975 Associate Scientist, Emulsion Research Lab
  Carried on research on Polaroid instant photographic systems using a variety of microscopic techniques.
  Researched background information for publications on Polaroid Instant Films.
  Developed SX-70 Microscope adaptor, allowing the SX-70 camera to be used as an automatic photomicrographic camera.
  Conducted functional assessment of Polaroid films and hardware applications to photomicrography, and competitive analysis of photomicrographic films.
- 1976-1980 Scientist, Emulsion Research Lab
- 1980-1990 Senior Scientist, Emulsion Research Lab
  Provided continuing microscopy support to Polaroid Research Division and Development Laboratories, on configuration of prototype structures, chemical behavior of products in development, and characterization of component materials. This support also included defect analysis, and elucidation of mechanisms.
  Served as technical editor on Polaroid publications of booklets on photomicrography with Polaroid materials.
- 1990-1995 Research Associate, Analytical Chemistry and Microscopy Lab
- Directed microscopic analyses of Competitive Digital Imaging Products – finding characteristics of the printed image, determining components, configuration and properties of print and donor sheet materials.
- Technical Editor, instructional book, "Instant Photography through the Microscope" published by Polaroid as a marketing aid for the use of Polaroid films at the microscope.

- Initiated design and development of dedicated photomicrographic camera, the Polaroid MicroCam. Developed protocols for testing performance of the camera on the microscope. Wrote instructional materials for the consumer

1995-2003    McCann Imaging

- Performed microscopy and microtomy on submitted materials, and consulted on related techniques for individuals and companies.
- Taught on-site Workshops and Seminars on Applications of Microscopy to specific industrial questions.
- Organized and taught courses on Fundamentals of Microscopy, held in Burlington VT, and at Wellesley College, Wellesley MA.
- Taught Workshops on Polarized Light Microscopy and Digital Imaging at the Microscope for the New York Microscopical Society.
- Clients include ASF, Applied Science Fiction Corp., Aprilis Corp., Boston Scientific Cabot Corp., Chem Motif, duPont, Eastern Fine Papers, Genzyme Corp., Haartz Corp., Iris Graphics, Polaroid Corp., PPG Industries, Quality Engineering Associates, Rowland Institute for Science, Spectra Corp., and University of Massachusetts, Lowell, Department of Chemistry.

**Patents**    Patent No. 3,976,3368, Issued August 24, 1976, Special optical element for camera to microscope adapter. Inventors: Mary Conlin McCann, William T. Plummer and Vivian K. Walworth

Patent No. 4, 021,825  Issued May 3, 1997,  Adaptor for operatively coupling an automated camera to an optical instrument. Inventors: John J. MCCann, Mary A. McCann, William T. Plummer, Myron A. Seiden and Vivian T. Walworth.

**Publications and Presentations 1993-2003**

Editor, "Edwin H. Land's Essays, Volume I –Polarizers and Instant Photography, Volume II – Science, Education and Industry, and Volume III – Color Vision" published by the Society for Imaging Science and Technology, Springfield VA, 1993.

"On the Intersection of Chemical and Psychophysical Imaging: Incipient Development and Retinexes" Optics News, Mary A. and John J. McCann 1994

"Microscopy of Imaging Materials" presented to Tokyo Japan, Rochester NY, Binghamton NY, St. Paul MN, and Boston MA chapters of the Society of Imaging Science and Technology.
IS&T Visiting Lecturer 1996-1997.

"An Exploration of Digital Imaging for the Small Microscopy Laboratory" presented at Eastern Analytical Symposium, November 2000.
"Replication: A Forgotten but Still Useful Preparation Technique", presented at Eastern Analytical Symposium November 2001.

Mary A. McCann
161 Claflin Street
Belmont MA 02478

**Education:**    1956-1960    Tufts University, College of Engineering
- B. S. in Chemical Engineering
- Graduated Cum Laude
- Elected to Tau Beta Pi, Engineering Honor Society

1962-1966    Massachusetts Institute of Technology
- Courses in Optics, X-Ray Diffraction, Crystallography and Materials Science

