PDI's Proposed Instruction No.8--Implied Warranty of Fitness for Particular Purpose

Here PDI has also pleaded in its Counterclaim that Andrews breached an implied warranty of fitness of the press strips for a particular purpose. An implied warranty of fitness for a particular purpose is created where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods. C.G.S. §42a-2-315; *Beech Aircraft Corp. v. Flexible Tubing Corp.*, 270 F. Supp. 548 (D. Conn. 1967). This implied warranty arises when the seller has reason to know of any particular purpose for which the goods are required and that the buyer relies on the seller's skill or judgment to select or furnish suitable goods. *See*, C.G.S. §42a-2-315.

Here, PDI has presented evidence that it furnished Andrews with information as to the particular purpose for which it required the press strips, including the requirements of the U.S. Mint for the inserts to be manufactured with Andrews' press strips. Additionally, PDI has presented evidence that it relied on Andrews' expertise and judgment to supply press strips that met the requirements of the purposes to which they would be put.

Should you find that Andrews had reason to know that the press strips were required for the particular purpose of the commemorative coin inserts and that PDI relied on Andrews' skill or judgment to provide suitable strips, then you must find that Andrews impliedly warranted the strips for that purpose.

Should you so find, then you must determine whether Andrews breached that warranty of fitness for a particular purpose.

-16-

<u>PDI's Proposed Instruction No.9—Damages:</u>

If you have found that Andrews breached its contract with PDI and any warranties therein, then you must determine whether PDI was damaged as a proximate result of such breach or breaches and whether Andrews is liable to pay damages to PDI to compensate for its losses.

Where a buyer justifiably revokes any acceptance it made of goods, then they buyer may cancel the contract with respect to the goods subject of its revocation or with respect to the whole contract and may also have damages as to all affected goods. *See*, C.G.S. §42a-2-711.

Furthermore a buyer "…may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." *See*, C.G.S. §42a-2-714.  Such damages may include "incidental damages" that may include expenses the buyer reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the seller's breach. Such damages may also include "consequential damages" which may include (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably have been prevented by cover or otherwise…" CGS §42a-2-715. *See, Waterbury Petroleum Products, Inc., v. Canaan Oil & Fuel Co., Inc.,* 193 Conn. 208 (1984).

In your consideration of damages, you are instructed that the general rule in breach of contract cases is that the award of damages is designed to placed the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed. A party may recover "general" contract damages for any loss that "may fairly and reasonably be considered [as] arising naturally, i.e., according to the usual course of things, from such breach of contract itself. *See, Hadley v. Baxendale*, 9 Ex. 341, 354, 156 Eng. ep. 145 (1854).

Your are further instructed that "[u]nless they are too speculative and remote, prospective profits are allowable as an element of damage whenever their loss arises directly from and as a natural consequence of the breach..." *See, West Haven Sound Development Corporation v. City of West Haven*, 201 Conn. 305, 319-20, 514 A.2d 734 (1986). To determine the amount of prospective profits as an element of damages, PDI need only show such profits by reasonable certainty of proof; any uncertainty may be dispelled by the same degree of proof as is required in other civil actions, that is, the amount may be determined approximately upon reasonable inferences and estimates..." *See, West Haven Sound Development Corporation v. City of West Haven*, 201 Conn. 305, 320-21, 514 A.2d 734 (1986).

Here PDI has introduced evidence that, following the U.S. Mint's rejection of a substantial number of the coin inserts PDI manufactured with Andrews' press strips, the U.S. Mint cancelled its contract with PDI and, further, advised PDI that the U.S. Mint would no longer consider PDI as a vendor to the Mint of coin inserts. PDI has further introduced evidence as to the profits it expected to realize had it continued as a vendor to

the Mint. If PDI has proven to you by a preponderance of evidence and with reasonable certainty upon reasonable inferences and estimates the amount of such lost profits, then you may award PDI that sum.

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| W.E. ANDREWS CO., INC., | : | CIVIL ACTION |
| Plaintiff/Counterclaim Defendant | : | 3:02 CV 599 (CFD) |
| | : | |
| VS. | : | |
| | : | |
| PLASTIC DEVELOPMENT, INC., | : | |
| Defendant/Counterclaim Plaintiff | : | APRIL 16, 2004 |

### PLAINTIFF'S VERDICT

We, the jury, find the issues in favor of the plaintiff W.E. Andrews Co., Inc., on its Complaint, as follows:

SECTION 1: FINDINGS OF DAMAGES

Contract Damages:    $ _____.\_\_\_

_____     _____

Jury Foreperson                     Date

NOTE: The jury foreperson MUST sign and date this verdict form in ink.

