more than an arbitrary assumption. (Renner dep. at 31-32)

21.     Similarly, Renner's assumption that Defendant would have incurred $271,067 in printing costs in 2001 was based on nothing other than her client telling her that is what it would have cost Defendant. (Renner dep. at 135) When pressed, Renner conceded she merely assumed this was a reasonable number and that she did nothing to confirm its accuracy. (Renner dep. at 135)

22.     In addition to the foregoing errors, Renner also made numerous unfounded assumptions relating to the cost of producing the inserts.  For example, Renner opined that Defendant's overhead would decrease from 2001 to 2002 based on speculation that the company would have purchased a camera that would replace inspectors. (Renner dep. at 170-71) Again, the sole basis for this assumption was merely the Defendant telling her that it would have purchased this camera for $23,500. (Renner dep. at 190)

23.     Similarly, in calculating production costs in 2000, Renner assumed that worker productivity would increase "due to assembly machine improvements." (Renner dep. at 147).  When asked what this referred to, Renner again conceded she did not know what those improvements were and that her client simply instructed her to make that assumption. (Renner dep. at 148).  Once again, Renner's calculations are plagued by the inclusion of the completely baseless, speculative desires of her client.  Renner has absolutely no idea whether her client is remotely accurate and she has done nothing to investigate these projections or even inquire as to the bases for them, Renner simply assumes her client is correct and adopts these assumptions as her own opinions.

24.     Worse yet, nearly half of Renner's past lost profit calculations are based on lost profits from sales of the blue inserts.  However, as she plainly recognized, the Mint never approved Defendant as a supplier of the blue inserts.(Renner dep. at 53)    Thus, she presupposes that

A0063600.WPD                                6

Defendant would have obtained this approval, netting it $1,445,579.00 in profits from 2001 through 2003. Renner incorporates the blue insert calculation in her Report notwithstanding the fact that this was a product Defendant has never sold and was never approved to sell to the Mint. Clearly, such an opinion is nothing more than wild speculation.

25.     In *JMJ Enterprises, Inc.*, the Court disallowed the plaintiff's expert, an accountant, to testify as to the plaintiff's lost profits because his methodology was unreliable. In so holding, the Court noted errors in his report, including the omission of certain expenses and estimates of future expenses, which were not based on any evidence or calculation. Thus, the court found that the plaintiff was "simply presenting their unrealistic hopes through the mouth of an expert. This conclusion follows from the conclusion that [the expert's] factual basis was inadequate and his methods were improper." *Id.*

26.     Similarly, in the case at bar, Renner's opinion of past lost profits is not based on any evidence, but rather unrealistic assumptions that do not comport with reality and incorrect calculations based on her client's desires, rather than her true beliefs. Thus, as in *JMJ Enterprises, Inc.*, Renner should be barred from testifying at trial as to Defendant's past lost profits.

## IV.     Renner's opinions of future lost profits are speculative, unreliable and should be barred

27.     Not only are Renner's opinions of past lost profits unreliable, but her projections of future lost profits are unfounded and so speculative that she should be barred from offering her opinions on this topic also.

28.     The most blatant example of this is Renner's inclusion of lost profits for 2009. As she plainly acknowledged, the Mint's program is scheduled to terminate in 2008. (Renner dep. at 46). While Renner speculated that there may be some legislation that might extend the program

through 2009, she conceded she had no foundation for including lost profits for that year. (Renner dep. at 46-47). Thus, Renner included an additional $1,069,957.00 while simultaneously agreeing that said amount is entirely speculative. Such testimony clearly is inadmissible.

