UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| W.E. ANDREWS CO., INC., <br> a Georgia Corporation, <br><br> Plaintiff, <br><br> v. <br><br> PLASTIC DEVELOPMENT, INC., <br> a Rhode Island Corporation, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) No. 302-CV-00599 (CFD) <br> ) <br> ) <br> ) <br> ) <br> ) |

**PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE**
**THE OPINIONS OF NEAL KELLY**

Plaintiff, W.E. ANDREWS CO., INC ("Plaintiff"), moves this Court *in limine* to exclude certain testimony and opinions of Defendant's expert, Neal Kelly. In support of its motion, Plaintiff states as follows:

**I.  Background**

1.  On May 14, 2003, Defendant produced the Report (Exhibit 'A') of its expert, Neal Kelly ("Kelly") and disclosed Kelly as an expert pursuant to Fed. R. Civ. P. 26.

2.  On May 28 and 29, 2003, Plaintiff deposed Kelly.

3.  In his Report and at his deposition (Exhibit 'B'), Kelly criticized both the manner in which Plaintiff applied the aqueous coating to the Press Strips as well as Plaintiff's overall quality control efforts. In offering these criticisms, Kelly offered the following specific opinions in his Report:

- "There was insufficient quality control performed by the printer W.E. Andrews, on the Starkote AQ-520 coated surface. If a reasonable amount of quality control were performed on a coated web such as this filled styrene, with ink layers and an

A0062219.WPD

- overprinted protective layer, then potential defects would likely be found." (Kelly Report, p.6)

- "The data at this point, along with years of experience in evaluating coatings, suggested that the Kelstar lacquer may have been coated and dried improperly or in too thin a layer."

- "This particular styrene with its large filler particles should not have been used for this critical application, with such a thin lacquer coat weight. Either the filled styrene plastic should have been calendared to a smooth surface before coating, or the overprint lacquer should have been applied at a heavier coat weight."

4. As shown below, these opinions should be barred.

## II. Standard of Admissibility

5. In order to be admissible, all expert testimony must be relevant and reliable. Fed.R.Evid. 702; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

6. The proponent of expert testimony has the burden of demonstrating by a preponderance of the evidence that the testimony satisfies the above elements. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 n. 10 (1993).

7. Evidence is relevant if the testimony "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 264 (2nd Cir. 2002). Thus, even reliable testimony may be barred if it does not meet the standard for relevance. *Daubert*, 509 U.S. at 597.

8. Conversely, even relevant testimony may be barred if it does not satisfy Rule 702's reliability analysis. *Amorgianos*, 303 F.3d at 267. In this inquiry, a district court should consider the indica of reliability identified in Rule 702, namely 1) that the testimony is grounded on sufficient

facts or data; 2) that the testimony is the product of reliable principles and methods; and 3) that the witness has applied the principles and methods reliably to the facts of the case. *Id.* at 265, quoting Fed.R.Evid. 702.

9. For a court to determine whether an expert's testimony is reliable, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is valid. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). The factors to make this determination include: 1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) a technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and 4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. *Amorgianos*, 303 F.3d at 266, citing *Daubert*.

10. While the *Daubert* inquiry is a flexible one, it is critical that an expert's analysis be reliable at every step to warrant admissibility. *Id.* at 267. Thus, "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" *Id.* quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3rd Cir. 1994).

### III. Kelly's criticism of Plaintiff's quality control efforts is unreliable

11. In his Report, Kelly criticized Andrews' quality control efforts, concluding that "there was insufficient quality control performed by the printer W.E. Andrews, on the Starkote AQ-520 coated surface. If a reasonable amount of quality control were performed on a coated web such as this filled styrene, with ink layers and an overprinted protective layer, then potential defects would likely be found."

