UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

W.E. ANDREWS CO., INC.,          )
a Georgia Corporation,           )
                                 )
             Plaintiff,          )
                                 )
       v.                        )    No. 302-CV-00599 (CFD)
                                 )
PLASTIC DEVELOPMENT, INC.,       )
a Rhode Island Corporation,      )
                                 )
             Defendant.          )

**PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE
THE OPINIONS OF THERESA RENNER**

Plaintiff, W.E. ANDREWS CO., INC ("Plaintiff"), moves this Court *in limine* to exclude

certain testimony and opinions of Defendant's expert, Theresa Renner.  In support of its motion,

Plaintiff states as follows:

**I.    Background**

1.    On May 29, 2003, Defendant produced the Report of its expert, Theresa Renner

("Renner") and disclosed Renner as an expert pursuant to Fed. R. Civ. P. 26.

2.    On June 26, 2003, Plaintiff deposed Renner.

3.    In both her deposition (Exhibit 'A') and her Report (Exhibit '1' to her deposition),

Renner calculated Defendant's past and future profits, which Defendant claims it lost as a result of

Plaintiff's purported breaches.  Renner opined that Defendant's lost profits total $9,730,477,

calculated as $3,253,934 from 2000 through 2003 and $6,476,544 from 2004 through 2009.

4.    Renner's opinions are wrought with incorrect math, unfounded estimations, and

arbitrary assumptions which render them so unreliable that she should be barred from testifying.

A0063600.WPD

## II.    Standard of Admissibility

5.    In order to be admissible, all expert testimony must be relevant and reliable. Fed.R.Evid. 702; *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999).

6.    The proponent of expert testimony has the burden of demonstrating by a preponderance of the evidence that the testimony satisfies the above elements. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 n. 10 (1993).

7.    Evidence is relevant if the testimony "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 264 (2nd Cir. 2002). Thus, even reliable testimony may be barred if it does not meet the standard for relevance. *Daubert,* 509 U.S. at 597.

8.    Conversely, even relevant testimony may be barred if it does not satisfy Rule 702's reliability analysis. *Amorgianos,* 303 F.3d at 267. In this inquiry, a district court should consider the indica of reliability identified in Rule 702, namely 1) that the testimony is grounded on sufficient facts or data; 2) that the testimony is the product of reliable principles and methods; and 3) that the witness has applied the principles and methods reliably to the facts of the case. *Id.* at 265, quoting Fed.R.Evid. 702.

9.    For a court to determine whether an expert's testimony is reliable, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is valid. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). The factors to make this determination include: 1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) a

A0063600.WPD                    2

technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and 4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. *Amorgianos*, 303 F.3d at 266, citing *Daubert*.

10.     While the *Daubert* inquiry is a flexible one, it is critical that an expert's analysis be reliable at every step to warrant admissibility. *Id.* at 267. Thus, "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" *Id.* quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3rd Cir. 1994).

### III.     Renner's opinions of past lost profits are unreliable and should be barred

11.     In her Report and at her deposition, Renner opined that Defendant lost profits from 2000 through 2003 in the amount of $3,253,934.  However, Renner also conceded that many of the factors she considered were incorrect and/or did not comport with reality.  Renner also conceded she calculated various numbers based on instructions from her client, rather than her own beliefs.

12.     The most egregious example of Renner's unreliable conclusions is her concession that, in calculating the number of red coin holders[1] that Defendant would have sold to the U.S. Mint (the "Mint") in 2001, she did not consider the actual number of red inserts that the Mint purchased that year from other vendors.  Rather, despite possessing this information, Renner based her calculations on her client's inaccurate sales projections. (Renner dep. at 48).  The result is that her opinion assumes that Defendant would have sold 1,948,050 inserts to the Mint in 2001.  This assumption was based on averaging the actual amounts that Defendant had sold or shipped to the

---

[1]Renner's Report refers to the coin holders as inserts and they will be referred to as such in this motion.

Mint in 1999 and 2000 (Renner dep. at 48).

13.     However, Renner conceded that at the time she rendered this opinion, she knew that her calculation was wrong because it exceeded the total number of red inserts that the Mint ordered in 2001 from all vendors by more than 200,000 pieces! (Renner dep. at 62)  As Exhibit 5, page 3 of her deposition shows, the Mint only ordered 1,714,800 red inserts in 2001.  Thus, Renner knowingly included overinflated sales numbers in her calculations of lost profits for 2001.

14.     Where, as here, lost profits are at issue, "an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding" a party's future prospects. *Supply & Building Co. v. Estee Lauder International, Inc.*, 2001 WL 1602976 at *4 (S.D.N.Y. 2001) citing *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2nd Cir. 1996).  Thus, if an expert's opinions are based on unrealistic assurances from his client, rather than available records, his testimony is unreliable and, therefore, inadmissible. *Id.*

15.     Clearly, Renner's opinion as to Defendant's past profits, in which she knowingly included incorrect overinflated sales estimates should not, indeed cannot, be admitted at trial.  They are based, not on available records, but rather unrealistic assurances from her client.  Therefore, they are unreliable and inadmissible under *Daubert*.

