# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

2004 SEP -1 P 12: 04
U.S. DISTRICT COURT

W.E. ANDREWS CO., INC.    )
a Georgia Corporation,      )
                          )
  Plaintiff,           )
                          )
v.                     )    CIVIL ACTION NO: 302-CV-00599 (CFD)
                          )
PLASTIC DEVELOPMENT, INC.  )
a Rhode Island Corporation,    )
                          )
  Defendant.         )

AUGUST 31, 2004

## OBJECTION TO PLAINTIFF'S MOTION IN *LIMINE* TO EXCLUDE TESTIMONY OF CERTAIN LOST PROFITS

The Defendant, PLASTIC DEVELOPMENT, INC. ("PDI") objects to the Plaintiff, W.E. ANDREWS CO., INC.'s, ("ANDREWS") Motion in *Limine* to exclude testimony regarding Defendant's lost profits from November, 2003 through 2008.[1] In support of this Motion, the Defendant respectfully states as follows:

1. Notwithstanding the incremental nature of the contract between the U.S. Mint and PDI, PDI had a reasonable business expectation to maintain furnishing inserts to the U.S. Mint for the entire duration of the quarter project, to wit: 1999 through 2008. Portions of testimony from Normand Thibaudeau, Sam Savage of the U.S. Mint and Robert Campbell of the U.S. Mint are attached hereto.

---

[1] For other reasons which have been explained to this Court, PDI is no longer pressing its lost profit for the year 2009.

2. Not only was Andrews aware of the ten (10) year duration of the contract between the U.S. Mint and PDI, but its representative, John Vesia, testified in his deposition and presumably will testify at trial, that he was aware of the ten (10) year duration of the relationship between PDI and the U.S. Mint and he sought to maintain a relationship with PDI for the nine (9) years from 2000 through 2008 because of its profits and because he wanted to expand his business to print on styrene. See December 19, 2002 deposition of John Vesia, Pages 38, 39 and 40 attached hereto as Exhibit A, March 29, 2003 Deposition of Sam Savage, Pages 25, 26 and 27 attached hereto as Exhibit B and March 19, 2003 Deposition of Robert Campbell, Page 20 attached hereto as Exhibit C.

3. It is well settled that any expert must rely upon facts and evidence in order to render an opinion.  The evidence will show the following:

    a.   the U.S. Mint's 50 State Quarter project was for a duration of ten (10) years.
    b.  Assuming PDI produced inserts that met the quality of the contract, both U.S. Mint Officials and PDI intended to have a business relationship for the ten (10) year duration of the project.
    c.  Andrews knew of the facts of a and b above and sought to do the printing for for the nine (9) years of the contract.

4. Given the factual background of paragraph 3 above, PDI's experts, Theresa Renner and Derek Johnson can, under the foregoing circumstances, properly assume that the relationship between the U.S. Mint and PDI would have been for a ten (10) year duration.

Based on the above, there exist sufficient facts to allow the claim by PDI for future lost profits to go to the jury. It is up to the jury to decide whether or not the Defendant has proven these facts and it is up to the jury to find the value of those damages. Since these are all questions of fact for the jury, they are not properly the subject of a Motion in Limine.

WHEREFORE, the Defendant in the above entitled action respectfully requests that this Court grant its objection and allow the testimony regarding Defendant's lost profits from November, 2003 through 2008.

DEFENDANT ,
PLASTIC DEVELOPMENT, INC.


Neil F. Murphy, Jr., ct08381
Murphy, Laudati & Kiel, P.C.
270 Farmington Avenue, Ste. 360
Farmington, CT 06032
Telephone:  (860) 674-8296
Facsimile:   (860) 674-0850
nmurphy.mlk@sbcglobal.net

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed via regular mail on August 31, 2004, to all counsel of record, as set forth below:

William S. Fish, Jr., Esq.
Attorney Elizabeth K. Andrews
Matthew A. Sokol, Esq.
Tyler, Cooper & Alcorn, L.L.P.
P.O. Box 1936
205 Church Street
New Haven, CT  06509

James R. Byrne, Esq.
Tyler Cooper & Alcorn, LLP
185 Asylum Street
CityPlace – 35th Floor
Hartford, CT 06103-3488

Jeffrey L. Widman, Esq.
Shaw Gussis Fishman Glantz Wolfson & Towbin, L.L.C.
321 N. Clark Street, Ste. 800
Chicago, IL 60610

Neil F. Murphy, Jr., Esq., ct08381

38

1      A    A sheet is 38-inch sheet cut down to a six-inch

2    strip by 20, 22 inches long.

3      Q    That answers my question.  Did Andrews expend

4    money in the development phase of this project?

5      A    Yes.

6      Q    And what would those expenses consist of?

7      A    All the press time, all the paper that we bought,

8    stock, ink.

9      Q    Is it fair to say that since the P & D period was

10   longer than normal that the costs were greater than one

11   might experience in this, or anticipate, rather?

12     A    I don't understand the question.

13     Q    Okay.  Was it more costly, the P & D process,

14   because of the length of time of it than it would have been

15   if it was shorter?

16     A    Yeah.

17     Q    Was there ever a time during production and

18   development that the project was considered to be not worth

19   it by Andrews?

20     A    No.

21     Q    And why was that, if you know?

22     A    Because we felt that we could make this product

23   work and it was a market for it.

24     Q    And presumably if you could make the product work

25   and you had a market, you could make a profit on your

NIZIANKIEWICZ & MILLER REPORTING SERVICES

Exhibit A

39

1    product, is that my understanding?

