# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| W.E. ANDREWS CO., INC.<br>a Georgia Corporation, | )<br>)<br>) | |
| Plaintiff, | )<br>) | |
| v. | )<br>) | CIVIL ACTION NO: 302-CV-00599 (CFD) |
| PLASTIC DEVELOPMENT, INC.<br>a Rhode Island Corporation, | ) )<br>)<br>) | |
| Defendant. | ) | AUGUST 31, 2004 |

## OBJECTION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF NEAL KELLY

The Defendant, PLASTIC DEVELOPMENT, INC. ("PDI") objects to the Plaintiff, W.E. ANDREWS CO., INC.'s, ("ANDREWS") Motion in *Limine* to exclude testimony from its expert, Neal Kelly. In support, of its objection the Defendant states the following.

## STANDARD OF REVIEW

In reviewing Motions In Limine based on the holding in *Daubert v. Merrill Dow Pharms*, 509 U.S. 579 (1993), "abuse of discretion is the proper standard by which to review district court's decision to admit or exclude scientific evidence". *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). Thus, it is well within the trial court's discretion to make such a ruling on proffered expert evidence and testimony. However,

> Trial judges must exercise sound discretion as gatekeepers of expert testimony under *Daubert*, [Plaintiff], however would elevate them to the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witnesses' soul – separating the saved from the damned. Such an inquiry would inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury.

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1045 ( 2nd Cir. 1995).

> Disputes as to the strength of his credential, faulted in his use of different etiology as a methodology, or a lack of textual authority for his opinions, go to the weight, not the admissibility, of his testimony. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional appropriate means of attacking shaky but admissible evidence.

*Id.* at 1044, citing *Daubert*, 509 U.S., 579 at 596; and see, *Amorgianos v. AMTRACK*, 303 F.3d 256, 266-67 (2202); *Zuchowicz v. U.S*, 140 F.3d 381, 387 (2d.Cir 1998); and *Campbell v. Metro Prop. & Casualty Inc. Co.*, 239 F.3d 179, 186 ( 2d.Cir. 2001)(any gaps or inconsistencies in reasoning leading to expert's otherwise admissible opinion...went to weight of evidence, not to its admissibility).

Here, the Plaintiff seeks improperly to exclude the testimony of Neal Kelly based on the claim that Mr. Kelly's testimony is unreliable. Such position is without merit and not based on the complete testimony as more fully discussed below.

## RELEVANT FACTS and ARGUMENT

Neal Kelly was properly disclosed as an expert on, *inter alia,* coatings and quality control. Mr. Kelly was deposed by the Plaintiff on two separate dates. However, and importantly, the Motion in Limine filed by the Plaintiff and the facts asserted therein are incomplete and inaccurate because (1) the Motion ignores the facts discovered during the first day of Mr. Kelly's deposition (a copy of the first 37 pages of Mr. Kelly's deposition is attached hereto); and (2) the Motion completely ignores the fact that Mr. Kelly signed

an affidavit (errata sheet) correcting typographical errors and clarifying portions of his

testimony as he is permitted to do in accordance with the federal and state rules

applicable to deposition testimony. A copy of Mr. Kelly's errata sheet affidavit is also

attached.

Additionally, the issues raised in the Plaintiff's Motion are issues that go the

credibility of the expert's testimony and testing criteria and not as to the admissibility of

it. These are issues squarely within the province of the jury.

WHEREFORE, the Defendant in the above entitled action respectfully requests

that this Court grant its objection and allow the testimony of Neal Kelly.

DEFENDANT ,
PLASTIC DEVELOPMENT, INC.

Neil F. Murphy, Jr., ct08381
Murphy, Laudati & Kiel, P.C.
270 Farmington Avenue, Ste. 360
Farmington, CT 06032
Telephone: (860) 674-8296
Facsimile:  (860) 674-0850
nmurphy.mlk@sbcglobal.net

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed via regular mail on August 31, 2004, to all counsel of record, as set forth below:

William S. Fish, Jr., Esq.
Attorney Elizabeth K. Andrews
Matthew A. Sokol, Esq.
Tyler, Cooper & Alcorn, L.L.P.
P.O. Box 1936
205 Church Street
New Haven, CT  06509

James R. Byrne, Esq.
Tyler Cooper & Alcorn, LLP
185 Asylum Street
CityPlace – 35th Floor
Hartford, CT 06103-3488

Jeffrey L. Widman, Esq.
Shaw Gussis Fishman Glantz Wolfson & Towbin, L.L.C.
321 N. Clark Street, Ste. 800
Chicago, IL 60610