**Experience:**    1960-1995    Polaroid Corporation, Research Division
- 1960-1961 Assistant Scientist, Color Film Development Lab
- 1961-1964  Assistant Scientist, Structures & Microscopy Lab
Used X-Ray Diffraction, Transmission Electron Microscopy and Light Microscopy to study characteristics of development of silver halide emulsions with Polaroid instant developers.
- 1964-1968 Associate Scientist, Structures & Microscopy Lab
- 1969-1975  Associate Scientist, Emulsion Research Lab
Carried on research on Polaroid instant photographic systems using a variety of microscopic techniques.
Researched background information for publications on Polaroid Instant Films.
Developed SX-70 Microscope adaptor, allowing the SX-70 camera to be used as an automatic photomicrographic camera.
Conducted functional assessment of Polaroid films and hardware applications to photomicrography, and competitive analysis of photomicrographic films.
- 1976-1980 Scientist, Emulsion Research Lab
- 1980-1990 Senior Scientist, Emulsion Research Lab
Provided continuing microscopy support to Polaroid Research Division and Development Laboratories, on configuration of prototype structures, chemical behavior of products in development, and characterization of component materials.  This support also included defect analysis, and elucidation of mechanisms.
Served as technical editor on Polaroid publications of booklets on photomicrography with Polaroid materials.
- 1990-1995 Research Associate, Analytical Chemistry and Microscopy Lab
- Directed microscopic analyses of Competitive Digital Imaging Products – finding characteristics of the printed image, determining components, configuration and properties of print and donor sheet materials.
- Technical Editor, instructional book, "Instant Photography through the Microscope" published by Polaroid as a marketing aid for the use of Polaroid films at the microscope.

- Initiated design and development of dedicated photomicrographic camera, the Polaroid MicroCam. Developed protocols for testing performance of the camera on the microscope. Wrote instructional materials for the consumer

1995-2003    McCann Imaging

- Performed microscopy and microtomy on submitted materials, and consulted on related techniques for individuals and companies.
- Taught on-site Workshops and Seminars on Applications of Microscopy to specific industrial questions.
- Organized and taught courses on Fundamentals of Microscopy, held in Burlington VT, and at Wellesley College, Wellesley MA.
- Taught Workshops on Polarized Light Microscopy and Digital Imaging at the Microscope for the New York Microscopical Society.
- Clients include ASF, Applied Science Fiction Corp., Aprilis Corp., Boston Scientific Cabot Corp., Chem Motif, duPont, Eastern Fine Papers, Genzyme Corp., Haartz Corp., Iris Graphics, Polaroid Corp., PPG Industries, Quality Engineering Associates, Rowland Institute for Science, Spectra Corp., and University of Massachusetts, Lowell, Department of Chemistry.

**Patents**

Patent No. 3,976,3368, Issued August 24, 1976, Special optical element for camera to microscope adapter. Inventors: Mary Conlin McCann, William T. Plummer and Vivian K. Walworth

Patent No. 4, 021,825  Issued May 3, 1997,  Adaptor for operatively coupling an automated camera to an optical instrument. Inventors: John J. MCCann, Mary A. McCann, William T. Plummer, Myron A. Seiden and Vivian T. Walworth.

**Publications and Presentations 1993-2003**

Editor, "Edwin H. Land's Essays, Volume I –Polarizers and Instant Photography, Volume II – Science, Education and Industry, and Volume III – Color Vision" published by the Society for Imaging Science and Technology, Springfield VA, 1993.

"On the Intersection of Chemical and Psychophysical Imaging: Incipient Development and Retinexes" Optics News, Mary A. and John J. McCann 1994

"Microscopy of Imaging Materials" presented to Tokyo Japan, Rochester NY, Binghamton NY, St. Paul MN, and Boston MA chapters of the Society of Imaging Science and Technology.
IS&T Visiting Lecturer 1996-1997.

"An Exploration of Digital Imaging for the Small Microscopy Laboratory" presented at Eastern Analytical Symposium, November 2000.
"Replication: A Forgotten but Still Useful Preparation Technique", presented at Eastern Analytical Symposium November 2001.



ATTACHMENT B - QUALIFICATIONS

## THERESA L. RENNER, CPA, CVA
Magdefrau, Renner & Ciaffaglione LLC
7 Keynote Drive
Vernon, Connecticut 06066
(860)875-8539   theresar@keynotecpas.com

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1995-Present | **Magdefrau, Renner & Ciaffaglione LLC, CPA's, Vernon,CT**<br>**Partner** |
| 1986-1995 | Magdefrau & Rathbun, CPA's, Vernon, CT<br>Accountant |
| 1985-1986 | Massa and Hinsley, CPA's, East Hartford, CT<br>Accountant |
| 1984-1985 | CIGNA Corporation, Bloomfield, CT<br>Mortgage Accountant, Investments Group |

## CERTIFICATIONS

Certified Public Accountant in Connecticut, 1989
Certified Valuation Analyst

## EDUCATION

| | |
|---|---|
| 1984 | B.S., Business/Economics with concentration in Accounting<br>Saint Joseph College, West Hartford, CT |

## PROFESSIONAL ORGANIZATIONS & ACTIVITIES

| | |
|---|---|
| 1986-Present | **Connecticut Society of Certified Public Accountants**<br>    * Current member of Compilation and Review Committee and<br>      Business Valuation Roundtable<br>    * Appointed to the Board of Governors of the CSCPA'S (1996-1998)<br>    * Chaired Membership Committee |
| 1993-Present | **Tolland County Chamber of Commerce**<br>    * President 2000-2001 |
| 1990-1996 | **Director - Visiting Nurse & Community Care, Inc.**<br>    * Chaired Finance Committee and served on Executive Committee |