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **W.E. ANDREWS CO., INC.,** | : | **CIVIL ACTION** |
| **Plaintiff/Counterclaim Defendant** | : | **3:02 CV 599 (CFD)** |
| | : | |
| **VS.** | : | |
| | : | |
| **PLASTIC DEVELOPMENT, INC.,** | : | |
| **Defendant/Counterclaim Plaintiff** | : | **APRIL 16, 2004** |

### DEFENDANT'S VERDICT

We, the jury, find the issues in favor of the defendant Plastic Development, Inc., on the Complaint as follows:

In this case, on the Complaint, the jury finds for the defendant and awards the plaintiff W.E. Andrews Co., Inc., no damages.

_____       _____

Jury Foreperson                              Date

NOTE: The jury foreperson MUST sign and date this verdict form in ink.

-1-



# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| W.E. ANDREWS CO., INC.,<br>a Georgia Corporation, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 302-CV-00599 (CFD) |
| | ) | |
| PLASTIC DEVELOPMENT, INC.,<br>a Rhode Island Corporation, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE
## THE OPINIONS OF MARY MCCANN

Plaintiff, W.E. ANDREWS CO., INC ("Plaintiff"), moves this Court *in limine* to exclude

certain testimony and opinions of Defendant's expert, Mary McCann.  In support of its motion,

Plaintiff states as follows:

## I.    Background

1.    On May 14, 2003, Defendant produced the Report (Exhibit 'A') of its expert, Mary

McCann ("McCann") and disclosed McCann as an expert pursuant to Fed. R. Civ. P. 26.

2.    On May 28, 2003, Plaintiff deposed McCann.

3.    In her Report and at her deposition (Exhibit 'B'), McCann offered certain opinions

relating to the thickness of the coating on certain coin holder samples and the cause of any scratches

on the coating.

4.    As shown below, these opinions should be barred.

## II.    Standard of Admissibility

5.    In order to be admissible, all expert testimony must be relevant and reliable.

A0063990.WPD

Fed.R.Evid. 702; *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999).

6.      The proponent of expert testimony has the burden of demonstrating by a preponderance of the evidence that the testimony satisfies the above elements. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 n. 10 (1993).

7.      Evidence is relevant if the testimony "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 264 (2nd Cir. 2002). Thus, even reliable testimony may be barred if it does not meet the standard for relevance. *Daubert,* 509 U.S. at 597.

8.      Conversely, even relevant testimony may be barred if it does not satisfy Rule 702's reliability analysis. *Amorgianos*, 303 F.3d at 267. In this inquiry, a district court should consider the indica of reliability identified in Rule 702, namely 1) that the testimony is grounded on sufficient facts or data; 2) that the testimony is the product of reliable principles and methods; and 3) that the witness has applied the principles and methods reliably to the facts of the case. *Id.* at 265, quoting Fed.R.Evid. 702.

9.      For a court to determine whether an expert's testimony is reliable, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is valid. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). The factors to make this determination include: 1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) a technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and 4) whether a particular technique or theory has gained

general acceptance in the relevant scientific community. *Amorgianos*, 303 F.3d at 266, citing *Daubert*.

10.    While the *Daubert* inquiry is a flexible one, it is critical that an expert's analysis be reliable at every step to warrant admissibility. *Id.* at 267.    Thus, "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" *Id.* quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3rd Cir. 1994).

### III.    McCann's conclusion as to the cause of certain scratches is irrelevant

11.    Although not disclosed in her Report, McCann opined at her deposition that the scratches she viewed on certain coin holders in 2002 resulted from "bumps in the surface of the base caused by the big particles included in the base rub against the other surface, the adjacent surface, and scratch it and build up a bit of scratch styrene on the adjacent surface or on itself." (McCann dep. at 92)

12.    McCann's conclusion regarding the cause of the scratches is irrelevant because she conceded that she could not offer an opinion on whether the scratches were present in 2000. (McCann dep. at 150).