29.    Moreover, as she did with past lost profits, Renner improperly included speculative claims for future lost profits from the blue inserts. Adding insult to injury, she ignored the significant fact that blue insert orders dropped drastically from over 9 million pieces in 2001 to 6 million pieces in 2002 to a projection in May, 2003 that the Mint would order 4.8 million pieces in 2003.[2] Rather than incorporating this highly relevant, obvious downward trend, Renner simply averaged the three years and computed 25% of that number[3] for a total estimate of 1,717,630 blue inserts per year. However, as Renner's own notes make clear, she was concerned about future returns from the Mint being lower and asked Defendant if it was concerned that unit sales would decrease. (Renner dep. at 88-89, Renner Dep, Exhibit 5) Defendant responded by advising Renner not to take this into account. (Renner dep., Exhibit 5) Once again, rather than formulating her own opinion based on historical numbers showing a decline in sales, Renner simply did as she was told. Renner's willingness to once again turn a blind eye to the truth and calculate numbers that do not comport with the facts illustrates once more the speculative, unreliable nature of her "opinions," which, in reality, amount to nothing more than the unrealistic hopes of her client. As such, they should be barred.

30.    Even if the Court accepts the use of this average as a proper method, it cannot

_____

[2] Plaintiff expects that the evidence will show that the mint's projections were wildly optimistic and that it only ordered 2.4 million blue inserts in 2003.

[3] Renner's basis for the 25% estimate is nothing more than Defendant's speculation; Renner conceded she did not know the basis for that estimate. (Renner dep. at 52)

overlook the fact that Renner's math is simply wrong. If the Court averages the blue insert numbers

for 2001 through 2003 contained in Exhibit 5, it will see that 25% of the average, 6,868,533[4], is

1,717,133; not 1,717,630. While the difference is only 500 inserts per year, for a total overstatement

of 4,000 inserts, Renner's math is simply wrong again. Combined with the multitude of other

problems with her methodology, this is yet another indication of the unreliable nature of Renner's

proposed testimony.

## CONCLUSION

31.    Renner's opinions are unreliable and lack foundation. Her calculations for every year

from 2000 through 2009 are incorrect because they include: 1) $4,480,295 in profits for blue inserts;

2) $1,069,957 in profits for 2009; 3) incorrect calculations for the cost to produce inserts due to her

mistake in the coating calculation and her omission of certain printing costs; 4) unfounded

assumptions as to worker productivity, retirement of debt, and capital expenditures that ultimately

might reduce costs; 5) overstated sales figures for 2001; and 6) wildly optimistic projections of future

sales despite having doubts about the accuracy of those numbers.

32.    Because Renner's opinions are riddled with these mistakes and unfounded

assumptions, her testimony lacks any reliability. Simply put, Renner's opinions do not satisfy the

requirements set forth in Fed.R.Ev. 702 and *Daubert*. Accordingly, she should be barred from

offering her opinions on lost profits at trial.

WHEREFORE, Plaintiff/Counter-defendant, W.E. ANDREWS, respectfully requests that

this Court grant its motion *in limine* and bar Theresa Renner from offering any opinions as to

Defendant's lost profits, pursuant to *Daubert*.

---

[4] 9,623,200+6,115,200+4,867,200=20,605,600 and 20,605,600/3=1,717,133

Respectfully submitted,

W.E. ANDREWS CO, INC.


By: _____
Jeffrey L. Widman, ct24236
Shaw Gussis Fishman Glantz
    Wolfson & Towbin LLC
321 N. Clark, Suite 800
Chicago, IL 60610
Ph: (312) 541-0151
Fax: (312) 980-3888

A0063600.WPD

10

14

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

W.E. ANDREWS CO., INC.,               )
a Georgia Corporation,                )
                                      )
              Plaintiff,              )
                                      )
       v.                             )        No. 302-CV-00599 (CFD)
                                      )
PLASTIC DEVELOPMENT, INC.,            )
a Rhode Island Corporation,           )
                                      )
              Defendant.              )

## PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE THE OPINIONS OF DEREK JOHNSON

Plaintiff, W.E. ANDREWS CO., INC ("Plaintiff"), moves this Court *in limine* to exclude certain testimony and opinions of Defendant's expert, Derek Johnson.  In support of its motion, Plaintiff states as follows:

**I.    Background**

1.    On May 29, 2003, Defendant produced the report (Exhibit 'A') of its expert, Derek Johnson ("Johnson") and disclosed Johnson as an expert pursuant to Fed. R. Civ. P. 26.