12. However, at his deposition, Kelly offered the following testimony regarding Andrews' quality control:

```
 4   Q.  And in your last paragraph you state, "It is
 5   the opinion of Adhesive & Coating Technology," which is
 6   you --
 7   A.  Correct.
 8   Q.  -- "that there was insufficient quality
 9   control performed by the printer, W.E. Andrews, on the
10   Starkote AQ-520 coated surface.  If a reasonable amount
11   of quality control were performed on a coated web such
12   as this filled styrene with ink layers and an
13   overprinted protective layer, then potential defects
14   would likely be found."  What is a reasonable amount of
15   quality control, in your opinion?
16   A.  At least some test to evaluate the durability
17   of the surface.
18   Q.  And do you have any knowledge as to whether
19   W.E. Andrews performed such a test?
20   A.  I have not seen any tests that they
21   performed.
22   Q.  You don't know either way?
23   A.  I have not seen any tests that they
24   performed.
                      * * *
 1   Q.  Do you know if they did perform tests?
 2   A.  No, I do not.
 3   Q.  And when you're referring to a coated web,
 4   you're not referring -- again, you're referring to the
 5   roll of styrene?  Is that what you're referring to?
 6   A.  A coated web such as this filled styrene,
 7   yes.
 8   Q.  You're saying there was insufficient quality
 9   control -- that there was insufficient quality control
10   performed by Andrews, but you're also saying that you
11   have no idea whether or not they performed any quality
12   control, correct?
13   A.  Yes. (Kelly deposition, pp. 150-51)
```

13. Kelly plainly states that he has no idea what, if any, quality control Andrews

conducted, but nonetheless criticizes these unknown efforts. Clearly, Kelly's opinion that Andrews did not have sufficient quality control is not grounded on any, let alone sufficient, facts or data. Accordingly, it fails to meet Rule 702's reliability analysis and should be barred.

### IV. Kelly's opinion that the coating was improperly applied is unreliable

14. Kelly's opinions as to the coating being improperly applied should be barred because they are unreliable. In his report, Kelly notes that he performed three tests on the coin holders at issue and other coin holders that the mint had previously accepted, comparing the results. Specifically, Kelly performed a coefficient of friction test, a "Pencil Scratch Hardness Tester," and an abrasion test "devised to recreate marks similar to the rejected surface marks." After performing these tests, Kelly's report states that "[t]he data at this point, along with years of experience in evaluating coatings, suggested that the Kelstar lacquer may have been coated and dried improperly or in too thin a layer."

15. Despite reaching this conclusion, Kelly's report and his deposition testimony clearly establish that the first two tests did not establish a failure in the coating. Rather, Kelly relies on the third test, in which he states that "the mechanism for creating defects was apparently different for the two different coatings."

16. At his deposition, Kelly expounded on this tepid opinion, conceding that his abrasion test did not lead him to conclude there was too thin a coating, but rather that "too thin a coating could have been one possibility of contributing to the defect." (Kelly dep. at 102/14-21) This opinion must be barred as unreliable for a myriad of reasons.

17. First, Kelly conceded that his abrasion test was not performed until August 2002 - two years after the coin holders were manufactured. Moreover, Kelly conceded he had no idea whether

the coin holder samples he tested in 2002 were in the same condition in 2000. In fact, Kelly conceded he does not know if the coin holders even existed in 2000. (Kelly dep. at 153) Thus, as an initial matter, Kelly cannot testify as to what effect the passage of time had on the samples and whether they were even in the same condition as they were when they arrived at the Mint in 2000.

18.   Second, the methodology Kelly employed to perform his abrasion test falls far short of meeting the stringent requirements of *Daubert*. Rather than performing an abrasion test that is considered authoritative in the coating industry, such as the Sutherland Rub Test (Kelly dep. at 95), Kelly "devised" an abrasion test (Kelly dep. at 77). Thus, Kelly simply rubbed two coin holders against each other with his hands, using a back and forth motion of approximately one-eighth of an inch ("I arbitrarily picked a small motion of about an eighth of an inch"; Kelly dep. at 83) while placing different weights on the pieces. (Kelly dep. at 82) In performing this test, Kelly conceded he arbitrarily picked the time frame ("Have to start somewhere"; Kelly dep. at 83), and that he does not know whether he exerted any force on the coin holders during the test in addition to the weights (despite trying not to)(Kelly dep. at 84-85). Moreover, Kelly stated that his findings were based on an *approximate*, rather than exact, number of strokes (Kelly dep. at 84). Worse yet, Kelly's lack of notes of the tests he supposedly performed, rendered him unsure of exactly what tests he performed:

```
 4    Q.  Would it be logical to conclude, then, that
 5   you did not perform the test on the unlaminated styrene
 6   or Yupo?
 7    A.  No, it would not be logical to conclude Neal
 8   Kelly did not do that. It would be logical to conclude
 9   that he might have done it and didn't record it as a
10   preliminary investigation before I designed the test,
11   for instance.
12    Q.  Would these results that you have listed
13   in your report also -- would these be results
14   for -- they're obviously results for the completed coin
```

```
15  holders, correct?
16     A.  Yes.
17     Q.  How do we know if they're results for the
18  unlaminated pieces if we're not sure that you even
19  performed the test on the unlaminated pieces?
20     A.  We don't know. (Kelly Dep. at 88).
```