16.     Renner's calculations of past profits for 2000 are also unreliable.  As she conceded at her deposition, Renner's 2000 lost profit calculation is wrong because it does not include a cost component that Defendant told her to omit that she would have otherwise included.

17.     In calculating Defendant's lost profits for 2000, Renner included all the costs of producing the coin holders, but omitted printing costs which reflect the unpaid amounts Plaintiff seeks.  Renner testified that she omitted the printing costs, not because she thought it was an accurate

way to calculate damages, but rather simply because her client instructed her to do so. (Renner dep. at 43).  In fact, Renner plainly conceded that, but for her client's instructions, she would have deducted printing costs from the gross sales figure that she included in her lost profit analysis. (Renner dep. at 43).

18.    Where, as here, an accountant does not calculate lost profits according to her own beliefs, but rather based on the instructions of her client, her opinions must be considered unreliable and lacking foundation. *See JMJ Enterprises, Inc. V. Via Veneto Italian Ice, Inc.*, 1998 WL 175888 at *10 (E.D.Pa. 1998)("A reasonable accountant does not report certain expenses, and choose to omit other, like expenses.") Accordingly, Renner's lost profit calculations for 2000 are unreliable and, therefore, inadmissible.

19.    An additional mistake that Renner conceded she made was her incorrect calculation of the projected coating costs for the inserts.  Renner conceded that the cost she assigned for coating as part of the cost component of her analysis was simply wrong since it was too high, thus rendering her net profit numbers incorrect. (Renner dep. at 126-7).

20.    Another unfounded component of Renner's calculations relates to the retirement of certain debt by Defendant.  Renner's opinions assume that, had Defendant earned profits from the Mint in 2000 and 2001, it would have paid off debt resulting from a mortgage on Defendant's property. (Renner dep. at 16-17).  However, in making this assumption, Renner conceded she did not know whether the mortgage contained a prepayment penalty (Renner dep. at 20-21), she did not consider this issue (Renner dep. at 20-21) and she arbitrarily picked amounts that Defendant would have paid to lower the mortgage amount. (Renner dep. at 30-32).  In fact, Renner testified that her calculation that Defendant would have paid its mortgage down by $228,000 in 2002 was nothing

more than an arbitrary assumption. (Renner dep. at 31-32)

21.    Similarly, Renner's assumption that Defendant would have incurred $271,067 in printing costs in 2001 was based on nothing other than her client telling her that is what it would have cost Defendant. (Renner dep. at 135) When pressed, Renner conceded she merely assumed this was a reasonable number and that she did nothing to confirm its accuracy. (Renner dep. at 135)

22.    In addition to the foregoing errors, Renner also made numerous unfounded assumptions relating to the cost of producing the inserts.  For example, Renner opined that Defendant's overhead would decrease from 2001 to 2002 based on speculation that the company would have purchased a camera that would replace inspectors. (Renner dep. at 170-71) Again, the sole basis for this assumption was merely the Defendant telling her that it would have purchased this camera for $23,500. (Renner dep. at 190)

23.    Similarly, in calculating production costs in 2000, Renner assumed that worker productivity would increase "due to assembly machine improvements." (Renner dep. at 147).  When asked what this referred to, Renner again conceded she did not know what those improvements were and that her client simply instructed her to make that assumption. (Renner dep. at 148).  Once again, Renner's calculations are plagued by the inclusion of the completely baseless, speculative desires of her client.  Renner has absolutely no idea whether her client is remotely accurate and she has done nothing to investigate these projections or even inquire as to the bases for them, Renner simply assumes her client is correct and adopts these assumptions as her own opinions.

24.    Worse yet, nearly half of Renner's past lost profit calculations are based on lost profits from sales of the blue inserts.  However, as she plainly recognized, the Mint never approved Defendant as a supplier of the blue inserts.(Renner dep. at 53)    Thus, she presupposes that

Defendant would have obtained this approval, netting it $1,445,579.00 in profits from 2001 through 2003. Renner incorporates the blue insert calculation in her Report notwithstanding the fact that this was a product Defendant has never sold and was never approved to sell to the Mint. Clearly, such an opinion is nothing more than wild speculation.