2        A    That's correct.

3        Q    What was the market to which you referred?

4        A    People who wanted things printed on plastic.

5        Q    So was it Andrews' intentions to use this

6    particular product as a beginning to selling this type of

7    product to a greater market?

8        A    No.

9        Q    When you say people who wanted something printed

10   on plastic, I'm trying to determine, and I understand from

11   your expression -- I will try it again.

12            Did you anticipate a market other than the Mint

13   for this particular -- for these strips?

14       A    No.

15       Q    So what was your understanding of the Mint's

16   willingness to eventually buy PDI's product and, in turn,

17   Andrews strips?

18       A    One more time.

19       Q    Was the PDI contract that it had between it and

20   the Mint explained to anybody at Andrews?

21       A    In detail?

22       Q    The length of time.  Let's try that.

23       A    Yes.

24       Q    And what was the length of time that you

25   understood PDI to be involved with the Mint under its


                NIZIANKIEWICZ & MILLER REPORTING SERVICES

40

1    contract?

2        A    Ten years.

3        Q    So is it fair to say that if Andrews could

4    satisfy PDI with the strips, PDI assumed it would have up to

5    ten years of selling strips to Andrews so that -- excuse me

6    -- Andrews would sell strips to PDI so PDI could sell them

7    to the Mint?

8        A    Yes.

9        Q    Okay.  Now was the ten-year duration part of

10   Andrews' reasons for undertaking this project in the first

11   place?

12       A    Something in printing that we look at as the big

13   carrot.  If there is a potential for increased business, for

14   future business, then yes.

15       Q    And when you indicated earlier the market, is

16   that part of what you were referring to, i.e., the increased

17   business in years going forward?

18       A    Yeah.  And printing on styrene.

19       Q    Okay.  So kind of a second reason for the P & D

20   justification was Andrews learning how to print on styrene

21   because there might be other customers out there who might

22   want that?

23       A    That's possible.  It's a tough question to

24   answer.  The reality is we gain knowledge from everything

25   that we do.  And if we gain knowledge that we can turn

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    the number of vendors that the Mint was working with

2    prior to PDI being selected?

3         A    No.   That was before my time.

4         Q    After PDI was selected, did you personally

5    feel the need to solicit anymore vendors for the

6    project?

7         A    Well that's -- it depends on the time.

8    What time would you want?

9         Q    Exactly. After -- between 1999 and August

10   31, 2000 did you personally feel the need to solicit

11   any other vendors to work on the coin project?

12        A    No. No.

13        Q    Why?

14        A    At that time period we felt we had two

15   adequate vendors. We had two sources of supply that we

16   could go to.

17        Q    Did you entertain the thought of going to

18   a third vendor?

19        A    No.

20        Q    Why is that, if there is an answer to it?

21        A    Yes, there is. In this case we have to

22   realize that there's a lot of time and money and

Exhibit B

1    effort that both the Mint and the vendor puts into

2    getting qualified. So we feel if it's not necessary

3    to have that additional vendor, it's certainly not --

4    doesn't make any sense to go through all the trouble

5    to go through the qualification process.

6         Q    So do you have an ideal number or did you

7    have an ideal number of vendors on this project?

8         A    Yes.

9         Q    And what was that?

10        A    Two.

11        Q    Were the two to have performed adequately

12   for you, would you realistically have suspected to

13   solicit third vendors during the lifetime of the

14   project?

15        A    No.

16        Q    And during the lifetime of the project I'm

17   going to define -- withdrawn.

18             What was the lifetime of the overall

19   project as you know it?

20        A    Ten years.

21        Q    And was this communicated to your vendors?

22        A    I didn't do it myself, but I'm sure -- I'm

1    sure ___ had been done.

2        Q     What were the ten years to the best of

3    your knowledge, the time period?

4        A     1999 to 2008.

5        Q     Okay.  And what was the intention of

6    production by the Mint, what was intended to have been

7    produced during the ten year period to the best of

8    your understanding?  With reference to the set.

9        A     That's -- that's kind of hard to answer

10   because the numbers have fluctuated due to the

11   economy. And we find sales have changed from year-to-

12   year, so it's hard to speculate what the entire

13   program--

14       Q     I'm not asking for the quantity of

15   numbers, but I'm asking for types. In other words, we

16   talked about 2 sets, one was quarters and one was --

17       A     Oh, the type of sets.

18       Q     Yes.

19       A     Yes. We have -- we have three different

20   types of proof sets.

21       Q     All right.  And would you describe them?

22       A     The first is the silver proof set, this

1      Q    Did you enter into a contract or have

2   occasion to enter into a contract with them?

3      A    Yes.

4      Q    What was the background of the dynamics of

5   that contract?

6      A    The contract was what we call an IDIQ,

7   which stands for indefinite delivery/indefinite

8   quantity contract, which simply means that the Mint

9   does not know exactly how many items they need under

10   the contract nor do they know exactly when they need

11   them. But during the life of the contract we will

12   place orders under the contract for quantities that

13   are required. And in the order it will specify when

14   they're needed and where they need to be delivered.

15      Q    Do you know what was anticipated in 1999

16   by way of going forward annually? Not a quantity but

17   a finite period of time? You mentioned earlier

18   something going into the year 2008.

19      A    Yes. We expected in 1999 to issue

20   contracts with vendors who would remain vendors

21   through the life of the 50 State Quarter Program.

22      Q    Now, with regard to PDI specifically, you

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C. 20005-3701        www.nealrgross.com

Exhibit C