_____
Neil F. Murphy, Jr., Esq., ct08381

165

# CERTIFICATE

I, NEAL KELLY, do hereby certify that I have read the following transcript of

my testimony, and further certify that said transcript is a true and accurate record of said

testimony, with the exception of the following corrections listed below:

| Page | Line | Correction |
|------|------|------------|
| 45 | 1 | or TEM microscopy |
| 51 | 16 | of these filler particles |
| 56 | 14 | Clarification needed: "Shipped PDI Coin Holders Acceptable" These were samples from a rejected lot, but as individual samples, showed no defects. |
| 57 | 16 | That (the YUPO) was one group. I performed it also on unlaminated coated styrene and on the laminated structure that was made by PDI. (Rejected lot) |
| 69 | 19 | angle and the force |
| 80 | 19 | Clarification: The test was performed on completed coin holders (with no defects, from rejected lots of Kelstar on styrene). I did not have access to styrene coinholders"accepted by the Mint". Only the YUPO represented "accepted" coin holders, on which tests were made. |
| 81 | 12 | "Rejected" being samples with defects on them. |
| 82 | 21 | rate of 10 vibrations back and forth motion per second. So in 30 seconds I had 300 vibrations or 600 back and forth motions of approximately one-eighth of an inch. |
| 90 | 7 | It's roughly twice of 60 |
| 103 | 2 | "Yes" refers only to the YUPO samples, since I did not have access to accepted Kelstar coated samples. I did perform tests on Kelstar coated samples rejected by the Mint. |
| 114 | 3 | or lack of effect on either |
| 125 | 21 | or the density is, |
| 135 | 1 | In all probability, the 1.6 microns would be needed, as stated earlier, to cover the highest particle with sufficient coating. |
| 135 | 8 | On a reference of pounds per thousand feet, it stays above the surface. |
| 156 | 16 | the surface didn't block, |

Signed under the pains and penalties of perjury this _____15th_____ day of

_____July_____, 2003.

_Neal Kelly_

**NEAL KELLY**

_Anne M. Beauchamp_
_Notary Public_

# CERTIFICATE

I, NEAL KELLY, do hereby certify that I have read the following transcript of my

testimony, and further certify that said transcript is a true and accurate record of said

testimony, with the exception of the following corrections listed below:

| Page | Line | Correction |
|------|------|------------|
| 8 | 23 | change viscosity or the total solids |
| 10 | 20 | various grits |
| 11 | 3 | a certain RPM |
| 24 | 8 | final report |
| 35 | 16 | To change the tensile |

Signed under the pains and penalties of perjury this _____15th_____ day of

_____, 2003.

_____

**NEAL KELLY**

Anne M. Beauchamp
Notary Public
(Commission expires) 7/15/0

1

1       VOLUME:  I

2       PAGES:  1 to 37

3       EXHIBITS:  1 to 2

4

5           UNITED STATES DISTRICT COURT

6             DISTRICT OF CONNECTICUT

7   - - - - - - - - - - - - - - - - - - x

8   W.E. ANDREWS CO., INC.,

9   a Georgia Corporation,

10              Plaintiff,

11       v.                    Civil Action

12                            No. 302 CV-00599(CFD)

13  PLASTIC DEVELOPMENT, INC.,

14  a Rhode Island Corporation,

15              Defendant.

16  - - - - - - - - - - - - - - - - - - x

17          DEPOSITION OF NEAL KELLY

18             May 28, 2003

19              4:55 p.m.

20            Winfield Brooks

21            70 Conn Street

22         Woburn, Massachusetts

23

24      Reporter:  Karen A. Interbartolo, RPR

2

1    APPEARANCES:

2

3        SHAW, GUSSIS, FISHMAN, GLANTZ,

4        WOLFSON & TOWBIN, LLC

5        By Jeffrey L. Widman, Esq.

6        1144 West Fulton Street, Suite 200

7        Chicago, Illinois 60607

8        (312) 541-0151

9        Counsel for the Plaintiff

10

11       MURPHY, LAUDATI & KIEL, P.C.

12       By Neil F. Murphy, Esq.

13       270 Farmington Avenue

14       The Exchange, Suite 360

15       Farmington, Connecticut 06032

16       (860) 583-4906

17       Counsel for the Defendant

18

19   ALSO PRESENT:

20

21       Normand Thibaudeau

22

23

24

3

1                              I N D E X

2     EXAMINATION OF:                              PAGE

3     NEAL KELLY

4

5        Direct Examination by Mr. Widman              4

6

7

8

9

10

11                        E X H I B I T S

12     No.                                        Page

13

14     1            Curriculum Vitae of Mr. Kelly      7

15     2            Final Report of Mr. Kelly          24

16                  dated 5/6/03

17

18

19

20

21     *Original exhibits returned to Mr. Widman.