9

# ATTACHMENT C -- OTHER TESTIMONY

Gloria Coles v. J & K Associates, LLC
Superior Court Judicial District of Tolland at Rockville
October 2000



*Attachment-B*

*Curriculum vitae*

**Derek M. Johnson**
**University of Connecticut**
**Department of Economics, U-1063**
**341 Mansfield Rd.**
**Storrs, Connecticut 06269**
**(860) 486-8279**

## PROFESSIONAL EXPERIENCE

**VISITING PROFESSOR AND LECTURER OF ECONOMICS**          August 2000-present
University of Connecticut, Storrs, Connecticut

**ADJUNCT PROFESSOR OF ECONOMICS**          Sept. 1999-May 2000
Saint Joseph College, West Hartford, Connecticut

**PARTNER**          Dec. 1994-present
Ruben, Johnson & Morgan, P.C., Hartford, Connecticut

## EDUCATION

**UNIVERSITY OF CONNECTICUT**, Storrs, Connecticut
        ABD, Economics, June 2000

**EMORY UNIVERSITY SCHOOL OF LAW**, Atlanta, Georgia
        Juris Doctor Degree, May 1985

**UNIVERSITY OF WASHINGTON**, Seattle, Washington
        Master of Arts in Economics, June 1981

**UNIVERSITY OF WASHINGTON**, Seattle, Washington
        Bachelor of Arts in Economics with honors, August 1979

## PUBLICATIONS

D. Johnson and H. James, "Regulatory Environments and Economic Change: An Examination of Boundary, Conduct and Attribute Regulation in the Telecommunications Industry," Working Paper, (June 2002)

D. Johnson and H. James, "Why are there Explicit Contracts of Employment?" University of Missouri CORI Working Paper No.01-06 (September 2001)

D. Johnson and H. James, "Just-Cause Provisions, Severance Pay and the Efficiency Wage Hypothesis," <u>Managerial and Decision Economics</u>, Vol. 21(2), 2000, pp. 83-88

D. Johnson and H. James, "Mergers Testing, Redefining Monopolies," <u>Hartford Business Journal</u>, (July 20, 1998)

D. Johnson, "A Simple Welfare Proposal," <u>The Wall Street Journal</u>, (January 11, 1996)

D. Johnson, "NAFTA: A Generalized Perspective," <u>The Bankruptcy Yearbook and Almanac (1994)</u>, The New Generation Research (1994).

D. Johnson, "Vietnam's Foreign Investment Laws: A Overview for Businesses Planning to Invest," <u>Vietnam Market Watch</u>, Vol. II, No. 4 (April 1994).

D. Johnson, "Rent Assignment Weathers Failure to Enforce," <u>Bankruptcy Strategist</u>, Vol. XI, No. 2, (Dec. 1993).

## AWARDS

1996 W. Harris Carter Teaching Award, University of Connecticut

Academic Scholarship Recipient, Emory University School of Law 1982-185

1982 Henry T. Beuchel Teaching Award, University of Washington

Academic Scholarship Recipient, University of Washington, 1979-1982

Shell Oil Company Scholarship, 1997



## <u>PLAINTIFF'S TRIAL EXHIBITS</u>

Andrews may seek to introduce at trial the exhibits set forth on the list below, together with any and all exhibits marked during any deposition taken in this case, all pleadings and exhibits thereto, and responses to discovery requests. Andrews reserves the right to use additional documents (that may not have been identified) during cross-examination, or for impeachment or rebuttal.

Andrews reserves the right to supplement or modify this list as a result of any evidentiary rulings of the Court.

Nothing herein shall be construed as an admission by Andrews that any of the referenced Exhibits is authentic or admissible for any purposes. Andrews reserves its right to object on any grounds to the use or introduction of any of the referenced exhibits by any other party.

| Plaintiff's Exhibit # | Date | Description |
|---|---|---|
| 1 | 12/17/99 | Andrews quotation #615615 for Press Strips |
| 2 | 5/23/00 | PDI Purchase Order #36572 |
| 3 | 7/28/00 | Andrews Project Marketing Report |
| 4 | 7/29/00 | Andrews Invoice #13371 for $121,011.93 |
| 5 | 7/31/00 | Andrews Invoice #13412 for $10,016.53 |
| 6 | 2/6/03 | Drawing of PDI machinery |
| 7 | 7/29/00 | PDI list of Press Strips received, shipped and WIP |
| 8 | 3/1/99 | PDI/Mint Contract TM-HQ-037 |
| 9 | 2/23/00 | Modification to Contract TM-HQ-037 |
| 10 | 5/23/00 | e-mail approving red inserts with attachments |
| 11 | 4/13/99 | PDI manufacturing process for mint inserts |
| 12 | 4/7/99 | PDI manufacturing procedures |
| 13 | 12/21/99 | Vinyl Packaging Purchase Order 36242 |