### III.    McCann's conclusion as to the thickness of the coating is irrelevant

13.    Similarly, McCann's calculations of the thickness of the coating are irrelevant.    The purpose of McCann's testimony was to provide a basis for Neal Kelly's opinions regarding the adequacy of the coating - "my particular objective in this case was to determine the thickness of the overcoat". (McCann dep. at 49) Since Kelly's conclusions about the adequacy of the coating are based on the incorrect premise that the coating's suggested application was based on measuring the coating's thickness after it dried (See Plaintiff's Motion *In Limine* to Exclude the Opinions of Neal

Kelly), McCann's calculations are irrelevant because Kelly uses them to reach conclusions that are unreliable.

**IV.    McCann's conclusion as to the cause of certain scratches is unreliable**

14.    Rule 702 requires that an expert be qualified by skill, experience, training or education. Defendant has identified McCann as an expert pursuant to Fed.R.Civ.P. 26. However, while McCann opined on the cause of certain scratches she observed, she plainly conceded that she is neither a coating nor a printing expert (McCann dep. at 65). Accordingly, by her own admission, she is not qualified by skill, experience, training or education to render opinions as to the cause of certain scratches she observed. Thus, her testimony on this subject is necessarily unreliable and should be barred.

WHEREFORE, Plaintiff requests that the Court grant his Motion *in Limine* and

(a) bar Mary McCann from offering any opinions as to the thickness of the coating she observed or the cause of scratches she observed, pursuant to *Daubert;* and

(b) grant such other and further relief as the Court deems just and equitable.

Respectfully submitted,

W.E. ANDREWS CO., INC.

By: _____
Jeffrey L. Widman, ct24236
Shaw Gussis Fishman Glantz
   Wolfson & Towbin LLC
321 N. Clark, Suite 800
Chicago, IL 60610
Ph: (312) 541-0151
Fax: (312) 980-3888



UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| W.E. ANDREWS CO., INC., a Georgia Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 302-CV-00599 (CFD) |
| PLASTIC DEVELOPMENT, INC., a Rhode Island Corporation, | ) ) ) | |
| Defendant. | ) ) | |

## PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE
## THE OPINIONS OF NEAL KELLY

Plaintiff, W.E. ANDREWS CO., INC ("Plaintiff"), moves this Court *in limine* to exclude

certain testimony and opinions of Defendant's expert, Neal Kelly. In support of its motion, Plaintiff

states as follows:

I.    **Background**

   1.    On May 14, 2003, Defendant produced the Report (Exhibit 'A') of its expert, Neal

Kelly ("Kelly") and disclosed Kelly as an expert pursuant to Fed. R. Civ. P. 26.

   2.    On May 28 and 29, 2003, Plaintiff deposed Kelly.

   3.    In his Report and at his deposition (Exhibit 'B'), Kelly criticized both the manner in

which Plaintiff applied the aqueous coating to the Press Strips as well as Plaintiff's overall quality

control efforts. In offering these criticisms, Kelly offered the following specific opinions in his

Report:

   •    "There was insufficient quality control performed by the printer W.E. Andrews, on
        the Starkote AQ-520 coated surface. If a reasonable amount of quality control were
        performed on a coated web such as this filled styrene, with ink layers and an

A0062219.WPD

overprinted protective layer, then potential defects would likely be found." (Kelly Report, p.6)

- "The data at this point, along with years of experience in evaluating coatings, suggested that the Kelstar lacquer may have been coated and dried improperly or in too thin a layer."

- "This particular styrene with its large filler particles should not have been used for this critical application, with such a thin lacquer coat weight. Either the filled styrene plastic should have been calendared to a smooth surface before coating, or the overprint lacquer should have been applied at a heavier coat weight."

4.    As shown below, these opinions should be barred.

## II.    Standard of Admissibility

5.    In order to be admissible, all expert testimony must be relevant and reliable. Fed.R.Evid. 702; *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999).

6.    The proponent of expert testimony has the burden of demonstrating by a preponderance of the evidence that the testimony satisfies the above elements. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592 n. 10 (1993).

7.    Evidence is relevant if the testimony "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." *Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256, 264 (2nd Cir. 2002). Thus, even reliable testimony may be barred if it does not meet the standard for relevance. *Daubert,* 509 U.S. at 597.