2.    On June 26, 2003, Plaintiff deposed Johnson.

3.    In both is report and at his deposition, Johnson offered opinions on the present value of Defendant's future lost profits from 2004 through 2009.

4.    As shown below, these opinions should be barred.

**II.    Standard of Admissibility**

5.    In order to be admissible, all expert testimony must be relevant and reliable. Fed.R.Evid. 702; *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999).

6.     The proponent of expert testimony has the burden of demonstrating by a preponderance of the evidence that the testimony satisfies the above elements. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 n. 10 (1993).

7.     In addition, the court must decide whether the proffered evidence is relevant. Evidence is relevant if the testimony "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 264 (2nd Cir. 2002). Thus, even reliable testimony may be barred if it does not meet the standard for relevance. *Daubert,* 509 U.S. at 597.

8.     Conversely, even relevant testimony may be barred if it does not satisfy Rule 702's reliability analysis. *Amorgianos*, 303 F.3d at 267. In this inquiry, the district court should consider the indica of reliability identified in Rule 702, namely 1) that the testimony is grounded on sufficient facts or data; 2) that the testimony is the produce of reliable principles and methods; and 3) that the witness has applied the principles and methods reliably to the facts of the case. *Id.* at 265, quoting Fed.R.Evid. 702. For a court to determine whether an expert's testimony is reliable, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is valid. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). The factors to make this determination include: 1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) a technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and 4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. *Amorgianos*, 303 F.3d at 266, citing

A0063570.WPD                                    2

*Daubert.*

9.    While the *Daubert* inquiry is a flexible one, it is critical that an expert's analysis be reliable at every step to warrant admissibility. *Id.* at 267. Thus, "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" *Id.* quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3rd Cir. 1994).

## III.    Johnson's calculations are based on Theresa Renner's unreliable opinions

10.    Johnson's report states:

The scope of this engagement was to coordinate with Ms. Theresa L. Renner, CPA, CVA and prepare present value calculations of lost profits based on Ms. Renner's adjustments to the cost and revenue calculations prepared by PDI. (Johnson Report, Attachment A)

11.    Thus, Johnson was asked to perform present value calculations of lost profits from 2004 through 2009.

12.    As Johnson plainly concedes, he took no part in calculating Defendant's lost profits, but rather relied upon Renner's calculations to compute a present value of those purported lost profits. (Johnson dep. at 12).

13.    Thus, the reliability of Johnson's present value calculations rests, not only upon his own methodology, but on that of Renner's also. In other words, if Renner's methodology is unreliable - and it is - Johnson's opinions necessarily are unreliable also.

14.    As outlined in the motion to bar Renner's testimony, Renner's opinions are based on wholly unreliable methods, lack any factual basis and should be barred for multiple reasons. Therefore, if the Court bars Renner's testimony, Johnson's opinions must also be barred as unreliable under *Daubert*.

15.    If the Court sees fit to permit Renner to testify, then at a minimum, it should bar Johnson from testifying as to the present value of lost profits for 2009. As Renner conceded at her deposition, the mint state quarter program only runs through 2008, to extend the program through 2009 would require additional legislation and she is unsure as to what the status of such legislation is. Accordingly, there is absolutely no foundation whatsoever for Renner or Johnson to testify that Defendant suffered lost profits in 2009.

WHEREFORE, Plaintiff requests that the Court grant his Motion *in Limine* and

a) bar Derek Johnson from offering any opinions as to the present value of Defendant's future lost profits, pursuant to *Daubert;*

b) bar Derek Johnson from offering any opinions as to the present value of Defendant's future lost profits for 2009, pursuant to Rule 702 of the Federal Rules of Evidence; and

c) granting such other and further relief as the Court deems just and equitable.

Dated: April 19, 2004                         Respectfully submitted,

                                             W.E. ANDREWS CO., INC.