19. Kelly's "devised" abrasion test clearly is unreliable because it fails to satisfy any of the *Daubert* factors for reliability. First, *Daubert* requires that an opinion be testable. Clearly, it is impossible for anyone, including Kelly himself, to test the reliability of the abrasion tests he performed with the weights since: 1) he is unsure as to which samples he even tested: 2) he simply rubbed two coin holders together in a back and forth motion of approximately 1/8"; 3) he simply counted an approximate number of back and forth strokes; and 4) he is unsure if he exerted any force on the coin holders in addition to the weights. Second, this "devised" test has not been subjected to peer review since Kelly conceded he "improvised" the test (Kelly dep. at 95). Third, Kelly himself is unsure as to the actual number of times he rubbed each sample and whether he applied a consistent amount of force to the coin holders during his test. Thus, there was no standard controlling the technique's operation, as required by *Daubert*. Fourth, as Kelly conceded, because he improvised, Kelly's technique clearly has not gained acceptance in the scientific community. (Kelly dep. at 95)

20. Kelly's opinions are unreliable also because, as shown below, he incredibly conceded that the only coin holders he examined and performed tests on were those that the mint accepted. Therefore, any conclusions of deficiencies in the coating are necessarily unreliable since they relate to pieces that were not considered defective by anyone.

21. An expert's testimony is inadmissible if there is too great an analytical gap between the data and the opinion proffered so that the opinion is "connected to the existing data only by the

ipse dixit of the expert." *Amorgianos*, 303 F.3d at 266. Here, Kelly's conclusions are based on unreliable methodology, which cannot be tested, and should be barred.

## V. Kelly's criticism of the use of styrene and the amount of coating used are unreliable

22. In his Report and at his deposition, Kelly also criticized the amount of coating Andrews applied to the styrene, stating: "This particular styrene with its large filler particles should not have been used for this critical application, with such a thin lacquer coat weight. Either the filled styrene plastic should have been calendared to a smooth surface before coating, or the overprint lacquer should have been applied at a heavier coat weight."

23. Kelly's criticism is based, in large part, on the data sheet provided by Kelstar, the company that manufactured the coating. Kelly criticizes the amount of coating Andrews applied by taking the suggested coating mileage supplied by Kelstar, using those numbers to calculate the expected thickness of the coating, and comparing it to the coating thickness measured by Mary McCann. According to Kelly, the "data sheet for the Kelstar coating recommends it be applied at one pound per 1,000 square feet." (Kelly Report, p.5) Kelly proceeds to calculate the thickness of the coating that one could expect to view if Andrews had applied this amount recommended by Kelstar. Kelly deduces that because Mary McCann's photographs of the coin holders shows a coating thickness that is less than his calculations, Andrews should have applied a heavier coat weight. (Kelly Report, p.5).

24. Kelly's criticism of the amount of coating applied is unreliable because the premise off which he is operating is wrong. Kelly testified that he assumed that the recommended coat weight was a dry coat weight. In other words, the coating should be applied so that there is one pound of coating per 1000 square feet as measured after the coating dries on whatever surface to

which it is applied. (Kelly dep. at 126). This is incorrect. Jeff Jacobs and Tim Pigden, employees of Kelstar (the company that manufactured the coating and creating the recommended coat weight), both testified unequivocally that the suggested coat weight is a wet, not dry, coat weight. (Jacobs dep., Exhibit 'C', at 36-37, 41-42; Pigden dep., Exhibit 'D', at 37). Thus, the calculations using a wet coat weight would yield a lower dry thickness because, during the drying process, water evaporates from the coating, making it thinner. (Jacobs dep. at 37) Thus, Kelly's conclusions are based on improper assumptions and, therefore, are unreliable.