25.     In *JMJ Enterprises, Inc.*, the Court disallowed the plaintiff's expert, an accountant, to testify as to the plaintiff's lost profits because his methodology was unreliable. In so holding, the Court noted errors in his report, including the omission of certain expenses and estimates of future expenses, which were not based on any evidence or calculation. Thus, the court found that the plaintiff was "simply presenting their unrealistic hopes through the mouth of an expert. This conclusion follows from the conclusion that [the expert's] factual basis was inadequate and his methods were improper." *Id.*

26.     Similarly, in the case at bar, Renner's opinion of past lost profits is not based on any evidence, but rather unrealistic assumptions that do not comport with reality and incorrect calculations based on her client's desires, rather than her true beliefs. Thus, as in *JMJ Enterprises, Inc.*, Renner should be barred from testifying at trial as to Defendant's past lost profits.

**IV.    Renner's opinions of future lost profits are speculative, unreliable and should be barred**

27.     Not only are Renner's opinions of past lost profits unreliable, but her projections of future lost profits are unfounded and so speculative that she should be barred from offering her opinions on this topic also.

28.     The most blatant example of this is Renner's inclusion of lost profits for 2009. As she plainly acknowledged, the Mint's program is scheduled to terminate in 2008. (Renner dep. at 46). While Renner speculated that there may be some legislation that might extend the program

through 2009, she conceded she had no foundation for including lost profits for that year. (Renner dep. at 46-47). Thus, Renner included an additional $1,069,957.00 while simultaneously agreeing that said amount is entirely speculative. Such testimony clearly is inadmissible.

29.    Moreover, as she did with past lost profits, Renner improperly included speculative claims for future lost profits from the blue inserts. Adding insult to injury, she ignored the significant fact that blue insert orders dropped drastically from over 9 million pieces in 2001 to 6 million pieces in 2002 to a projection in May, 2003 that the Mint would order 4.8 million pieces in 2003.[2] Rather than incorporating this highly relevant, obvious downward trend, Renner simply averaged the three years and computed 25% of that number[3] for a total estimate of 1,717,630 blue inserts per year. However, as Renner's own notes make clear, she was concerned about future returns from the Mint being lower and asked Defendant if it was concerned that unit sales would decrease. (Renner dep. at 88-89, Renner Dep, Exhibit 5) Defendant responded by advising Renner not to take this into account. (Renner dep., Exhibit 5) Once again, rather than formulating her own opinion based on historical numbers showing a decline in sales, Renner simply did as she was told. Renner's willingness to once again turn a blind eye to the truth and calculate numbers that do not comport with the facts illustrates once more the speculative, unreliable nature of her "opinions," which, in reality, amount to nothing more than the unrealistic hopes of her client. As such, they should be barred.

30.    Even if the Court accepts the use of this average as a proper method, it cannot

---

[2]Plaintiff expects that the evidence will show that the mint's projections were wildly optimistic and that it only ordered 2.4 million blue inserts in 2003.

[3]Renner's basis for the 25% estimate is nothing more than Defendant's speculation; Renner conceded she did not know the basis for that estimate. (Renner dep. at 52)

overlook the fact that Renner's math is simply wrong. If the Court averages the blue insert numbers for 2001 through 2003 contained in Exhibit 5, it will see that 25% of the average, 6,868,533[4], is 1,717,133; not 1,717,630. While the difference is only 500 inserts per year, for a total overstatement of 4,000 inserts, Renner's math is simply wrong again. Combined with the multitude of other problems with her methodology, this is yet another indication of the unreliable nature of Renner's proposed testimony.

## CONCLUSION

31.    Renner's opinions are unreliable and lack foundation. Her calculations for every year from 2000 through 2009 are incorrect because they include: 1) $4,480,295 in profits for blue inserts; 2) $1,069,957 in profits for 2009; 3) incorrect calculations for the cost to produce inserts due to her mistake in the coating calculation and her omission of certain printing costs; 4) unfounded assumptions as to worker productivity, retirement of debt, and capital expenditures that ultimately might reduce costs; 5) overstated sales figures for 2001;and 6) wildly optimistic projections of future sales despite having doubts about the accuracy of those numbers.

32.    Because Renner's opinions are riddled with these mistakes and unfounded assumptions, her testimony lacks any reliability. Simply put, Renner's opinions do not satisfy the requirements set forth in Fed.R.Ev. 702 and *Daubert*. Accordingly, she should be barred from offering her opinions on lost profits at trial.

WHEREFORE, Plaintiff/Counter-defendant, W.E. ANDREWS, respectfully requests that this Court grant its motion *in limine* and bar Theresa Renner from offering any opinions as to Defendant's lost profits, pursuant to *Daubert*.

---

[4]9,623,200+6,115,200+4,867,200=20,605,600 and 20,605,600/3=1,717,133

Respectfully submitted,

W.E. ANDREWS CO, INC.

By: _____
Jeffrey L. Widman, ct24236
Shaw Gussis Fishman Glantz
    Wolfson & Towbin LLC
321 N. Clark, Suite 800
Chicago, IL 60610
Ph: (312) 541-0151
Fax: (312) 980-3888