22

23

24

4

1              P R O C E E D I N G S

2

3              MR. MURPHY:  Once again, I think we

4    ought to read and sign.  We never got around to it

5    before.  Usual stipulations, which is fine.  Other than

6    that --

7              MR. WIDMAN:  Okay.

8              MR. MURPHY:  We neglected that, but I

9    think we survived with the neglect.

10

11                   NEAL KELLY

12

13   a witness called for examination by counsel for the

14   Plaintiff, being first duly sworn, was examined and

15   testified as follows:

16

17                DIRECT EXAMINATION

18   BY MR. WIDMAN:

19       Q.   Can you state your name and spell your last

20   name for the record, please?

21       A.   My name is Neal F. Kelly.  My last name is

22   K-E-L-L-Y, my first name is N-E-A-L.

23              MR. WIDMAN:  Let the record reflect that

24   this is the deposition of Neal Kelly pursuant to notice

5

1    and by agreement of parties.

2        Q.    Let me give you a couple of ground rules.

3    Please answer all questions verbally because the court

4    reporter can't take down nods of the head, shrugs of

5    the shoulder.  Try to avoid "uh-huhs" and "uh-uhs," and

6    stick with "yes" and "no" when appropriate.  Okay?

7        A.    Yes.

8        Q.    Try to speak up, too.  Okay?  If you answer a

9    question, I'm going to presume that you understood the

10   question.  So if you don't understand a question and

11   you'd like me to repeat it or rephrase it, please say

12   so and I'll be happy to do so.  Okay?

13       A.    Fine.

14       Q.    What's your current address, Mr. Kelly?

15       A.    My current address is 42 Independence Drive

16   in Woburn, Massachusetts.

17       Q.    How long have you lived there?

18       A.    Since 1968.

19       Q.    You are currently self-employed?

20       A.    That's correct.

21       Q.    What's the name of your company?

22       A.    Adhesive & Coating Technology.

23       Q.    And prior to working at Adhesive & Coating

24   Technology you were employed by Polaroid Corporation?

6

1      A.   That's correct.

2      Q.   For approximately 25 years?

3      A.   Yes.

4      Q.   Why did you leave Polaroid in 1995?

5      A.   I took an early retirement offer that they

6   presented to me.

7      Q.   What does Adhesive & Coating Technology do?

8      A.   I help companies that manufacture products

9   which use adhesives and coatings to solve problems that

10  they may have or to create new adhesives and coatings

11  that they may have a need for for new products or to

12  replace current products.  A lot of work has to do with

13  companies who currently have adhesives and coatings

14  made out of solvents and they wish to convert them to

15  water base or something else that's more

16  environmentally friendly.

17     Q.   What's the difference between an adhesive and

18  a coating?

19     A.   Well, a coating has to be an adhesive because

20  it's coated on one surface and generally that's the end

21  of it.  An adhesive has to bond to two surfaces.  It's

22  sometimes coated on one and then bonded to another or

23  sometimes coated between two, but basically an adhesive

24  bonds to at least two surfaces and a coating generally

7

1    bonds to one surface.

2         A coating generally has to have no tack when

3    you get all finished with it so that it can be touched

4    and not hurt by coming in contact with something else.

5    An adhesive may be tacky.  It may not be tacky.  But

6    they're all built out of polymers and they all are

7    designed to adhere to one or more surfaces.

8         Q.    Are you the sole employee of Adhesive &

9    Coating Technology?

10        A.    That's right.  I'm self-employed.

11        Q.    Does anyone else work for the company?

12        A.    No.

13        Q.    Can you give me an example of how you would

14   analyze a coating process and make a recommendation for

15   an improvement?

16        A.    A coating process?

17        Q.    Well, I'm looking at --

18        A.    I can do that.

19        Q.    Okay.  Just one sec.

20              (Exhibit 1 marked

21              for identification.)

22        Q.    I'm handing you what's been marked as Kelly

23   Exhibit 1 which appears to be a copy of your curriculum

24   vitae; is that correct?