A0064267.WPD

| 14 | 3/7/00 | 7 page exhibit regarding mint orders |
| 15 | 5/5/00 | e-mail from S. Savage approving color |
| 16 | 6/28/00 | PDI invoices and packing lists to mint |
| 17 | 7/12/00 | Mint receiving inspection reports |
| 18 | 8/4/00 | Mint receiving inspection reports |
| 19 | 8/8/00 | Mint receiving inspection reports |
| 20 | 8/24/00 | Mint receiving inspection reports |
| 21 | 8/9/00 | e-mail from S. Savage re: "blue haze" |
| 22 | 8/31/00 | R. Campbell letter terminating contract |
| 23 | 8/18/00 | USF Worldwide packing list |
| 24 | 9/21/00 | R. Ayoub e-mail to N. Thibaudeau re: revised pricing |
| 25 | 9/21/00 | PDI quotation |
| 26 | 10/3/00 | R. Ayoub e-mail to N. Thibaudeau enclosing contract |
| 27 | 11/1/00 | Fax cover sheet with contract TM-K-115 |
| 28 | 2/20/02 | PDI quotation |
| 29 | 9/13/02 | PDI letter indicating account balance of $131,028.46 |
| 30 | 9/28/00 | Cervelli Report |
| 31 | 11/1/00 and 11/15/00 | Fax from John Vesia to N. Thibaudeau with draft letter rebutting claims of PDI's insurance carrier |
| 32 | 12/22/00 | Cervelli Report |
| 33 | 2/12/01 | Letter from John Vesia to L. Accardo re: 12/22/00 Cervelli Report |
| 34 | 8/22/01 | Letter from N. Thibaudeau to J. Vesia re: potential lawsuit against insurance carrier |
| 35 | | Kelstar Technical Data Sheet for Starkote AQ-520 |

| 36 | 9/1/00 | Letter from J. Jacobs to J. Vesia re: Sutherland rub test |
| 37 | 2/1/01 | Sun Chemical results from Sutherland Rub Test |
| 38 | 2/6/01 | Sun Chemical results from Sutherland Rub Test |
| 39 | | Nancy Plowman curriculum vitae |
| 40 | 7/9/01 | N. Plowman drawing of tray PDI used to ship inserts to mint |
| 41 | 6/24/03 | N. Plowman initial report |
| 42 | 7/14/03 | N. Plowman final report |
| 43 | 6/26/03 | Renner lost profit analysis |
| 43 | 5/2/03 | Renner damage calculation and cost analysis |
| 44 | 5/21/03 | Memo from R. Campbell to G. Weinman re: amount of coin holders ordered by Mint |
| 45 | 12/31/99 and 12/31/00 | PDI Finished Goods Costing and Factory Overhead Rate Calculation |
| 46 | 5/12/03 | T. Renner questions to PDI and responses |

A0064267.WPD



## ATTACHMENT 9

The PDI May Introduce the Following Exhibits at Trial:

1.    U.S. Mint Contract TM-HQ-037

2.    November 24, 1999 email from Lauran Sullivan to Normand Thibaudeau Re: 5 Coin Insert Drawings.

3.    December 1, 1999 email from Lauran Sullivan to Normand Thibaudeau Re: First Article Samples for Blue Inserts.

4.    W.E. Andrews, Inc.'s one-page quotation #61661 dated December 17, 1999.

5.    Purchase Order No. 3642 dated December 21, 1999 from PDI to Andrews for press proof 50 State Quarters red and blue.