8.    Conversely, even relevant testimony may be barred if it does not satisfy Rule 702's reliability analysis. *Amorgianos,* 303 F.3d at 267. In this inquiry, a district court should consider the indica of reliability identified in Rule 702, namely 1) that the testimony is grounded on sufficient

A0062219.WPD                                2

facts or data; 2) that the testimony is the product of reliable principles and methods; and 3) that the witness has applied the principles and methods reliably to the facts of the case. *Id.* at 265, quoting Fed.R.Evid. 702.

9.      For a court to determine whether an expert's testimony is reliable, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is valid. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). The factors to make this determination include: 1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) a technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and 4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. *Amorgianos*, 303 F.3d at 266, citing *Daubert*.

10.     While the *Daubert* inquiry is a flexible one, it is critical that an expert's analysis be reliable at every step to warrant admissibility. *Id.* at 267. Thus, "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" *Id.* quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3rd Cir. 1994).

## III.      Kelly's criticism of Plaintiff's quality control efforts is unreliable

11.     In his Report, Kelly criticized Andrews' quality control efforts, concluding that "there was insufficient quality control performed by the printer W.E. Andrews, on the Starkote AQ-520 coated surface. If a reasonable amount of quality control were performed on a coated web such as this filled styrene, with ink layers and an overprinted protective layer, then potential defects would likely be found."

12.     However, at his deposition, Kelly offered the following testimony regarding Andrews'

quality control:

```
4     Q.  And in your last paragraph you state, "It is
5   the opinion of Adhesive & Coating Technology," which is
6   you --
7     A.  Correct.
8     Q.  -- "that there was insufficient quality
9   control performed by the printer, W.E. Andrews, on the
10  Starkote AQ-520 coated surface.  If a reasonable amount
11  of quality control were performed on a coated web such
12  as this filled styrene with ink layers and an
13  overprinted protective layer, then potential defects
14  would likely be found."  What is a reasonable amount of
15  quality control, in your opinion?
16    A.  At least some test to evaluate the durability
17  of the surface.
18    Q.  And do you have any knowledge as to whether
19  W.E. Andrews performed such a test?
20    A.  I have not seen any tests that they
21  performed.
22    Q.  You don't know either way?
23    A.  I have not seen any tests that they
24  performed.
                    *   *   *
1     Q.  Do you know if they did perform tests?
2     A.  No, I do not.
3     Q.  And when you're referring to a coated web,
4   you're not referring -- again, you're referring to the
5   roll of styrene?  Is that what you're referring to?
6     A.  A coated web such as this filled styrene,
7   yes.
8     Q.  You're saying there was insufficient quality
9   control -- that there was insufficient quality control
10  performed by Andrews, but you're also saying that you
11  have no idea whether or not they performed any quality
12  control, correct?
13    A.  Yes. (Kelly deposition, pp. 150-51)
```

13.     Kelly plainly states that he has no idea what, if any, quality control Andrews

conducted, but nonetheless criticizes these unknown efforts. Clearly, Kelly's opinion that Andrews did not have sufficient quality control is not grounded on any, let alone sufficient, facts or data. Accordingly, it fails to meet Rule 702's reliability analysis and should be barred.

## IV.    Kelly's opinion that the coating was improperly applied is unreliable

14.    Kelly's opinions as to the coating being improperly applied should be barred because they are unreliable. In his report, Kelly notes that he performed three tests on the coin holders at issue and other coin holders that the mint had previously accepted, comparing the results. Specifically, Kelly performed a coefficient of friction test, a "Pencil Scratch Hardness Tester," and an abrasion test "devised to recreate marks similar to the rejected surface marks." After performing these tests, Kelly's report states that "[t]he data at this point, along with years of experience in evaluating coatings, suggested that the Kelstar lacquer may have been coated and dried improperly or in too thin a layer."

15.    Despite reaching this conclusion, Kelly's report and his deposition testimony clearly establish that the first two tests did not establish a failure in the coating. Rather, Kelly relies on the third test, in which he states that "the mechanism for creating defects was apparently different for the two different coatings."

16.    At his deposition, Kelly expounded on this tepid opinion, conceding that his abrasion test did not lead him to conclude there was too thin a coating, but rather that "too thin a coating could have been one possibility of contributing to the defect." (Kelly dep. at 102/14-21) This opinion must be barred as unreliable for a myriad of reasons.