                                       By: _____
                                             Jeffrey L. Widman, ct24236
                                             Shaw Gussis Fishman Glantz
                                               Wolfson & Towbin LLC
                                             321 N. Clark, Suite 800
                                             Chicago, IL 60610
                                             Ph: (312) 541-0151
                                             Fax: (312) 980-3888

A0063570.WPD                         4

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

W.E. ANDREWS CO., INC.,          )
a Georgia Corporation,           )
                                 )
                Plaintiff,       )
                                 )
        v.                       )        No. 302-CV-00599 (CFD)
                                 )
PLASTIC DEVELOPMENT, INC.,       )
a Rhode Island Corporation,      )
                                 )
                Defendant.       )

## MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF CERTAIN LOST PROFITS

Plaintiff, W.E. Andrews Co., Inc., moves this Court *in limine* to enter an Order excluding testimony regarding defendant's lost profits from November, 2003 through 2009. In support of its Motion, Plaintiff respectfully states as follows:

1.      Defendant has filed a Counterclaim against Plaintiff, alleging that Plaintiff breached its contract with Defendant and the various warranties associated with the contract as a result of Plaintiff delivering press strips that purportedly contained latent defects in the coating.

2.      Defendant claims that, as a result of these breaches, Defendant has lost profits, not only under the contract it had with the U.S. Mint (the "Mint") at the time of the purported breach, but also lost profits under a contract Defendant entered into with the Mint after the purported breaches occurred.

3.      In 1999, Defendant entered into a contract (the "Initial Contract") with the Mint pursuant to which the Mint purchased coin holders from Defendant. The Initial Contract's term was extended to September 30, 2000 (the modification to the Initial Contract is attached as Exhibit 'A'). In August, 2000, the Mint terminated the Initial Contract.

A0063631.WPD

4.    On or about October 25, 2000, Defendant, Plastic Development, Inc., and the Mint entered into a subsequent contract, which expired in October, 2003 (the "Second Contract" attached as Exhibit 'B'). Pursuant to the Second Contract, Defendant was obligated to deliver to the Mint coin holders only in the event the Mint ordered any such holders from Defendant. The Second Contract did not require the Mint to purchase any minimum amount of coin holders from Defendant and the Mint never placed any such orders with Defendant. Moreover, neither the Initial Contract nor the Second Contract entitled Defendant to enter into any subsequent contracts with the Mint.

5.    On May 29, 2003, Defendant produced the reports of its experts, Theresa Renner ("Renner") and Derek Johnson ("Johnson") and disclosed Renner and Johnson as experts pursuant to Fed. R. Civ. P. 26.

6.    On June 26, 2003, Plaintiff deposed Renner and Johnson.

7.    In both her report and at her deposition, Renner offered opinions on Defendant's past and future lost profits. Renner specifically testified that Defendant, not only lost profits associated with the Initial Contract, but the overwhelming majority of her calculations are based on lost profits under the Second Contract as well as for several years after the Second Contract expired. Thus, Renner's calculations of lost profits for 2000 through 2009 only contain 1 year of lost profits associated with the Initial Contract - 2000. Renner's calculations for 2001 through 2003 relate to the Second Contract and her calculations for 2004 through 2009 relate to a time in which Defendant had no contract with the Mint.

8.    In both his report and at his deposition, Johnson offered opinions on the present value of Defendant's future lost profits from 2004 through 2009.

9.    Renner and Johnson's anticipated testimony regarding lost profits after the expiration

of the Second Contract as well as after that period should be barred.

10.    Lost profits are not recoverable if they are too speculative and remote. *Ross & Roberts, Inc. v. Cook's Industrial Lubricants, Inc.*, 1997 WL 835054 at *4 (D.Conn. 1997). Furthermore, it is well-established that a government contractor cannot recover anticipated profits from future contracts on a breach of contract claim where, as here, the contract between the parties does not entitle the contractor to future contracts. *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320 (Fed.Cir. 2003). In *Rumsfeld*, the Court of Appeals held that such profits were simply too "remote and uncertain" to be recoverable. *Id.*

11.    In this case, while Defendant may be able to make a cognizable claim for lost profits related to the Second Contract, any damage claims after the expiration of the Second Contract are entirely speculative and remote. Neither the Initial Contract nor the Second Contract entitled Defendant to future contracts. Therefore, any claims for lost profits after the expiration of the Second Contract should be barred.