### VI.   Kelly's opinions are irrelevant

25.   Even if the Court concludes that Kelly's methodology was reliable, all of Kelly's opinions should be barred because they also fail to meet the relevancy prong of *Daubert* and its progeny.

26.   Kelly plainly concedes that all of the testing he performed on the coin holders was done on samples that the mint *accepted*. Like a doctor operating on a healthy patient, Kelly offers criticisms of coin holders with which there were no problems. In an abundance of caution, Kelly was asked on three separate occasions whether he tested rejected samples and, each time, Kelly reiterated he did not:

```
7    Q. So you performed none of your tests on the
8    rejected samples?
9    A. I did not try to generate defects on already
10   defect-showing samples, no. (Kelly Dep. at 57)
```

\* \* \*

```
5    Q. And the reason for this -- Well, what you
6    selected as your control were samples that were
7    accepted by the Mint?
8    A. That was my understanding.
```

```
 9   Q.  And you compared them to styrene samples that
10  were also accepted by the Mint?
11   A.  That were rejected by the Mint.
12   Q.  That's not what you testified to. What you
13  testified to -- And maybe you were mistaken, but what
14  you testified to was that you tested two sets of
15  samples, one, samples with no visible defects --
16   A.  Correct.
17   Q.  -- that were accepted by the Mint, and, two,
18  unlaminated coated styrene samples?
19   A.  That's correct. And rejected by the Mint
20  fully laminated -- No, I did not test rejected by the
21  Mint fully laminated. I did not. So you're correct. (Kelly dep. at 59)
```

\* \* \*

```
14   Q.  So the abrasion test didn't lead you to that
15  conclusion; is that correct?
16   A.  Didn't lead me to which conclusion?
17   Q.  That there was too thin of a coating.
18   A.  No.
19   Q.  Did it lead you to any conclusion?
20   A.  Yes. That too thin a coating could have been
21  one possibility of contributing to the defect.
22   Q.  And that was despite the fact that you
23  performed the test on samples that were actually
24  accepted by the Mint as opposed to rejected by the
 1  Mint?
 2   A.  Yes. (Kelly Dep. at 102-03)
```

27.     Such testimony is irrelevant to the rejected coin holders and should be barred.

## VI.   Conclusion

28.     "[A]n expert's report that does nothing to substantiate his opinion is worthless, and therefore inadmissible." *Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir. 1997). Kelly's criticism of Andrews' quality control is unfounded and his tests are unreliable and irrelevant. Despite these glaring deficiencies, Kelly nonetheless sees fit to opine on these subjects. However, in doing so, Kelly asks the Court to take these opinions on blind faith because he is unable

to provide any factual basis for them. As such, his opinions are "worthless, and therefore inadmissible."

29. For Kelly's opinions to be admissible, he is required to provide a factual basis for them or have them barred. "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989). Kelly provided no support for his conclusions and wholly failed to establish that they were the result of a scientific method. Thus, his opinions amount to nothing more than unsupported speculation which must be excluded.

WHEREFORE, Plaintiff requests that the Court grant his Motion *in Limine* and

a) bar Neal Kelly from offering any opinions criticizing the application of the coating on the coin holders;

b) bar Neal Kelly from offering any opinions on the condition of the rejected coin holders rights;

c) bar Neal Kelly from offering any opinions on Plaintiff's quality control efforts; and

d) granting such other and further relief as the Court deems just and equitable.

Respectfully submitted,

W.E. ANDREWS CO., INC.

By: _____
Jeffrey L. Widman, ct24236
Shaw Gussis Fishman Glantz
   Wolfson & Towbin LLC
321 N. Clark, Suite 800
Chicago, IL 60610
Ph: (312) 541-0151
Fax: (312) 980-3888