8

1          A.   Yes, it is.

2          Q.   And under your experience discussing what you

3    do for Adhesive & Coating Technology, you state you

4    analyze manufacturing and coating processes which use

5    adhesives and coatings and make specific

6    recommendations for improvement?

7          A.   Yes.

8          Q.   Explain for me what that means.  If you can

9    give me an example of that.

10         A.   Well, if a converter, which is another name

11   for a coater, coating company, if they're applying a

12   coating or an adhesive to some substrate, usually we

13   refer to them as webs, they may be encountering some

14   sort of a problem such as it's not drying correctly or

15   it's not flowing out smoothly or they're not getting

16   the appearance or the functionality that they want.

17              I will talk to them about their product and

18   find out what their needs are, and I'll usually examine

19   the process and then try to give them a recommendation

20   that will help solve that problem.  That may be

21   suggesting that they change the speed of their coating

22   machines, change the temperatures of the ovens, may

23   change the viscosity of the total solids of the coating

24   or the adhesive they're putting down, may add

1    sulfactants, things that will make it coat out better,

2    may have to add ingredients so that the surface

3    characteristics are more in line with what they want.

4            Coatings can have all kinds of

5    characteristics and needs.  So I'll recommend changes

6    to their process and maybe changes to the chemistry or

7    the composition to give them the ultimate properties

8    that they're looking for.

9        Q.    I think you referred to something as a web?

10       A.    Yes.

11       Q.    What did you refer to as a web?

12       A.    A web is generally a large roll of some

13   material.  It could be paper.  It could be plastic such

14   as mylar or polyethylene or many materials.  But

15   generally they're plastic or cardboard or paper and

16   they're in large rolls, and these are what the coaters

17   apply coatings and adhesives to using their big coating

18   machines.  This is heavy equipment.

19       Q.    According to your CV, you -- as senior

20   principal engineer of Polaroid you developed testing

21   methods or test methods?

22       A.    Yes.

23       Q.    What kind of test methods did you develop?

24       A.    Well, I had people that worked for my group,

10

1   and they were generally technicians.  And they would

2   run quality control evaluations of the coatings that

3   Polaroid made and had manufactured somewhere else

4   perhaps or that the various chemists and engineers in

5   Polaroid were proposing to use on our webs.

6           We would characterize the material so that we

7   would know what we had so that if any problem arose, we

8   would then have a clue as to where the problem might

9   be.  We would run things like total solids, viscosity,

10  co-efficient of friction.  We would run abrasion tests.

11      Q.    What kind of abrasion tests would you run?

12      A.    Well, particularly one called the Taber

13  abrasion.

14      Q.    T-A-B-E-R?

15      A.    Yes.

16      Q.    Describe for me what the Taber abrasion test

17  is.

18      A.    Taber abrasion is -- A Taber machine has

19  disks of various abrasive material, corundum stone or

20  sandpaper, various grips from course to hard, and the

21  Taber machine would require that you die-cut a sample

22  out of your web that has the coating on it, for

23  instance, and you would place that on top of the Taber

24  abrader.

1          And the machine has a weight associated with

2     it.  And the machine, you turn on the motor and it

3     revolves around at a certain rate, a certain RPA

4     against a certain abrasive disk with a certain weight.

5     And you look after various time frames what effect that

6     had on the coating, for instance.  And various

7     customers would have various needs.  Polaroid would

8     have various needs in our product.  So that was just

9     one way of characterizing the surface.

10         Q.    Are you familiar with certain standards that

11    were associated with the Taber abrasion test?

12         A.    Generally we followed ASTM standards,

13    American Society of Testing Materials.

14         Q.    And explain for me what relationship ASTM

15    standards have to the Taber abrasion.

16         A.    Well, the Taber abrasion test probably

17    runs -- can be run according to a test method set up by

18    ASTM.  ASTM is an independent society, organization,

19    and they set standards for many things, and I'm sure

20    they have ASTM, more than one probably on Taber

21    abrader.  So people that needed that test could go to

22    the ASTM files and look at different descriptions of

23    tests and run their material according to it so that

24    you then have continuity throughout the world and

1    compare.

2        Q.    What kind of factors would be controlled or

3    dictated by ASTM standards relative to the Taber

4    abrasion test?

5        A.    The particular abrasion wheel, maybe the

6    revolutions per minute that it ran at, the number of

7    seconds or minutes that you ran it or the number of

8    rotations that you ran it, the weight that's

9    on -- applied to the surface, to the back side of the

10   web that's against the abraded surface.

11       Q.    Other than the level of the abrasive surface,

12   the revolutions and the weight, are there any other

13   factors that you know of?