6.    January 14, 2000 email from Lauran Sullivan to Normand Thibaudeau Re: Blue Insert - color standard.

7.    January 24, 2000 correspondence from Samuel Savage to Normand Thibaudeau.

8.    January 27, 2000 email from Lauran Sullivan to Normand Thibaudeau.

9.    February 10, 2000 email from Lauran Sullivan to Normand Thibaudeau.

10.   February 11, 2000 email from Ken Boris to Normand Thibaudeau Re: Red Inserts.

11.   February 11, 200 email from Normand Thibaudeau to Lauran Sullivan Re: Red Insert Delivery.

12.   March 21, 2000 email from Sam Savage to Normand Thibaudeau Re: Red Inserts.

13.   March 23, 2000 email from Savage to Normand Thibaudeau Re: March 29th visit.

14.   March 27, 2000 email from Sam Savage to Normand Thibaudeau Re: March 29th visit.

15.   March 29, 2000 email from Sam Savage to Normand Thibaudeau.

16.   March 31, 2000 email from Sam Savage to Normand Thibaudeau Re: Press Sheet from March 29th visit.

17.   April 28, 2000 letter from Lauran Sullivan to Normand Thibaudeau.

18.   May 2, 2000 email from Lauran Sullivan to Normand Thibaudeau Re: Red Inserts.

19.   May 5, 2000 email from Sam Savage to Normand Thibaudeau Re: Red Inserts.

20.   May 10, 2000 email from Bill Sybalsky to Normand Thibaudeau.

21.   May 23, 2000 email from Lauran Sullivan to Normand Re: First Article Approval.

22.   Plastic Development, Inc.'s Purchase Order #36572 dated May 23, 200.

23.   December 9, 1999 Mint Delivery Order #3 under Contract TM-HQ-037 Re: Blue Inserts.

24.   March 2, 2000 Mind Delivery Order #4 under Contract TM-HQ-037 including change order.

25.    March 2, 2000 Mint Delivery Order #5 under Contract TM-HQ-37

26.    May 25, 2000 Mint Delivery Order #6 under Contract TM-HQ-037

27.    July 13, 2000 Invoice #169946 from PDI to U.S. Mint.

28.    August 2, 2000 Invoice #170250 from PDI to U.S. Mint.

29.    August 2, 2000 Invoice #170251 from PDI to U.S. Mint.

30.    August 18, 2000 Invoice #170614 from PDI to U.S. Mint.

31.    August 18, 2000 Invoice #170615 from PDI to U.S. Mint.

32.    July 24, 2000 email from Sam Savage to Normand Thibaudeau Re: Inspection results for first shipment.

33.    August 4, 2000 Memorandum Re: Rejection of Shipment No. 2. Smudge was the major defect.

34.    August 8, 2000 Memorandum Re: Rejection of Shipment No. 3. Smudge was the major defect.

35.    August 9, 2000 email from Latonia Johnson to Normand Thibaudeau Re: Shipment No. 3's defects.

36.    August 9, 2000 email from Sam Savage to Normand Thibaudeau Re: Shipment No. 3's defects.

37.    August 24, 2000 Memorandum Re: Rejection of Shipment No. 4 (Red Coin Dollar Foam Insert). Smudge was the major defect.

38.    August 24, 2000 Memorandum Re: Rejection of Shipment No. 4 (Red 5- Coin Quarter Foam Insert). Smudge was the major defect.

39.    August 31, 2000 letter from the U.S. Mint canceling PDI's contract.

40.    U.S. Mint Contract TM-K-115 dated October 25, 2000.

41.    September 1, 2000 letter from Jeff Jacobs at Kelstar International to John Vesia Re: findings regarding the U.S. Mint styrene sheets.

42.    September 28, 2000 Report from Cervelli Enterprises, Inc., inclusive of photographs.

43.    October 23, 2000 letter from Tim Pigden at Kelstar International to John Vesia Re: styrene sheets

44.    November 7, 2000 letter from John F. Obrien at Sun Chemical to John Vesia Re: press sheet strips.

45.    November 7, 2000 Sun Chemical Memo re: U.S. Mint Silver Proof Sets inclusive of pictures

46.    November 21, 2000 letter from Brad E. Evans at GATF to John Vesia Re: Coin Inserts.

47.    February 1, 2001 letter from John F. O'Brien at Sun Chemical to John Vesia Re: Sutherland Rub Test on state quarter proof sets.

48.    February 6, 2001 letter from John F. O'Brien to John Vesia.

49.    Curriculum Vitae of Neal F. Kelly

A0064458.WPD 2          19

50. Final Report of Neal F. Kelly dated May 6, 2003

51. Curriculum Vitae of Mary A. McCann

52. Final Report of Mary A. McCann

53. Photographs of defective inserts taken by Mary A. McCann (7 total)

54. Engagement Report from Theresa Renner inclusive of curriculum vitae

55. Report of Theresa Renner.

56. Curriculum vitae of Derek Johnson.

57. Report of Derek Johnson.

58. Press Sheet Strip.

59. Red Insert.

60. Blue Insert.

61. Red Insert with smudge.

62. Correspondence from Ward, Fisher & Company, LLP

63. Correspondence from Ward, Fisher & Company, LLP, dated 9/17/02

64. Job Data Collection Form Job No. 29044

65. Job Tickets for Order 29044 together with data on red and blue printing



## PLAINTIFF'S PROPOSED JURY INSTRUCTIONS

## 1.    PRELIMINARY INSTRUCTIONS

MEMBERS OF THE JURY:

You have now been sworn as the jury to try this case. As the jury you will decide the disputed questions of fact.

As the Judge, I will decide all questions of law and procedure. From time to time during the trial and at the end of the trial, I will instruct you on the rules of law that you must follow in making your decision.

Soon, I will read to you written statements prepared by the lawyers for each party. I have asked the lawyers to prepare these written statements to assist you in understanding the evidence. The statements themselves are not evidence.

After the written statements, the plaintiff will call witnesses and present evidence. Then, the defendant will have an opportunity to call witnesses and present evidence. After the parties' main case is completed, the plaintiff may be permitted to present rebuttal evidence. After all the evidence is completed, the lawyers will again address you to make final arguments. Then I will instruct you on the applicable law. You will then retire to deliberate on a verdict.