17.    First, Kelly conceded that his abrasion test was not performed until August 2002 - two years after the coin holders were manufactured. Moreover, Kelly conceded he had no idea whether

the coin holder samples he tested in 2002 were in the same condition in 2000. In fact, Kelly conceded he does not know if the coin holders even existed in 2000. (Kelly dep. at 153) Thus, as an initial matter, Kelly cannot testify as to what effect the passage of time had on the samples and whether they were even in the same condition as they were when they arrived at the Mint in 2000.

18.    Second, the methodology Kelly employed to perform his abrasion test falls far short of meeting the stringent requirements of *Daubert*. Rather than performing an abrasion test that is considered authoritative in the coating industry, such as the Sutherland Rub Test (Kelly dep. at 95), Kelly "devised" an abrasion test (Kelly dep. at 77). Thus, Kelly simply rubbed two coin holders against each other with his hands, using a back and forth motion of approximately one-eighth of an inch ("I arbitrarily picked a small motion of about an eighth of an inch"; Kelly dep. at 83) while placing different weights on the pieces. (Kelly dep. at 82) In performing this test, Kelly conceded he arbitrarily picked the time frame ("Have to start somewhere"; Kelly dep. at 83), and that he does not know whether he exerted any force on the coin holders during the test in addition to the weights (despite trying not to)(Kelly dep. at 84-85). Moreover, Kelly stated that his findings were based on an *approximate*, rather than exact, number of strokes (Kelly dep. at 84). Worse yet, Kelly's lack of notes of the tests he supposedly performed, rendered him unsure of exactly what tests he performed:

```
 4     Q.  Would it be logical to conclude, then, that
 5  you did not perform the test on the unlaminated styrene
 6  or Yupo?
 7     A.  No, it would not be logical to conclude Neal
 8  Kelly did not do that.  It would be logical to conclude
 9  that he might have done it and didn't record it as a
10  preliminary investigation before I designed the test,
11  for instance.
12     Q.  Would these results that you have listed
13  in your report also -- would these be results
14  for -- they're obviously results for the completed coin
```

15 holders, correct?
16    A.  Yes.
17    Q.  How do we know if they're results for the
18 unlaminated pieces if we're not sure that you even
19 performed the test on the unlaminated pieces?
20    A.  We don't know. (Kelly Dep. at 88).

19.    Kelly's "devised" abrasion test clearly is unreliable because it fails to satisfy any of

the *Daubert* factors for reliability.  First, *Daubert* requires that an opinion be testable.  Clearly, it is

impossible for anyone, including Kelly himself, to test the reliability of the abrasion tests he

performed with the weights since: 1) he is unsure as to which samples he even tested: 2) he simply

rubbed two coin holders together in a back and forth motion of approximately 1/8"; 3) he simply

counted an approximate number of back and forth strokes; and 4) he is unsure if he exerted any force

on the coin holders in addition to the weights. Second, this "devised" test has not been subjected to

peer review since Kelly conceded he "improvised" the test (Kelly dep. at 95).  Third, Kelly himself

is unsure as to the actual number of times he rubbed each sample and whether he applied a consistent

amount of force to the coin holders during his test.  Thus, there was no standard controlling the

technique's operation, as required by *Daubert*.  Fourth, as Kelly conceded, because he improvised,

Kelly's technique clearly has not gained acceptance in the scientific community. (Kelly dep. at 95)

20.    Kelly's opinions are unreliable also because, as shown below, he incredibly conceded

that the only coin holders he examined and performed tests on were those that the mint accepted.

Therefore, any conclusions of deficiencies in the coating are necessarily unreliable since they relate

to pieces that were not considered defective by anyone.

21.    An expert's testimony is inadmissible if there is too great an analytical gap between

the data and the opinion proffered so that the opinion is "connected to the existing data only by the

ipse dixit of the expert." *Amorgianos*, 303 F.3d at 266. Here, Kelly's conclusions are based on unreliable methodology, which cannot be tested, and should be barred.

**V.     Kelly's criticism of the use of styrene and the amount of coating used are unreliable**

22.     In his Report and at his deposition, Kelly also criticized the amount of coating Andrews applied to the styrene, stating: "This particular styrene with its large filler particles should not have been used for this critical application, with such a thin lacquer coat weight. Either the filled styrene plastic should have been calendared to a smooth surface before coating, or the overprint lacquer should have been applied at a heavier coat weight."