WHEREFORE, Plaintiff respectfully request that this Court bar Defendant from presenting any evidence regarding lost profits from November, 2003 through 2009.

Respectfully submitted,

W.E. ANDREWS CO., INC.

By: _____
Jeffrey L. Widman, ct24236
Shaw Gussis Fishman Glantz
Wolfson & Towbin LLC
321 N. Clark, Suite 800
Chicago, IL 60610
Ph: (312) 541-0151
Fax: (312) 980-3888

A0063631.WPD                                3

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| W.E. ANDREWS CO., INC.,<br>a Georgia Corporation, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 302-CV-00599 (CFD) |
| | ) | |
| PLASTIC DEVELOPMENT, INC.,<br>a Rhode Island Corporation, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE
## THE OPINIONS OF NANCY PLOWMAN

Pursuant to Fed.R.Evid. 702 as interpreted by the United States Supreme Court in

Daubert v. Merrell Dow Pharmaceuticals, Inc. 509 U.S. 579 (1993) and Kumho Tire Co., Ltd. V.

Carmichael, 526 U.S. 137 (1999) the Defendant/Counter-Claim Plaintiff, Plastic Development,

Inc. "PDI" hereby moves, *in limine*, for an order precluding the Plaintiff/Counter-Claim

Defendant, W.E. Andrews Co., Inc. ("Andrews") from introducing evidence through its disclosed

expert Ms. Nancy Plowman.  The evidence at issue is intended to rebut PDI's experts,  Mr. Neal

Kelly and Ms. Mary McCann.  However, it is PDI's position that Ms. Plowman is not qualified to

criticize the expertise of Mr. Kelly and Ms. McCann.  PDI also moves to preclude any testimony

of Ms. Plowman as to the cause of the defects and any documents on which she relies since she

lacks the necessary expertise to render an opinion and she has failed to conduct any requisite

testing in order to render such an opinion.

In support of this motion PDI represents the following:

1.      Ms. Plowman was disclosed as an expert by Andrews. She rendered a preliminary opinion in June, 2003 and a final report on July 14, 2003. Ms. Plowman was deposed by PDI on July 24, 2003. According to her testimony at deposition and her curriculum vitae, Ms. Plowman purports to be an expert in graphic arts. Significantly, she is not an expert in the field of chemistry or microscopy. Notwithstanding this distinct lack of expertise, Ms. Plowman has seen fit to opine that packaging by PDI was the sole cause of the defects to the coin inserts, the central issue in dispute.

PDI will demonstrate that Ms. Plowman essentially misunderstood the purpose of the protective coating and, as such, her testimony and opinions are irrelevant. It appears that Ms. Plowman, from a graphic arts perspective, presumed that the purpose of the aqueous coating was to impede "blocking" which, in the printing industry, is a term used to describe a drying process of ink and coating. She also appears to have been interested only in the surface features and has ignored the subsurface characteristics of the coin inserts. Moreover, she conducted absolutely no tests on the coin inserts. PDI represents that the stated purpose under the contract between the parties was that the press sheet strips were to protect the coin inserts from scratches and marring. Ms. Plowman completely ignores this contractual purpose.

As to her criticism of Ms. McCann, Ms. Plowman acknowledged that she is not experienced in the field of microscopy and that her experience in viewing printing through a

2

microscope is limited.  In fact, when Ms. Plowman requires services akin to those provided by

Ms. McCann in her own day to day work, Ms. Plowman out sources those jobs. The microscope

that Ms. Plowman uses is irrelevant to the work done by Ms. McCann because it lacks sufficient

intensity.  Ms. Plowman has demonstrated an obvious misunderstanding of the use of a light

microscope in order to determine a material's characteristics.  At the other extreme, her

suggestion that a scanning electron microscope was an appropriate tool is another significant

manifestation of her lack of expertise in that a scanning electron microspore would not depict

with any form of clarity or color the information sought by Ms. McCann.