14       A.    Well, there may be.  I'm not a specialist on

15   ASTM.  That I left up to the people that did those

16   tests.  It would probably be specified somewhere.

17       Q.    In the standards?

18       A.    Right.  If Polaroid required it, they would

19   specify it.

20       Q.    Is ASTM something you need to be a member of

21   to have access to this information?

22       A.    No.  You just buy their volumes with the

23   particular tests that apply to your particular

24   industry.

13

1      Q.    What kind of surfaces would the Taber

2   abrasion test be appropriate for?

3      A.    Floor finishes.  If you put urethane on your

4   wood floors, how much abrasion could it withstand to

5   give some indication of how long it would survive with

6   people walking on it, for instance.

7      Q.    Did you test floor finishes --

8      A.    No.  We didn't use floor finishes at

9   Polaroid.

10     Q.    Well, give me a context in which you would

11  use this at Polaroid.

12     A.    Camera bodies, which are not webs, but I was

13  involved in other things too.  Cameras are made out of

14  plastic, metal, glass.  They have paint on them.  We

15  would do Taber abrasions on coated plastic parts, for

16  instance.  Lenses -- No, I don't think we did lenses.

17     Q.    Were there any other abrasion tests that you

18  performed at Polaroid that you can recall?

19     A.    Abrasion tests?  I can't think of any

20  specific ASTMs.  We were always inventing our own tests

21  that were applicable to our own problems so that we

22  would probably modify something called a Crock abrasion

23  test, but that Crock abrader refers really to dye on a

24  fabric and doesn't rub off with time.  But we can apply

14

1   that to other coatings that we knew didn't need to take

2   the severe punishment that the Taber would provide so

3   we could build our own test around the Crock abrader

4   maybe.

5       Q.    What's the purpose of an abrasion test?  What

6   does it measure?

7       A.    It measures the durability under friction.

8       Q.    Would the ASTM standards for the Taber

9   abrasion test give you a specific level that says if it

10  can withstand this many revolutions at this much weight

11  it passes?

12      A.    No.

13      Q.    Is there a bright line at some point?

14      A.    No.  The ASTM doesn't tell you what's good or

15  bad.  It tells you how to run a test.

16      Q.    What do you mean?

17      A.    Well, it tells you a set of conditions under

18  which a test is run so that somebody in California can

19  run the same test as somebody in Massachusetts or in

20  Europe and things will be equivalent.  How good or bad

21  it is depends on your product and what you want your

22  product to do.  So you'll have to develop your product,

23  find how good is good, and then maybe find a test that

24  measures how good is good.

1   Q. All right.  But --

2   A. And it doesn't necessarily have to have a

3 Taber abrader to do it.

4   Q. But the question of how good is good is not

5 determined by the ASTM standards?

6   A. No.

7   Q. It's determined by whatever appropriate

8 industry is involved?

9   A. No.  It's determined by the manufacturer of

10 the product usually.  There could be industry wide

11 standards, but I don't know that.

12   Q. So you would view a product manufacturer's

13 proclamation regarding what's good as being

14 authoritative?

15   A. A product manufacturer will specify maybe

16 what his product will survive according to a particular

17 test, ASTM or otherwise, so that his customers may have

18 an idea of how good it is or even know that it's

19 tested.

20   Q. Other than the Taber abrasion test and the

21 tests that you were inventing on your own as applied to

22 your own company's particular needs at Polaroid, were

23 there any other abrasion tests that you performed at

24 Polaroid?

1      A.    I can't think of any offhand.

2      Q.    What other types of tests other than abrasion
3  tests did you develop?

4      A.    Many types of adhesion tests.

5      Q.    Is there an ASTM adhesion test?

6      A.    There are probably many.  Peele, Shear,
7  generally two types of adhesion tests.

8      Q.    What's the difference between an abrasion
9  test and an adhesion test?

10     A.    An abrasion test shows you how much wear and
11 tear a surface can handle.  An adhesion test tells you
12 how strong surface A bonds or adheres to surface B.

13     Q.    Other than abrasion and adhesion tests, what
14 other categories of tests were you involved with?

15     A.    Viscosity, physical properties, softening
16 points, hardness.

17     Q.    I'm sorry?

18     A.    Hardness, which would be a measure of
19 polymers, hardness or toughness or something like that.
20 Generally you could get basic information on the
21 toughness of a polymer from the supplier or out of a
22 journal or something.

23     Q.    Is your curriculum vitae up to date and
24 accurate?