Keep an open mind during the trial. Do not decide any fact until you have heard all of the evidence, the closing arguments, and my instructions.

If you would like to take notes during the trial, you may do so. If you do take notes, be careful not to get so involved in note taking that you become distracted and miss part of the testimony. Your notes are to be used only as aids to your memory, and if your memory should later be different from your notes, you should rely on your memory and not on your notes. If you do not take notes, rely on your own independent memory of the testimony. Do not be unduly influenced by the notes of other jurors. A juror's notes are not entitled to any greater weight than the recollection of each juror concerning the testimony. Even though the court reporter is making stenographic notes of everything that is said, a typewritten copy of the testimony will not be available for your use during deliberations. On the other hand, any exhibits may be available to you during your deliberations.

Until this trial is over, do not discuss this case with anyone and do not permit anyone to discuss this case in your presence. Do not discuss the case even with the other jurors until all of the jurors are in the jury room actually deliberating at the end of the case. If anyone should attempt to discuss this case or to approach you concerning the case, you should inform the Court immediately. Hold yourself completely apart from the people involved in the case—the parties, the witnesses, the attorneys and persons associated with them. It is important not only that you be fair and impartial but that you also appear to be fair and impartial.

Do not make any independent investigation of any fact or matter in this case. You are to be guided solely by what you see and hear in this trial. Do not learn anything about the case from any other source.

During the trial, it may be necessary for me to confer with the lawyers out of your hearing or to conduct a part of the trial out of your presence. I will handle these matters as briefly and as conveniently for you as I can, but you should remember that they are a necessary part of any trial.

I will now read the parties' written statements. **[Fifth Circuit Pattern Jury Instructions §1.1]**

## 2.    STIPULATIONS OF FACT

Before we begin, I will also read to you certain facts to which the parties have agreed, or stipulated. This means that both sides agree that what I am about to read to you are facts. You must therefore treat these facts as having been proved: **[read stipulations of fact] [Fifth Circuit Pattern Jury Instructions §2.3]**

## 3.    BENCH CONFERENCES AND RECESSES

At times during the trial it may be necessary for me to talk with the lawyers here at the bench out of your hearing, or by calling a recess. We meet because often during a trial something comes up that doesn't involve the jury. **[Fifth Circuit Pattern Jury Instructions §2.7]**

## 4.    OBJECTIONS

During the course of the trial, the lawyers may object to the admission of certain evidence. When I sustain an objection, that means that the evidence will not be allowed to be presented to you for use in deciding this case. When I overrule an objection, that means that the evidence will be allowed. My decision whether to sustain or overrule an objection is based on the rules of evidence that govern this trial.

When evidence is offered, a lawyer has the right and sometimes the obligation to object and seek a ruling as to the admissibility of proposed evidence under the rules, or whether evidence already admitted should be stricken. You should not hold it against a lawyer, or the party that lawyer represents, if the lawyer objects to evidence, regardless of whether the objection is sustained or overruled. Just because evidence is admitted after an objection, you are not required to treat that evidence as true, but you should weigh and consider it in the same way as other evidence. You should not infer from my rulings on evidence that I favor or disfavor any party or lawyer: the court is neutral and is merely enforcing the rules of evidence so as to assure a fair trial. Do not speculate as to what the answer would have been had I not sustained an objection to the question and do not

A0062361.WPD 4                                   2

place any emphasis on a piece of evidence merely because I overruled an objection as to it. **[Connecticut Civil Jury Instructions, §1-17]**

5.    **FIRST RECESS**

We are about to take our first break during the trial and I want to remind you of the instruction I gave you earlier. Until the trial is over, you are not to discuss this case with anyone, including your fellow jurors, members of your family, people involved in the trial, or anyone else. If anyone approaches you and tries to talk to you about the case, do not tell your fellow jurors but advise me about it immediately. Do not read or listen to any news reports of the trial. Finally, remember to keep an open mind until all the evidence has been received and you have heard the views of your fellow jurors.

If you need to speak with me about anything, simply give a signed note to the marshal to give to me.

I may not repeat these things to you before every break that we take, but keep them in mind throughout the trial. **[Fifth Circuit Pattern Jury Instructions §2.1]**

6.    **DEPOSITION TESTIMONY**

Certain testimony will now be presented to you through a deposition. A deposition is the sworn, recorded answers to questions asked a witness in advance of the trial. Under some circumstances, if a witness cannot be present to testify from the witness stand, that witness' testimony may be presented, under oath, in the form of a deposition. Some time before this trial, attorneys representing the parties in this case questioned this witness under oath. A court reporter was present and recorded the testimony. The questions and answers will be read to you today. This deposition testimony is entitled to the same consideration as if the witness had been present and had testified from the witness stand in court. **[Fifth Circuit Pattern Jury Instructions §2.23]**

7.    **DUTY TO DELIBERATE**

It is your sworn duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you are wrong. However, do not give up your honest beliefs solely because the others think differently, or merely to finish the case.