23.     Kelly's criticism is based, in large part, on the data sheet provided by Kelstar, the company that manufactured the coating. Kelly criticizes the amount of coating Andrews applied by taking the suggested coating mileage supplied by Kelstar, using those numbers to calculate the expected thickness of the coating, and comparing it to the coating thickness measured by Mary McCann. According to Kelly, the "data sheet for the Kelstar coating recommends it be applied at one pound per 1,000 square feet." (Kelly Report, p.5) Kelly proceeds to calculate the thickness of the coating that one could expect to view if Andrews had applied this amount recommended by Kelstar. Kelly deduces that because Mary McCann's photographs of the coin holders shows a coating thickness that is less than his calculations, Andrews should have applied a heavier coat weight. (Kelly Report, p.5).

24.     Kelly's criticism of the amount of coating applied is unreliable because the premise off which he is operating is wrong. Kelly testified that he assumed that the recommended coat weight was a dry coat weight. In other words, the coating should be applied so that there is one pound of coating per 1000 square feet as measured after the coating dries on whatever surface to

which it is applied. (Kelly dep. at 126). This is incorrect. Jeff Jacobs and Tim Pigden, employees of Kelstar (the company that manufactured the coating and creating the recommended coat weight), both testified unequivocally that the suggested coat weight is a wet, not dry, coat weight. (Jacobs dep., Exhibit 'C', at 36-37, 41-42; Pigden dep., Exhibit 'D', at 37). Thus, the calculations using a wet coat weight would yield a lower dry thickness because, during the drying process, water evaporates from the coating, making it thinner. (Jacobs dep. at 37) Thus, Kelly's conclusions are based on improper assumptions and, therefore, are unreliable.

## VI.    Kelly's opinions are irrelevant

25.    Even if the Court concludes that Kelly's methodology was reliable, all of Kelly's opinions should be barred because they also fail to meet the relevancy prong of *Daubert* and its progeny.

26.    Kelly plainly concedes that all of the testing he performed on the coin holders was done on samples that the mint *accepted.* Like a doctor operating on a healthy patient, Kelly offers criticisms of coin holders with which there were no problems. In an abundance of caution, Kelly was asked on three separate occasions whether he tested rejected samples and, each time, Kelly reiterated he did not:

```
7      Q.  So you performed none of your tests on the
8   rejected samples?
9      A.  I did not try to generate defects on already
10  defect-showing samples, no. (Kelly Dep. at 57)

           *   *   *

5      Q.  And the reason for this -- Well, what you
6   selected as your control were samples that were
7   accepted by the Mint?
8      A.  That was my understanding.
```

9      Q.  And you compared them to styrene samples that
10  were also accepted by the Mint?
11      A.  That were rejected by the Mint.
12      Q.  That's not what you testified to.  What you
13  testified to -- And maybe you were mistaken, but what
14  you testified to was that you tested two sets of
15  samples, one, samples with no visible defects –
16      A.  Correct.
17      Q.  -- that were accepted by the Mint, and, two,
18  unlaminated coated styrene samples?
19      A.  That's correct.  And rejected by the Mint
20  fully laminated -- No, I did not test rejected by the
21  Mint fully laminated.  I did not.  So you're correct. (Kelly dep. at 59)

* * *

14      Q.  So the abrasion test didn't lead you to that
15  conclusion; is that correct?
16      A.  Didn't lead me to which conclusion?
17      Q.  That there was too thin of a coating.
18      A.  No.
19      Q.  Did it lead you to any conclusion?
20      A.  Yes.  That too thin a coating could have been
21  one possibility of contributing to the defect.
22      Q.  And that was despite the fact that you
23  performed the test on samples that were actually
24  accepted by the Mint as opposed to rejected by the
1   Mint?
2      A.  Yes. (Kelly Dep. at 102-03)

27.    Such testimony is irrelevant to the rejected coin holders and should be barred.

## VI.    Conclusion

28.    "[A]n expert's report that does nothing to substantiate his opinion is worthless, and

therefore inadmissible." *Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir.

1997).  Kelly's criticism of Andrews' quality control is unfounded and his tests are unreliable and

irrelevant.  Despite these glaring deficiencies, Kelly nonetheless sees fit to opine on these subjects.