    As to Mr. Kelly, Ms. Plowman is not an expert in chemistry, adhesive coating or quality

control.  Notwithstanding this fact, she has attempted to criticize Mr. Kelly's' methodology.

Furthermore, she herself had never tested the product nor did she have the product tested by

others.  Her summary conclusions are unreliable and without proper foundation.

### CONCLUSION

    In order to be admissible, all expert testimony must be relevant and reliable.  Fed. R.

Evid. 702, Kumho Tire Co., Ltd. V. Carmichael, 526 U.S. 137, 147 (1999).  Furthermore, the

proponent of expert testimony has the burden of demonstrating that such expert testimony is in

fact relevant and reliable.  The opinions of Ms. Plowman are not grounded on sufficient facts or

data nor are they the product of reliable principles and methods that are within her area of

expertise.  Accordingly, she should be barred from (a) rendering any opinions as to the opinions

3

of Mr. Neal Kelly and Ms. Mary McCann; and (b) proffering an opinion as to the source of the defect on the coin inserts.

WHEREFORE, the Defendant Counterclaim Plaintiff, PDI, request that the Court grant its Motion *in Limine* and

a)    bar Nancy Plowman from offering any opinions as to the reports, conclusions and testimony of Mr. Neal Kelly; and

b)    bar Nancy Plowman from offering any opinion as to the reports, conclusions and testimony of Ms. Mary McCann; and

c)    granting such other and further relief as the Court deems just and equitable.

Dated: April 19, 2004.

Respectfully submitted,

PLASTIC DEVELOPMENT, INC.

By_____
Neil F. Murphy, Jr.
Murphy, Laudati & Kiel, P.C.
270 Farmington Avenue, Suite 360
Farmington, CT 06032
Fed. Bar No. ct 08381
Phone: 860.674.8296
Facsimile: 860.674.0850

4

15

## Plaintiff's Written Statement In Lieu Of Opening Statement

On May 23, 2000, Plaintiff W.E. Andrews and Defendant, Plastic Development, Inc., entered into a contract for the printing and delivery by Andrews of press strips (the "Press Strips") that Plastic Development would die cut and use in its assembly of coin holders for the United States Mint (the "Mint"). Under the Contract, Plastic Development agreed to pay Andrews $119,820.82 for the Press Strips along with the cost of Andrews' proofs.

Pursuant to the parties' contract, Plastic Development ordered 50,000 Press Strips of "State Quarters" for a total of 900,000 inserts and 61,000 Press Strips of "Proof Sets" for a total of 1,098,000 inserts. The evidence will show that, from June 19, 2000 through August 15, 2000, Andrews printed and shipped the Press Strips from its plant in Manchester to Plastic Development's plant in Pawtucket, Rhode Island, where it accepted delivery of the Press Strips. Shortly after each delivery, Plastic Development inspected and then used the Press Strips in its production of the coin holders. The evidence will show that Plastic Development die-cut and then glued the die-cut Press Strips on to pieces of styrofoam, thus forming coin holders. Plastic Development then packaged and shipped the fully assembled coin holders from Rhode Island to the Mint's San Francisco facility.

On July 29, 2000, Andrews sent Plastic Development an invoice for $121,011.93 for the printing of the Press Strips and freight charges, pursuant to the Contract. On July 31, 2000, Andrews sent Plastic Development an invoice for $10,016.53 for press proofs, a change order charge, and freight charges. Despite Plastic Development's inspection, acceptance, alteration and use of the Press Strips and its receipt of Andrews's invoices for its performance under the contract, Plastic Development has not paid Andrews anything. Andrews intends to establish that Plastic Development's failure to make any payments to Andrews constitutes a breach of the parties' contract and that Plastic Development must pay Andrews for its acceptance and use of the Press Strips.