Remember that in a very real way you are the judges—judges of the facts. Your only interest is to seek the truth from the evidence in the case. **[Fifth Circuit Pattern Jury Instructions §2.11]**

A0062361.WPD 4                                    3

## 8.    CAUTIONARY INSTRUCTION ON DAMAGES

You should not interpret the fact that I have given instructions about the plaintiff's damages as an indication in any way that I believe that the plaintiff should, or should not, win this case. Likewise, you should not interpret the fact that I have given instructions about the defendant's damages as an indication in any way that I believe that the defendant should, or should not, win this case.**[Fifth Circuit Pattern Jury Instructions §2.22]**

## 9.    GENERAL INSTRUCTIONS FOR CHARGE

MEMBERS OF THE JURY:

**a.**    You have heard the evidence in this case. I will now instruct you on the law that you must apply. It is your duty to follow the law as I give it to you. On the other hand, you the jury are the judges of the facts. Do not consider any statement that I have made in the course of trial or make in these instructions as an indication that I have any opinion about the facts of this case.

**b.**    In a general sense, a civil trial such as this has two issues: liability and damages. You will reach the issue of damages on plaintiff's claims for breach of contract and goods sold and delivered only if you find liability in favor of the plaintiff. Conversely, you will only reach the issue of damages on defendant's claims for breach of breach of contract, breach of express warranty, breach of implied warranty of fitness for use, breach of implied warranty of merchantability and set-off if you find liability in favor of the defendant. If you find that liability for either party is established, you will have occasion to apply my instructions concerning damages against that party. If you find that liability for either party has not been established, then you will not consider damages against that party. The fact that I am instructing you on both liability and damages should not be taken by you as any indication as to how the court would decide liability. Rather, my charge includes both liability and damages because I must give you instructions on all the issues in the case. **[Connecticut Civil Jury Instructions, §1-37]**

**c.**    If you find that the defendant is liable to the plaintiff for breach of contract or for goods sold and delivered, then you must determine the amount of money to award to the plaintiff as contract damages. The following instructions tell you how to do that.

**d.**    If you find that the defendant is not liable for any of the breach of contract or for goods sold and delivered, then you do not need to consider the subject of damages. The fact that I am telling you about the law of contract damages does not mean that I believe that you will, or should, find against the defendant. **[Connecticut Civil Jury Instructions, §3-78]**

**e.**    The plaintiff must prove by a preponderance of the evidence the amount of any damages to be awarded. The evidence must give you a sufficient basis to estimate the amount of damages to a reasonable certainty. Although damages may be based on reasonable and probable estimates, you may not award damages on the basis of guess, speculation or conjecture. **[Connecticut Civil Jury**

**Instructions, §3-80]**

**f.**    If a party to a contract breaches the contract, the nonbreaching party is entitled to recover the damages arising naturally and generally from the breach. <u>Goldblatt v. Ferrigno</u>, **1950 WL 644 (Conn.Super. 1950)**; <u>Walter Kidde Constructors, Inc. v. State of Connecticut</u>, **434 A.2d 962 (Conn.Super. 1981)**

**g.**    The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract. **C.G.S.A. § 42a-2-301.**

**h.**    Acceptance of goods occurs when the buyer (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or (b) fails to make an effective rejection. Acceptance does not occur until the buyer has had a reasonable opportunity to inspect the goods. **C.G.S.A. § 42a-2-606(1).**

**i.**    A buyer that uses goods in its business is unable to establish that those goods are nonconforming and unfit for their intended purpose. <u>Sun Hill Industries, Inc. v. Kraftsman Group, Inc.</u>, **27 Conn.App. 688, 693 (Conn. App. 1992)**

**j.**    Acceptance of a part of any commercial unit is acceptance of that entire unit. **C.G.S.A. § 42a-2-606(2).**

**k.**    If you find Defendant accepted the Press Strips, Defendant must pay Plaintiff for the Press Strips at the contract rate even if they are nonconforming. **General Statutes §42a-2-607(1)**; <u>Sun Hill Industries, Inc. v. Kraftsman Group, Inc.</u>, **27 Conn.App. 688, 694 (Conn. App. 1992).**

**l.**    If you find Defendant wrongfully rejected or revoked acceptance of the Press Strips, then Plaintiff may recover damages for Defendant's nonacceptance in the amount of the price of the Press Strips. **C.G.S.A. § 42a-2-703.**

**m.**    If you find Defendant failed to pay for the Press Strips as the amount became due, Plaintiff may recover, together with any incidental damages, the price of the accepted Press Strips. **C.G.S.A. § 42a-2-709(1).**

**n.**    To support its claims of breach of contract and breach of warranty, Defendant bears the burden of proving that the Press Strips did not conform to the requirements of the contract. <u>Sun Hill Industries, Inc</u>, **27 Conn.App. at 694.**