However, in doing so, Kelly asks the Court to take these opinions on blind faith because he is unable

A0062219.WPD                          10

to provide any factual basis for them. As such, his opinions are "worthless, and therefore inadmissible."

29.     For Kelly's opinions to be admissible, he is required to provide a factual basis for them or have them barred. "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Mid-State Fertilizer Co. v. Exchange National Bank,* 877 F.2d 1333, 1339 (7th Cir. 1989). Kelly provided no support for his conclusions and wholly failed to establish that they were the result of a scientific method. Thus, his opinions amount to nothing more than unsupported speculation which must be excluded.

WHEREFORE, Plaintiff requests that the Court grant his Motion *in Limine* and

a) bar Neal Kelly from offering any opinions criticizing the application of the coating on the coin holders;

b) bar Neal Kelly from offering any opinions on the condition of the rejected coin holders rights;

c) bar Neal Kelly from offering any opinions on Plaintiff's quality control efforts; and

d) granting such other and further relief as the Court deems just and equitable.

Respectfully submitted,

W.E. ANDREWS CO., INC.

By: _____

Jeffrey L. Widman, ct24236
Shaw Gussis Fishman Glantz
Wolfson & Towbin LLC
321 N. Clark, Suite 800
Chicago, IL 60610
Ph: (312) 541-0151
Fax: (312) 980-3888

13

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

W.E. ANDREWS CO., INC.,       )
a Georgia Corporation,        )
                       )
        Plaintiff,       )
                       )
      v.             )   No. 302-CV-00599 (CFD)
                       )
PLASTIC DEVELOPMENT, INC.,  )
a Rhode Island Corporation,    )
                       )
        Defendant.     )

## PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE
### THE OPINIONS OF THERESA RENNER

Plaintiff, W.E. ANDREWS CO., INC ("Plaintiff"), moves this Court *in limine* to exclude

certain testimony and opinions of Defendant's expert, Theresa Renner. In support of its motion,

Plaintiff states as follows:

## I.    __Background__

1.    On May 29, 2003, Defendant produced the Report of its expert, Theresa Renner

("Renner") and disclosed Renner as an expert pursuant to Fed. R. Civ. P. 26.

2.    On June 26, 2003, Plaintiff deposed Renner.

3.    In both her deposition (Exhibit 'A') and her Report (Exhibit '1' to her deposition),

Renner calculated Defendant's past and future profits, which Defendant claims it lost as a result of

Plaintiff's purported breaches. Renner opined that Defendant's lost profits total $9,730,477,

calculated as $3,253,934 from 2000 through 2003 and $6,476,544 from 2004 through 2009.

4.    Renner's opinions are wrought with incorrect math, unfounded estimations, and

arbitrary assumptions which render them so unreliable that she should be barred from testifying.

A0063600.WPD

## II.    Standard of Admissibility

5.    In order to be admissible, all expert testimony must be relevant and reliable. Fed.R.Evid. 702; *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999).

6.    The proponent of expert testimony has the burden of demonstrating by a preponderance of the evidence that the testimony satisfies the above elements. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 n. 10 (1993).

7.    Evidence is relevant if the testimony "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 264 (2nd Cir. 2002). Thus, even reliable testimony may be barred if it does not meet the standard for relevance. *Daubert,* 509 U.S. at 597.

8.    Conversely, even relevant testimony may be barred if it does not satisfy Rule 702's reliability analysis. *Amorgianos*, 303 F.3d at 267. In this inquiry, a district court should consider the indica of reliability identified in Rule 702, namely 1) that the testimony is grounded on sufficient facts or data; 2) that the testimony is the product of reliable principles and methods; and 3) that the witness has applied the principles and methods reliably to the facts of the case. *Id.* at 265, quoting Fed.R.Evid. 702.

9.    For a court to determine whether an expert's testimony is reliable, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is valid. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). The factors to make this determination include: 1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) a

A0063600.WPD                                    2

technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and 4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. *Amorgianos*, 303 F.3d at 266, citing *Daubert*.

10.     While the *Daubert* inquiry is a flexible one, it is critical that an expert's analysis be reliable at every step to warrant admissibility. *Id.* at 267. Thus, "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" *Id.* quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3rd Cir. 1994).