Plastic Development's defense to these claims is that it revoked its acceptance of the Press Strips and that it properly notified Andrews that the Press Strips were defective. Andrews expects the evidence to show otherwise. You will hear testimony that, contrary to Plastic Development's claims, it acted in a manner completely consistent with a buyer who did not believe that the seller breached the contract and, in fact, defended the seller to third parties. The evidence will show that over one year after the Mint rejected the coin holders in August, 2000, Plastic Development not only sought Andrews' help in making a claim against Plastic Development's insurance carrier, but also refuted the carrier's allegation that there was damage to the Press Strips due to printing problems. The evidence will show that Plastic Development never advised Andrews that it felt that the coating on the Press Strips was insufficient or that the Mint's rejection was due to any nonconformity caused by Andrews. The evidence will show this lack of notice is fatal to Plastic Development's defense.

Plastic Development also contends that Andrews breached the parties' contract by providing it with Press Strips which were defective. Plastic Development contends that the coating was plagued by a latent defect of being too thin. Thus, it seeks millions of dollars in lost profits from the mint based on its contention that Andrews providing Press Strips of "insufficient quality." However, the evidence will not support Plastic Development's claim. You will hear testimony that the Press Strips were shipped from Connecticut to Rhode Island and arrived at Plastic Development's plant

A0063993.WPD

with no scratches.  You will hear testimony from Plastic Development's Executive Vice President, Normand Thibaudeau, which will establish that Plastic Development inspected and accepted every single Press Strip at issue.  You will also hear him testify that once the company accepted the Press Strips, it used them in their manufacturing process to produce the coin holders.  You will also hear testimony that Plastic Development employed scores of employees whose only job was to inspect the outgoing coin holders for defects, that the coin holders did not contain any noticeable defects, that Plastic Development packed the coin holders and shipped them cross country, and that it was only after they arrived in San Francisco that a small fraction of the coin holders exhibited evidence of some scratches.

You will not hear any credible testimony to support Plastic Development's claim that the cause of the scratches was because the coating on the Press Strips was too thin.  Rather, you will hear evidence which establishes that the only reason that some of the coin holders were scratched was because Plastic Development did not pack them properly.

At the conclusion of this trial, Andrews expects that it will have demonstrated with great clarity that it fully performed its obligations under the contract with Plastic Development, that the Press Strips were sufficiently and properly coated, that Plastic Development improperly packed them for shipment across the country to the Mint, and that the scratched that were evident on the complete coin holders upon arrival in San Francisco were not caused by Andrews' application of the coating.  Rather, the evidence will show that the scratches were due to Plastic Development's failure to pack the coin holders tight enough to prevent them from rubbing against each other.  As a result, the evidence will show that Plastic Development breached its contract with Andrews, that it must pay Andrews at the contract rate, and that its counterclaim for damages caused by Andrews' purported breach will fail.

16

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| W. E. ANDREWS CO., INC., | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff | : | 3:02 CV 599 (CFD) |
| | : | |
| VS. | : | |
| | : | |
| PLASTIC DEVELOPMENT, INC., | : | |
| | : | |
| Defendant | | |

## STATEMENT IN LIEU OF OPENING STATEMENT

The lawsuit that brings us here today was brought by the Plaintiff, W.E. ANDREWS CO., INC. ("ANDREWS") against the Defendant, PLASTIC DEVELOPMENT, INC. ("PDI"). Both the Plaintiff and the Defendant agree that there was a contract between them in which Andrews agreed to provide press sheet strips to PDI, which strips would serve as the tops and bottoms of coin inserts which PDI produced for the U.S. Mint.

In its complaint, Andrews claims that PDI accepted and used the press sheet strips in the calendar year 2000 to produce approximately two million inserts and has failed to pay Andrews for those inserts. PDI has responded that while some of the press sheet strips were used by it and eventually accepted by the U.S. Mint, that as a result of latent defects, the last shipment of inserts was rejected by the U.S. Mint and it blames Andrews for the rejection and substantial lost profits for the year 2000 and for the remainder of the project until the year 2008. It has therefore filed what is known as a counterclaim in which it alleges that it has been damaged by Andrews's breach of contract.