**o.**    Effective notice is an absolute prerequisite to a buyer's revocation of acceptance. **Solar Kinetics Corp. v. Joseph T. Ryerson & Son, Inc., 488 F. Supp. 1237, 1249 (D. Conn. 1980).**

**p.**    Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. **General Statutes §42a-2-608**

**q.**    Revocation of acceptance is not accomplished by notice of any breach, but requires that the notice be given of the particular nonconformity in the goods materially impairing their value to the buyer. **Solar Kinetics Corp. v. Joseph T. Ryerson & Son, Inc., 488 F. Supp. 1237, 1247 (D. Conn. 1980).**

**r.**    Where goods have been accepted, the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy. **§42a-2-607(3)**

**s.**    In closing argument, counsel mentioned some formulas or amounts that might figure in your verdict. I caution you that figures suggested by counsel do not constitute evidence. It is up to you to decide what fair, just and reasonable compensation is, whatever you find that figure might be, without regard to amounts that may have been suggested by counsel in argument. **[Connecticut Civil Jury Instructions, §1-48]**

**t.**    The Defendant claims lost profits for the future, until 2009. That time period for awarding future lost profits must be reasonable and supported by the evidence. Lost profits are not recoverable if they are too speculative and remote. **[Connecticut Civil Jury Instructions, §3-84;** *Ross & Roberts, Inc. v. Cook's Industrial Lubricants, Inc.,* **1997 WL 835054 at \*4 (D.Conn. 1997)]**

**u.**    In addition to damages, you may award interest. This is intended to compensate the plaintiff for the loss of use of money that was not paid when it was due. To award interest, you must find that the plaintiff is entitled to an award of damages in the first place, and you must find under all of the circumstances that the defendant wrongfully detained money due to the plaintiff. There is no hard and fast rule for what constitutes wrongful detention. The question is whether justice requires that the prevailing party be paid interest for the loss of use of money.

**v.**    Waiver is the voluntary relinquishment of a known right.  It involves the idea of assent, and assent is an act of understanding.  This presupposes that the person to be affected has knowledge of his rights, but does not wish to asset them. *General Accident Insurance Co. of America v. Powers, Bolles, Houlihan and Hartline, Inc.,* 719 A.2d 77, 82 (Conn.App. 1998)

**w.**    Estoppel occurs when a party does or says something calculated or intended to induce another party to believe that certain facts exist and to act on that belief and the other party must change its position in reliance on those facts, thereby incurring some injury. ***Town of West Hartford v. Rechel,*** 190 Conn 114, 121 (1983)

**x.**    You have heard the closing arguments of the attorneys. Statements and arguments of the attorneys are not evidence and are not instructions on the law. They are intended only to assist the jury in understanding the evidence and the parties' contentions.

**y.**    Answer each question from the facts as you find them. Do not decide who you think should win and then answer the questions accordingly. Your answers and your verdict must be unanimous.

**z.**    You must answer all questions from a preponderance of the evidence. By this is meant the greater weight and degree of credible evidence before you. In other words, a preponderance of the evidence just means the amount of evidence that persuades you that a claim is more likely so than not so. In determining whether any fact has been proved by a preponderance of the evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

**aa.**    In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave before you during the trial.

**bb.**    You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people may forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

**cc.**    While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.

A0062361.WPD 4                     7

**dd.** The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

**ee.** There are two types of evidence that you may consider in properly finding the truth as to the facts in the case. One is direct evidence—such as testimony of an eyewitness. The other is indirect or circumstantial evidence—the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

**ff.** When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field—he is called an expert witness—is permitted to state his opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely upon it.

**gg.** In deciding whether to accept or rely upon the opinion of an expert witness, you may consider any bias of the witness, including any bias you may infer from evidence that the expert witness has been or will be paid for reviewing the case and testifying, or from evidence that he testifies regularly as an expert witness and his income from such testimony represents a significant portion of his income.

**hh.** Any notes that you have taken during this trial are only aids to memory. If your memory should differ from your notes, then you should rely on your memory and not on the notes. The notes are not evidence. A juror who has not taken notes should rely on his or her independent recollection of the evidence and should not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

**ii.** When you retire to the jury room to deliberate on your verdict, you may take this charge with you as well as exhibits which the Court has admitted into evidence. Select your Foreperson and conduct your deliberations. If you recess during your deliberations, follow all of the instructions that the Court has given you about/on your conduct during the trial. After you have reached your unanimous verdict, your Foreperson is to fill in on the form your answers to the questions. Do not reveal your answers until such time as you are discharged, unless otherwise directed by me. You must never disclose to anyone, not even to me, your numerical division on any question.

**jj.** If you want to communicate with me at any time, please give a written message or question to the bailiff, who will bring it to me. I will then respond as promptly as possible either in writing or by having you brought into the courtroom so that I can address you orally. I will always first

A0062361.WPD 4                                  8