### III.    Renner's opinions of past lost profits are unreliable and should be barred

11.     In her Report and at her deposition, Renner opined that Defendant lost profits from 2000 through 2003 in the amount of $3,253,934. However, Renner also conceded that many of the factors she considered were incorrect and/or did not comport with reality. Renner also conceded she calculated various numbers based on instructions from her client, rather than her own beliefs.

12.     The most egregious example of Renner's unreliable conclusions is her concession that, in calculating the number of red coin holders[1] that Defendant would have sold to the U.S. Mint (the "Mint") in 2001, she did not consider the actual number of red inserts that the Mint purchased that year from other vendors. Rather, despite possessing this information, Renner based her calculations on her client's inaccurate sales projections. (Renner dep. at 48). The result is that her opinion assumes that Defendant would have sold 1,948,050 inserts to the Mint in 2001. This assumption was based on averaging the actual amounts that Defendant had sold or shipped to the

---

[1]Renner's Report refers to the coin holders as inserts and they will be referred to as such in this motion.

Mint in 1999 and 2000 (Renner dep. at 48).

13.    However, Renner conceded that at the time she rendered this opinion, she knew that her calculation was wrong because it exceeded the total number of red inserts that the Mint ordered in 2001 from all vendors by more than 200,000 pieces! (Renner dep. at 62)  As Exhibit 5, page 3 of her deposition shows, the Mint only ordered 1,714,800 red inserts in 2001.  Thus, Renner knowingly included overinflated sales numbers in her calculations of lost profits for 2001.

14.    Where, as here, lost profits are at issue, "an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding" a party's future prospects. *Supply & Building Co. v. Estee Lauder International, Inc.*, 2001 WL 1602976 at *4 (S.D.N.Y. 2001) citing *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2nd Cir. 1996).  Thus, if an expert's opinions are based on unrealistic assurances from his client, rather than available records, his testimony is unreliable and, therefore, inadmissible. *Id.*

15.    Clearly, Renner's opinion as to Defendant's past profits, in which she knowingly included incorrect overinflated sales estimates should not, indeed cannot, be admitted at trial.  They are based, not on available records, but rather unrealistic assurances from her client.  Therefore, they are unreliable and inadmissible under *Daubert.*

16.    Renner's calculations of past profits for 2000 are also unreliable.  As she conceded at her deposition, Renner's 2000 lost profit calculation is wrong because it does not include a cost component that Defendant told her to omit that she would have otherwise included.

17.    In calculating Defendant's lost profits for 2000, Renner included all the costs of producing the coin holders, but omitted printing costs which reflect the unpaid amounts Plaintiff seeks.  Renner testified that she omitted the printing costs, not because she thought it was an accurate

way to calculate damages, but rather simply because her client instructed her to do so. (Renner dep. at 43). In fact, Renner plainly conceded that, but for her client's instructions, she would have deducted printing costs from the gross sales figure that she included in her lost profit analysis. (Renner dep. at 43).

18.     Where, as here, an accountant does not calculate lost profits according to her own beliefs, but rather based on the instructions of her client, her opinions must be considered unreliable and lacking foundation. *See JMJ Enterprises, Inc. V. Via Veneto Italian Ice, Inc.*, 1998 WL 175888 at *10 (E.D.Pa. 1998)("A reasonable accountant does not report certain expenses, and choose to omit other, like expenses.") Accordingly, Renner's lost profit calculations for 2000 are unreliable and, therefore, inadmissible.

19.     An additional mistake that Renner conceded she made was her incorrect calculation of the projected coating costs for the inserts. Renner conceded that the cost she assigned for coating as part of the cost component of her analysis was simply wrong since it was too high, thus rendering her net profit numbers incorrect. (Renner dep. at 126-7).

20.     Another unfounded component of Renner's calculations relates to the retirement of certain debt by Defendant. Renner's opinions assume that, had Defendant earned profits from the Mint in 2000 and 2001, it would have paid off debt resulting from a mortgage on Defendant's property. (Renner dep. at 16-17). However, in making this assumption, Renner conceded she did not know whether the mortgage contained a prepayment penalty (Renner dep. at 20-21), she did not consider this issue (Renner dep. at 20-21) and she arbitrarily picked amounts that Defendant would have paid to lower the mortgage amount. (Renner dep. at 30-32). In fact, Renner testified that her calculation that Defendant would have paid its mortgage down by $228,000 in 2002 was nothing