A



NANCY PLOWMAN ASSOCIATES, INC.

July 14, 2003

Mr. Jeffrey L. Widman
**Shaw, Gussis, Fishman, Glantz, Wolfson, & Towbin, JLLC**
1144 West Fulton Street
Suite 200
Chicago, IL 60607

*RE: Final Report – W.E. Andrews, Inc. v. Plastic Development, Inc.*

Dear Jeff:

**SUMMARY OF OPINIONS:**

In my opinion, the scratches exhibited on the coin holders that were rejected by the US Mint, were the result of transit damage created during the shipment of the coin holders from Plastic Development, Inc. to the U.S. Mint. The transit damage was the result of improper packaging techniques used by Plastic Development, Inc. (See attached diagram showing the headspace allowed surrounding the holders in the packaging tray, further documented in the photos of these trays identified as #12 in the Cervelli report.)

It is my further opinion that W.E. Andrews did not have an inherent problem with insufficient application of the aqueous coating on the styrene (used in the assembly of the coin holders) since the printed styrene was accepted by the customer (Plastic Development) both upon arrival at Plastic Development, as well as after converting it, prior to shipment to the Mint.

Finally it is my opinion that the opinions of both Ms. Mary A. McCann and Mr. Neal F. Kelly are based on improper methodologies that are neither standard in the coating and printing industries nor capable of being evaluated and/or repeated. And furthermore, that both experts lack the expertise required to offer their opinions. As a result, many of their conclusions are incorrect.

These opinions are more fully set forth below.

**QUALIFICATIONS, COMPENSATION AND OTHER TESTIMONY:**

Attached to this report is a current copy of my Curriculum Vitae, which includes a list of published technical publications I have authored in the last 10 years.

I am being compensated at my normal rate of $400 per hour, and my fees are not contingent upon the outcome of this case. In the past 4 years I have given testimony in a deposition taken on May 16, 2003 in the case of Hartford Insurance Company v. The Newark Group, Inc. et al. (Chicago) Court No. 01 C 2350.

### INFORMATION CONSIDERED:

I have considered the following information and/or documentation:

- My extensive knowledge of offset printing, printable styrene, aqueous coatings, and investigation of numerous transit damage complaints.
- The samples described in my initial report
- The final reports, and then the deposition testimonies of McCann and Kelly
- Information provided to me by John Vesia, of W. E Andrews regarding the printing and coating processes used during the manufacture of the printed styrene, as well as the cutting of that styrene and the shipping conditions of this printed material between W. E. Andrews and Plastic Development, Inc. John Vesia also described to me and showed me a carton tray used by Plastic Development, Inc to ship the completed coin holders to the U.S. Mint in California.
- The deposition testimony of Normand Thibaudeau
- Information from Kelstar about aqueous coating weight/mileage, as well as their recommendations for abrasion testing
- The Cervelli report, and photocopies of their supporting photographs.

### OPINIONS - Transit Damage

The fact that the entire order of coin holders was inspected for various categories of damage and approved by Plastic Development prior to shipment to the Mint in California and then arrived damaged, is a classic description of transit damage. If printed pieces are packed in a manner that allows them to move about inside a package or carton, the vibration in the shipping process causes the pieces to move slightly, rub against each other and show scuffed areas. Under low magnification, using either a 12X magnifier or a low powered microscope, one can easily see transit damage. Of course other factors, like heat during the summer, can make this problem significantly worse.

Two key factors in avoiding transit damage, are first, to assure that the job is dry, and second that the pieces, brochures, books etc. are packed so tightly in their shipping cartons that no movement is allowed. Here, the job was dry, but the packaging was improper.

### Insufficient Drying:

In this case, it has been demonstrated that the job was dry by the fact that W.E.Andrews was able to print the job without offsetting in the delivery pile, and then cut the large

press sheets into strips required by Plastic Development without any sticking. Nor was there a problem with marking, as the job was accepted upon delivery by truck from W.E. Andrews to Plastic Development. And finally, Plastic Development was able to convert the pieces without marking problems on their assembly machinery, since the end-of-the-process inspection showed no defects on the coin holders shipped to the Mint.

**Packaging:**

The packing sleeves, however, are oversized for these pieces. I have attached a diagram of the measurements taken here on a coin holder and the interior dimensions of the tray they were set in for shipping. This is also clearly shown in photograph #12 of the Cervelli report. It is my opinion that the manner in which these coin holders were packed and shipped is what caused the transit damage. It should be noted that the pallets sent to Plastic Development from W.E. Andrews were banded to prevent movement.

**OPINION – Insufficient Application of Coating:**

This printed job was able to withstand trimming, shipping to PDI, and then laminated/glue/foam assembly, die-cutting and a final inspection without any damage to the pieces. It was only after they were packed by Plastic Development, Inc. into the oversized trays and shipped, did any damage occur. Therefore it is my opinion there was not an inherent problem in the application of the aqueous coating.

**OPINIONS – Mary McCann**

In addition to the problems in my initial report relating to Mary McCann's report, I have additional opinions to offer after reviewing her deposition testimony.

First of all, the samples Ms. McCann used have no chain of custody documentation so, even as she conceded during her deposition testimony, she has no knowledge as to where these samples came from, how they were shipped back to Mr. Kelly or even what had happened just prior to them being delivered to her. She also offers an opinion as to the cause of the damage despite not knowing their custody chain, nor even knowing the condition of the samples in 2000 when the job was initially delivered to the Mint.

Ms. McCann is not a printing expert, nor is she an expert on aqueous coatings used by the printing industry for in-line sheet fed offset operations. Her knowledge of printable styrene is also lacking. She offers an opinion that the "protuberances from the styrene" were causing the damage, yet she was unable to even define the components of the material itself, let alone state an opinion of any of the flaws that might be present. Nor did she document the conditions upon which she based her opinions.

I am also concerned about the analytical methods she chose to use, since they cannot be replicated or repeated. I particularly object to her use of optical photo-microscopy on glycerin-immersed samples and using these cross-section examinations for quantitative analyses. The method of sample preparation for her examination can be destructive, and

in general is not a recognized standard methodology for use with printing substrates. In fact Ms. McCann acknowledged that the process had a negative effect on the Yupo sample and was unsure if it had any affect on the styrene. Nor does this methodology and subsequent visual examination provide the detail and quality for any type of quantitative measurement.

It is important to understand that optical photographs are extremely difficult to interpret; demonstrated in her testimony by her references to "fuzzy areas", items being out of focus because they are in a "different plain" in the view field (depths), and her comment about "how to interpret what I was seeing in the light microscope". A preferable method of analysis would have been to use a Scanning Electron Microscope, together with cryogenic fracturing of the samples to better examine the damaged v. the good areas. These methods, when used by a skilled and knowledgeable printing expert would have been accurate, particularly if used with additional Elemental Dispersive X-Ray analysis

The inadequacies of her techniques are in further question by the fact that she was not able to detect the presence of an overall (100% coverage) buffed-colored tinted ink that was applied in-line over the black and red inks, and under aqueous coating. The printing sequence used was:

1st color = Black
2nd color = Red
3rd color = Tinted varnish
+ In-line Kelstar aqueous coating

Ms. McCann also never considered that foreign material/contamination (between the pieces) during shipment might have caused damage. Her report, even in the cross-section analysis, concentrated solely on the surface of the pieces, not any of the other layers, or any possible source of contamination that might have been between the pieces that might have created abrasion. She did not look at the layer underneath the styrene (the glue or it's uniformity) nor any debris from the die cutting process, the adhesive application, or packaging materials.

Ms. McCann never considered the packaging and shipping conditions. Nor did she appear to know that the strips of printed and coated styrene were successfully shipped between W.E. Andrews (Hartford, CT) and Plastic Development, Inc. (Pawtucket, RI)

To summarize my comments about Ms. McCann's work and testimony, it is my opinion that her conclusions pertaining to the efficiency, quality and thickness of the aqueous coating cannot possibly be supported by the methods of sample preparation and the optical photomicroscopic examination she chose to use. Her testimony that areas along the length of a single microtomed section were "skipped" if they were out of focus confirms these problems that are inherent in this type of visual evaluation of specimens. She was asked by Neal Kelly to determine the thickness of the aqueous coating yet, several times during her testimony she was unable to identify the precise film thickness in selected areas when requested. Again using this methodology makes it difficult at best to

"estimate"; yet she further offers opinions of the styrene material of which she has no working knowledge of its intended design.

**OPINIONS –Neal F. Kelly**

In addition to the problems in my initial report relating to Neal Kelly's report, the opinions offered by Mr. Kelly in his deposition regarding the cause of the transit damage and the purported coating deficiency are incorrect and are based on improper methodology.

My initial objection is that the destructive tests he performed to show the purported coating failure are meaningless when performed on printed and coated samples that are nearly 2 years old. Testing after the fact for any type of durability could skew results either positively or negatively, and are rarely accurate.

In addition, Mr. Kelly offers 3 basic reasons why he feels there is "insufficient coating" which resulted in transit damage. It is my opinion that none of these reasons supports his conclusion.

First, his test procedures:

Abrasion – Kelly Abrasion test: After the coefficient of friction and the pencil hardness tests failed to show the coin holders had a problem, Mr. Kelly devised an abrasion test, where he used laboratory weights and rubbed the samples by hand for several strokes until failure was noted. The main problem with this test is that it cannot be repeated to confirm its accuracy (He used his hand to control pressure but conceded he does not know if he was successful in his attempt in not applying pressure in addition to the weight. Plus the 1/8" back and forth motion could not be repeated accurately), nor rated (It is not a test recognized in the printing and coating industries[1]). Furthermore, it is my opinion that his findings are irrelevant since he tested samples that were accepted by the Mint. Moreover, he says he came up with no hard conclusions, yet he uses his abrasion test to conclude that there is insufficient coating.

Second, Ms McCann's work – Upon failing to show surface failure using any industry standard test, Mr. Kelly contracted Ms. McCann to document his theory of insufficient coating on the coin holders and uses her testimony as a basis for his conclusion that there was not sufficient coating. However, in her testimony, she states that her measurements are, at times, estimates, and that when the film is thin, she cannot detect the coating if it is less than 1 micron, so even in the damaged areas, she cannot determine the condition of the coating. She clearly did not support her finding that the coating is insufficient.

---

[1] Mr. Kelly acknowledges both the Sutherland Rub Test and the Taber Abraser test as industry accepted tests, yet he chose not to perform them. When he did not have the proper equipment, he improvised.

Third, Mr. Kelly used the information supplied by Kelstar for calculating the amount of coating applied and, based on his knowledge of 'coat weight' as used in the 'industry', concluded that there was simply not enough coating applied to protect the pieces from transit damage.

His calculations are in error. I have confirmed with Kelstar that the pound of coating referenced on Kelstar's specification sheet is for estimating the number of wet pounds of coating (or gallons) required to coat a job. This estimate is made based on the size of the press sheet (in square inches), and how many sheets will be coated in the job. Obviously the dried weight applied would be less, based on the percentage of water in the coating formulation, and its dry thickness is dependent on the formulation as well. If a printer were to apply wet coating to attain a 4.6 microns dry coating thickness, the wet usage on the coater machine would be higher than Kelstar's recommendation of 1 wet pound per 1000 square feet. This would result in applying too much coating on the sheet causing it to stick together at the delivery end of the printing press.

In conclusion, it is my opinion that Mr. Kelly provided no test data that determined the cause of the transit damage to these coin holders. Furthermore, there was no documentation of the chain of custody of any samples used in his lab, he repeatedly stated that his documentation showed only having tested accepted product, and his reliance on Ms. McCann's work did not corroborate his theory of insufficient coating.

Sincerely Yours,

Nancy Plowman Sandreuter
President

Attachments:

1. Packaging Tray Diagram
2. Curriculum Vitae

Nancy Plowman Associates, Inc.
30-32 Ray Avenue
Burlington, MA 01803
1-781-272-7410
Fax 1-781-273-1820
nancy_plowman@npatest.com
www.npatest.com

B

**Page 174**

1  of your paragraph 6?
2      A. Because in her testimony she said
3  sometimes she's estimating what's there, yes, that
4  that's what you can do is estimate.
5      Q. Do you have as you sit here the parameters
6  of what you understood her estimates to have been?
7      A. I mean, they're in her deposition, and I
8  know she was pointing out certain optical
9  cross-sections and using these bars as one of the
10 tools for measuring the thickness. So I have a
11 general understanding of why she or how she measured
12 the film thickness of the coating if that's what
13 you're asking me. I do have a general understanding
14 of that. And her numbers I believe went from
15 submicron up.
16     Q. I guess, and this is not -- if we know it,
17 we do. If we don't, we don't. Do you have a sense,
18 an understanding as to the parameters of her
19 estimate within a fraction of a micron, within
20 microns plural, within inches, within yards. As you
21 sit here do you recall what the I repeat the
22 parameters of the estimate was?
23     A. Well, I'm pretty sure that I remember her
24 saying she can't tell if it's less than a micron,

**Page 175**

1  she can't see it. I'd have to go back and look what
2  she said upwards of I'll take a guess -- I don't
3  want to take a guess. I mean, I'm thinking she said
4  two or three microns.
5      Q. So as you sit here -- I don't want you to
6  guess either, but we're talking from an estimate as
7  you recall it, and this is subject to your reviewing
8  things. But just now an estimate of the low side
9  being submicron and the high parameter being .2, .3
10 microns, and within that area would be your quote
11 estimate?
12     A. I think she said 3 microns.
13     Q. Okay. As you sit here, I'm asking for
14 your recollection.
15     A. 3, not .3. That's my recollection right
16 now.
17     Q. Okay. And I gather by definition that
18 subzero to 3 microns is not accurate enough for what
19 you perceive to be correct?
20     A. Well --
21     MR. WIDMAN: You mean submicron?
22     MR. MURPHY: What did I say?
23     A. Subzero.
24     Q. Submicron.

**Page 176**

1      A. I mean, if her charge by Kelly was to
2  determine the film thickness, okay, that was, my
3  understanding of her project description was to
4  determine the film thickness and she spent a lot of
5  time looking at the damaged area where the coating
6  was removed anyway.
7      Q. In your opinion, do we need that
8  measurement in order to determine whether some of
9  the particles are protruding through the top, for
10 lack of a better term? And by the top, I mean the
11 last thing --
12     A. I know. I know what you mean. Personally
13 I would not have approached that with cross-section
14 work.
15     Q. What would you have done?
16     A. Surface work, but better quality surface
17 work than optical, and then you can see there's a
18 continuous film over the surface.
19     Q. And that is again the SEM?
20     A. You can use an SEM in which case you
21 wouldn't be worried about color because you're
22 looking at the very top of the sample.
23     Q. Did it occur to you that these could be
24 inaccurate?

**Page 177**

1      A. Inaccurate in what way, like not the right
2  samples or --
3      Q. You indicated personally you wouldn't have
4  done it this way. Because she did do it this way,
5  does it occur to you that these might demonstrate
6  inaccuracies in the project?
7      A. It could.
8      Q. Can you point to any areas that they're
9  potentially inaccurate to your way of thinking?
10     A. I think my whole point in the criticism of
11 her work is that by using optical light
12 photomicrographs, you can't tell if it's accurate or
13 not.
14     Q. And on what experience or expertise do you
15 base that statement?
16     A. Over 30 years in the business of looking
17 at optical photomics of materials that are
18 transparent. And so you're looking through all
19 these layers and you don't want to look through the
20 layers. You want to look at the surface.
21     Q. As a nonlooker but as a taker, what is
22 your experience?
23     A. Of what?
24     Q. Being -- you said you're not a

Page 178

1  microscopist, you send these things out?
2      A.  Um-hmm.
3      Q.  And then you presumably look at the
4  pictures as they come back?
5      A.  I sit there while they're being done,
6  yeah.
7      Q.  Okay.  If you go out to a microscopist to
8  get a project done, do you dictate what you want
9  done or do you rely upon their knowledge and
10 expertise to tell you the tool that they think
11 they'll use to show you what you want to see?
12     A.  I dictate it.
13     Q.  Okay.  Do you have any reservation or
14 doubt on the basis of your investigation, albeit
15 without testing, that the substrate in question was
16 styrene?
17     A.  Do I have any doubt that it is?
18     Q.  Correct.
19     A.  No.
20     Q.  Do you agree that it seems like all the
21 parties; Andrews, PDI, Cervelli?
22     A.  Yes.
23     Q.  So in that respect what significance is
24 there practically in Mary McCann and Neal Kelly

Page 179

1  accepting the fact that it was styrene?
2      A.  I think it all just instead of one
3  specific reason it's the fact that they made an
4  attempt to identify things in these optical
5  photomics that maybe they're right, maybe they're
6  part of the styrene.  But if there were large
7  particles that, you know, they suspected were the
8  cause of the problem, one would think that they
9  would have confirmed that.  That's all.
10     Q.  So is it fair to say that your criticism
11 goes to the method and methodology as opposed to the
12 result that they achieved?
13     A.  Well, my opinion is that the methodology
14 that they used makes it difficult for them to claim
15 result to give opinions about what they see.
16     Q.  That having been said, can you point to
17 anything where what they said, there's photographs,
18 were not accurate because of their erroneous
19 methodology or any other reason?
20     A.  I don't think there's anything visual that
21 I can actually -- I don't think it's a matter of
22 just pointing to something and saying it's
23 inaccurate.  It's the statements, you know, that she
24 says that are measurements are estimates, and I can

Page 180

1  see where they'd have to be because of the
2  methodology.
3      Q.  Okay.  So the answer is no?
4      A.  No.
5      Q.  Okay.  Is it fair to say then that with
6  regard to the majority of your criticisms, it is
7  your opinion that the methodology employed by Mr.
8  Kelly and Ms. McCann was improper or not appropriate
9  and wouldn't have been what you used?
10     A.  Exactly.
11     Q.  And in order to support that opinion, did
12 you think about conducting any tests?
13     A.  You know, it's so long after the fact.  I
14 could never testify that anything I did to any
15 samples now in any way mirrored what happened three
16 years ago or the condition of the styrene, the
17 condition of the coating, you know.
18     Q.  Would the layer of coating be reduced in
19 any way during that period of time, would it become
20 less thick?
21     A.  I have no idea.  I don't know.
22     Q.  Were you to assume that it went out to
23 California, was rejected and came back courtesy of
24 Mr. Thibaudeau, sat in his office for two years,

Page 181

1  what factors would you consider as to whether, just
2  given that, the thickness of the coating would be
3  reduced?
4      MR. WIDMAN:  Objection.  She just
5  testified she had no idea whether it could be
6  reduced.
7      A.  Yeah, I don't know if it would be.
8      Q.  Isn't it a fact that it couldn't be
9  reduced?
10     A.  No, I wouldn't say that.
11     Q.  Why wouldn't you say that?
12     A.  Because it's going to -- it chemically
13 could change over time.  Moisture changes up and
14 down over time.
15     Q.  What tests could we perform to determine
16 if moisture chemically could change and all of that,
17 in fact, did occur?
18     A.  The only way you can do that is if you
19 still had the ink and you still had the wet coating
20 used on that job by Andrews in 2002, then you
21 could --
22     Q.  Off the record.
23         (Off the record.)
24     Q.  You said still used by Andrews.  I gather

46 (Pages 178 to 181)

LEGALINK BOSTON
(617) 542-0039

Page 182

1  that we couldn't in your opinion get a current batch
2  of Kelstar AQ-520 and use that?
3      A. No, I wouldn't.
4      Q. So is it fair to say that your opinion
5  that it's impossible to measure now whether that
6  coating was diminished between August 2000 and now?
7      A. The coating.
8      Q. The coating, the aqueous coating, whether
9  its thickness --
10     A. Without the original --
11     Q. If we don't have the ability to get the
12 exact coating and we don't have the ability to get
13 the ink --
14     A. And the styrene.
15     Q. -- and we don't have the ability to get
16 the styrene, then it's impossible to determine
17 whether that coating width has been reduced, the
18 thickness?
19     A. It may not be a thickness issue now.
20 Maybe, you know, that it has a different tensile
21 now, microtome's different now than when it was
22 softer and more pliable. I don't know.
23     Q. My question was: For all the variables
24 out there, the maybes, maybes, maybes, maybes, is it

Page 183

1  your conclusion that it would be impossible to
2  address that issue?
3      A. Yeah, it would be impossible.
4      Q. Okay. And is that answer based solely on
5  your experience or is there some academic support
6  for that? And by academic support, I mean something
7  along the lines of analytic chemistry or physics or
8  whatever other principle you would bring into it.
9  Or is it your experience?
10     A. It's experience.
11     Q. Okay. Speaking of which, you majored in
12 mathematics and you had a minor in chemistry.
13 Academically have you any other credentials that you
14 would cite in addition to those that you bring to
15 the table as an expert?
16     A. No.
17     Q. Have you attended any courses, chemistry
18 of coating and that sort of thing?
19     A. No.
20     Q. Within the realm of not my being too
21 specific, is there anything else but your experience
22 that you would proffer as a support for your
23 opinion?
24     A. Well, obviously part of my experience.

Page 184

1      Q. Other than your experience.
2      A. But part of my experience is data that's
3  been gathered through the years working on a lot of
4  other printing jobs. So it's not just experience.
5  I've seen that, I've done that. A lot of times
6  we've done testing, and we've done analysis, and
7  we've done microscopic work. So if that's my
8  experience, it's part of my experience.
9      Q. I think I have that.
10     A. Okay.
11     Q. Do you have any knowledge as to whether
12 Andrews sought anything beyond the Jeff Jacobs/Sun
13 analysis back when this was relevant in the year
14 2000?
15     A. Do I have any knowledge, no.
16     Q. What is your understanding as to the value
17 of the Sutherland rub test with regard to this
18 process?
19     A. With regard to using it on an aqueous
20 coated job?
21     Q. No. More specifically with regard to back
22 when we could still analyze it.
23     A. I need to see the copy of that because I
24 didn't take into consideration --

Page 185

1      Q. Let's take a quick break because I'm
2  looking for something else, too.
3          (Recess held.)
4      Q. We have off the record located and agreed
5  to utilize what has been previously introduced at
6  Mr. Kelly's deposition as coincidently Exhibit 6 and
7  7 respectfully, and I think we're in agreement that
8  we will retain our respective copies but we will
9  utilize for purposes of the next line of questioning
10 Exhibit 6 which is a letter dated February 6, '01 to
11 Mr. John Vesia from a Mr. John O'Brien, and as
12 Exhibit 7 a letter to Mr. Vesia from Mr. Jeff Jacobs
13 which letter is dated September 1st, 2000. May the
14 record reflect that I have furnished each of those
15 one-page documents as they have been marked
16 previously to Ms. Plowman. For purposes of
17 foundation going forward, I also will produce what's
18 been marked as an Exhibit No. 2 at a prior
19 deposition which I've retained, and I think it's the
20 deposition of -- do you recognize that? Off the
21 record.
22         (Off the record.
23     Q. I guess we'd have to go back on the
24 record. The only other possibility will be that of

47 (Pages 182 to 185)

LEGALINK BOSTON
(617) 542-0039

Page 186

1  John Vesia 1.
2      MR. WIDMAN: Yes, I think that's what it
3  was.
4      MR. THIBAUDEAU: John Vesia 1 was
5  December 19th.
6      MR. MURPHY: So let's agree that that's
7  what it probably is subject to some change. I
8  should also put on the record that over time I have
9  retained in safekeeping various exhibits which have
10 been referred to in depositions in this matter. Mr.
11 Widman has done likewise. We've been in two or
12 three states in the District of Columbia. As such
13 we're a little bit who's got what is sometimes
14 uncertain but there is a universe among us out
15 there.
16     Q. So with that having been said, I will show
17 you, Ms. Plowman, what has been previously
18 introduced in all probability we think at the
19 deposition of Mr. Vesia and ask you if you can
20 identify on that, there's a big old yellow sticky
21 that says "smudge."
22     A. I can see it.
23     Q. Independent of that, can you see any
24 surface smudges, scratches or defects on that?

Page 187

1      A. I see writing on it, a gold pen, and I see
2  stuff.
3      Q. Now, if we assume that the chain of
4  custody on that is intact; to wit, Mr. Thibaudeau
5  got it at the Mint, brought it back to Rhode Island
6  and gave it to me, therefore we assume that that is
7  one of the defective inserts, is it your testimony
8  that it's useless to us in terms of examination for
9  the coating, the top coating, the aqueous coating on
10 it to determine whether that coating is satisfactory
11 to cover at this juncture the substrate and layers
12 being it?
13     A. I wouldn't use it.
14     Q. And the reason you wouldn't use it is?
15     A. Just because it's been passed around here
16 and marked. You know, if this was protected on both
17 sides in a sleeve that I knew didn't get bounced
18 around in somebody's pile of papers or briefcase or
19 whatever -- you know, I don't know when these
20 original markings were made. If those were
21 original, I see something in between here, but
22 there's one here and there's one here that aren't
23 marked. So did they -- you know, custody of a
24 sample is one thing but custody of something that

Page 188

1  can be abraded is another thing because you need to
2  protect it.
3      Q. That's very true. My question is: Is it
4  your testimony that it's impossible to measure the
5  thickness of that aqueous coating?
6      A. Where, overall or in --
7      Q. Yes, overall.
8      A. Like across in several areas or just in
9  the defect area?
10     Q. Why don't we start with just in the defect
11 area. And I should add in fairness to you to have a
12 sense as to whether it was like that when it was
13 returned from the Mint.
14     A. God, it's almost impossible for me to
15 answer that. I mean, it looks to me like the
16 sample's been handled so much, I wouldn't want to
17 use it as an example.
18     Q. Would the handling of the sample in any
19 way reduce the thickness of the aqueous coating?
20     A. You know, if you had on the -- on both
21 sides, particularly on this side, there's a whole
22 bunch of fingerprints. Yes, you could reduce the
23 thickness from handling with your hands. With the
24 heat and the oil from your hands you could actually

Page 189

1  soften it and rub it off.
2      Q. Would it have any impact on your opinions
3  throughout this matter if the purpose of the aqueous
4  coating was to protect this product from having
5  mars, scratches or defects?
6      A. If the purpose was to protect it?
7      Q. Yes.
8      A. I'm not sure what -- am I supposed to
9  answer yes or no?
10     Q. Yes.
11     A. I'm confused. Can you read the question
12 back because I don't --
13         MR. WIDMAN: It doesn't make any sense.
14     Q. Well, let me rephrase it this way. What
15 is your understanding of the purpose of the aqueous
16 coating on this product?
17     A. There's a lot of reasons why aqueous
18 coating is used.
19     Q. This product.
20         MR. WIDMAN: I'm going to object. It
21 has been asked and answered. We are getting late in
22 the day and you are repeating yourself. I'd like to
23 move along.
24     A. I think it enhances the rub resistance in

48 (Pages 186 to 189)

Page 190

1   the sample. I believe that's what I said.
2       Q. What enhances the rub resistance?
3       A. The aqueous coating.
4       Q. All right. Anything else?
5       A. Anything else an aqueous coating does?
6       Q. No, by way of the purpose of this coating
7   on this product.
8       A. My understanding?
9       Q. Yes.
10      A. My understanding was the sheen or the look
11  of the gloss.
12      Q. Okay. Conversely, did you understand that
13  the product was to have protected the printing and
14  styrene from harm that could come from usage,
15  travel, scars, mars and the like?
16      A. Am I aware of that?
17      Q. Yes.
18      A. No.
19      Q. Okay. You've indicated in your report on
20  multiple occasions you've referred to, let me put it
21  that way, Sutherland rub test. What's that?
22      A. It's a test that's used by the printing
23  and coating industries to exert a consistent force
24  and speed and number of swipes to measure rub

Page 191

1   resistance of a material. It was originally
2   developed for ink, and now a lot of coating
3   companies are using it as an abrasion test.
4       Q. Now back to our exhibits. The September
5   1st which I think is 7 letter to Mr. Vesia.
6       A. Um-hmm.
7       Q. Did you consider that in your opinions?
8   It was in your material, but did it have any
9   significance?
10      A. Not really.
11      Q. Okay. Do you see the second to last
12  paragraph; to wit, regarding the reasons for rub
13  transmit problems, "there are many contributing
14  factors, including substrate roughness, low dyne
15  levels on the sheets, contamination by abrasive
16  materials, ink drying, poor shipping conditions,
17  etc." To the best of your knowledge, was any
18  testing done on behalf of Andrews or any material
19  gathered on the substrate roughness?
20      A. To my knowledge --
21      MR. WIDMAN: I just object to this line
22  of questioning. You are asking her about a document
23  she did not consider in performing her expert
24  opinions. I mean, you can answer.

Page 192

1       Q. Well, it could be independent of this
2   document, to the best of her knowledge on the topic
3   including substrate roughness. So we got the whole
4   universe here.
5       A. No, I don't know of any.
6       Q. With regard to Exhibit 6, again this time
7   Mr. O'Brien tells Mr. Vesia that some Sutherland rub
8   tests were done, and indicates in the third
9   sentence, "There is some coating rubbed off of the
10  holder but this is to be expected when running 150
11  cycles. It appears to me to be that the coating has
12  done its job because the ink film remains
13  undamaged." First, what is your interpretation of
14  what he's saying?
15      MR. WIDMAN: I'll make the same
16  objection.
17      A. I have a question.
18      Q. Go ahead.
19      A. Is SunChemical a supplier?
20      Q. Yeah.
21      A. Did he provide results for this? I will
22  say that the Sutherland rub test is not designed to
23  run thick material. So it sounds like he used --
24  Kelstar says die-cut 50 State Quarter Holders. I

Page 193

1   mean, Sutherland rub tests isn't designed to run
2   thick samples like these holders. So I don't know
3   what to think about it. I mean, it's all very
4   supplier oriented. Both of these are.
5       Q. What do you mean by supplier oriented?
6       A. Well, you know, he goes on to say, you
7   know, it's like, well, you know, this isn't a test
8   you should use. He's an ink guy. This is a coating
9   guy. I just didn't -- I don't put a lot of credence
10  in supplier's letters. He's obviously not going to
11  say his ink failed. It's the coating.
12      Q. Okay. Is Kelstar a supplier?
13      A. Yes.
14      Q. What was your credibility threshold with
15  regard to your discussions with Mr. Jacobs?
16      A. I asked him about, on his Technical Data
17  Sheet I asked about his mileage requirements, was it
18  in wet pounds or dry pounds. I asked if he used a
19  Sutherland rub. That's all I asked him. And the
20  third one was --
21      Q. Whatever. Is it fair to say that the
22  questions were such that you could rely upon the
23  answers as not being self-serving --
24      A. Because I wasn't asking him about this

49 (Pages 190 to 193)

LEGALINK BOSTON
(617) 542-0039

Page 194

1  report. Called pencil hardness.
2      Q. So were the questions such that regardless
3  of his being a supplier, you could rely upon the
4  responses?
5      A. Yes.
6      Q. Okay. Let me take five minutes and then
7  maybe either wrap it up or close it.
8          (Recess held.)
9          (Marked, Exhibit 6, letter dated
10 February 6, 2001 to Mr. John Vesia from John F.
11 O'Brien.)
12         (Marked, Exhibit 7, letter dated
13 September 1, 2000 to Mr. John Vesia from Jeff
14 Jacobs.)
15     Q. I have here a couple of surface scratches
16 on -- I'll just show it to you and represent it on
17 the record to be an example of the final product
18 without coins. And if we assume that that has been
19 preserved by the plastic overcasing, not been passed
20 around but by definition over three years old, is
21 your testimony with regard to it similar in terms of
22 its ability to be tested at this juncture for
23 purposes of determining the thickness of the aqueous
24 coating on it, would that do us any better?

Page 195

1      A. You know, I don't know. I mean, it seems
2  as though it has the best where have I been label on
3  it, and I don't mean to make a joke, but it appears,
4  you know, because I can't see it because it's welded
5  into this thing but, you know, I think anything can
6  be tested for film thickness. But is it
7  representative of what it was three years ago,
8  that's the compromise.
9      Q. And you're saying that is compromised how?
10     A. By age.
11     Q. Okay. And that same aging has in your
12 opinion possibly affected the thickness of the
13 aqueous coating?
14     A. It could have affected the aging process
15 that the polymers might have gone through, you know,
16 yes, no. Yes, it's a possibility. I'm not saying
17 it definitely shrunk or it thickened up. It's just
18 there's always that possibility it's not the same as
19 it was.
20     Q. And as such you personally would not deem
21 it worthy of practically being able to examine and
22 come up with some conclusions with which you feel
23 comfortable?
24     A. Which is why I haven't done any testing.

Page 196

1      Q. Do you know what type of styrene this was,
2  Ms. Plowman?
3      A. I haven't seen any purchase orders. It
4  looks like, and I believe John Vesia had told me it
5  was Transilwrap where they purchased it, and it
6  matches up to one of their samples in their sample
7  book, but I wouldn't, unless I saw the purchase
8  order, I wouldn't guess as to what it is.
9      Q. And other than your personal visit to Mr.
10 Vesia, a brief phone call prior to your report to
11 Mr. Vesia, a five minute phone call to Mr. Jacobs of
12 Kelstar, is there anyone else other than Mr. Widman
13 to whom you communicated with regard to your
14 investigation which led to your report?
15     A. No.
16     Q. So is it fair to say that the time
17 reflected on the statement value that you gave me,
18 how would you break that down, your review, your
19 conversation with Mr. --
20     A. Well, I had, you know, initial over a half
21 a day going to Hartford, and a significant amount of
22 time reading through the depositions and the other
23 expert reports, and writing my first draft for the
24 initial recovery, you know, a couple of drafts

Page 197

1  before this, and then a couple of drafts before the
2  final.
3      Q. Okay. So I have the universe of your --
4      A. Yeah.
5      Q. -- in broad brush efforts with regard to
6  this?
7      A. Yes.
8      Q. I have no further questions.
9          MR. WIDMAN: We'll reserve signature or
10 whatever the proper terminology out here is.
11         MR. MURPHY: Read and sign, whatever. I
12 know what you mean.
13         MR. WIDMAN: Read and sign.
14         (Whereupon, at 3:31 p.m., the deposition
15 of Nancy Plowman adjourned.)

Attachment #2

Nancy Plowman Associates, Inc.
30-32 Ray Avenue
Burlington, MA 01890
Tel: 1-888-672-8378 (USA only)
Fax: 781-273-1820

nancy_plowman@npatest.com
www.npatest.com

July 10, 2003

## CURRICULUM VITAE

Nancy Plowman Sandreuter, President of Nancy Plowman Associates, Inc., Burlington Massachusetts, (NPA) and Graphic Arts Testing Equipment, Inc. (GATE) located in Winchester, Massachusetts.

Incorporated in 1986, NPA is a graphic arts testing and consulting service specializing in handling print production related problem, including analysis of all components of the offset printing process. Examples of these include inks, papers, aqueous and UV coatings, adhesives, fountain solutions, blankets and chemical additives to the printing system.

NPA is developing and selling its own line of print testing equipment. We work with and assist major paper companies in setting up new in-house testing facilities and procedures to test ink and paper in a production environment. This type of work has expanded in 1994 to suppliers of paper mills, such as Chemical and Pigment manufacturers.

I graduated from the University of Maine with a Bachelor of Science degree in Mathematics, and a minor in Chemistry. My first employment was with the S. D. Warren Paper Company, a Printing Paper Subsidiary of Scott Paper Company, based in Philadelphia, PA, USA. I began working for Warren in 1969. I entered the University of Maine in 1971 and continued working at Warren on full time status and graduated from U of M in April 1976. During my career at Warren, I spent a total of 17 years in their Research & Development facility, with 9 years devoted to paper coating technology and chemistry. This training enables me to identify materials found in an analysis that are paper related and to establish any cause and affect relationships between materials in the paper and a particular problem in a printing job.

In 1978 I moved from the Fundamental Coating group to the Graphic Arts Research group where we ran print analyses on inks, paper and other materials submitted to the company for claims in a complaint from a customer. The work in this group included tests in the laboratory as well as on press. Other responsibilities included in assisting Marketing and Manufacturing in attempts to being new paper products to the market. In the capacity of Assistant Manager of the department, my responsibilities included running tests and coordinating chemical analyses being run in our Analytical department, which included Infra Red Spectroscopy, Gas Chromatography, Scanning Electron Photomicroscopy, and X-ray analysis on specimens taken from press, or on samples submitted after the fact, from printing runs.

I resigned from S.D. Warren and moved to Boston in 1985. In January of 1985, I joined Acme Printing Company, a commercial web and sheet fed offset printer, currently located in Wilmington, MA. I worked for Acme until November 1985 when I left to organize NPA. While at Acme, I sold printing, and was involved in jobs from pre-press to shipping. I also assisted in quality changes in the pressroom, such as recommending ink and fountain solution chemistry changes to improve all aspects of print quality.

## *Professional Publications and Associations:*

### Contributing Editor - Converting Magazine - Bi-Monthly column since July, 1997, "Print Forum".

| | |
|---|---|
| Converting Magazine - *Pretest materials to stop problems before they start* | July 1997 |
| Converting Magazine - *Will reducing the tack of my inks correct surface-picking problems on press?* | August 1997 |
| Converting Magazine - *Water Pick-Up of Offset Inks…How is it Measured?* | December 1997 |
| Converting Magazine - *Taking the Scientific Approach to Printing* | January 1998 |
| Converting Magazine - *Do all Inks set and Dry in the same Way?* | February 1998 |
| Converting Magazine - *Do Conventional Offset Inks Differ in Their Setting And Drying Characteristics?* | April 1998 |
| Converting Magazine - *How Do Conventional Heat Set Web Offset Inks Set and Dry?* | June 1998 |
| Converting Magazine - *Communication - Time and Money* | July 1998 |
| Converting Magazine - *Laminating Problems Part 1 - Adhesion* | October 1998 |
| Converting Magazine - *Laminating Problems Part 2 - Color Changes* | December 1998 |
| Converting Magazine - *What are My Choices for Offset Blankets* | January 1999 |

### Contributing Editor - Graphic Arts Monthly Magazine - Bi-Monthly column since 1988 on the "Printing System"/"Print Clinic"

| | | |
|---|---|---|
| Graphic Arts Monthly, *Understanding The Printing System* | Sept. 1988 | p 76 |
| Graphic Arts Monthly, *How Offset Blankets Affect Print Quality* | Oct. 1988 | p 156 |
| Graphic Arts Monthly, *A Quality Control Checklist* | Dec. 1989 | p 105 |
| Graphic Arts Monthly, *Ink Tack - Part I: How Is It Measured?* | Feb. 1989 | p 110 |
| Graphic Arts Monthly, *Ink Tack - Part II: Wet Film Thickness* | April 1989 | p 126 |
| Graphic Arts Monthly, *Ink Tack - Part III: Surface Measurement* | June 1989 | p 114 |

| Publication | Article | Date | Page |
|---|---|---|---|
| Graphic Arts Monthly | *Ink Tack - Part IV: Blanket Release Forces* | Aug. 1989 | p 133 |
| Graphic Arts Monthly | *The Color Story* | Oct. 1989 | p 196 |
| Graphic Arts Monthly | *Wet Ink Trapping* | Dec. 1989 | p 102 |
| Graphic Arts Monthly | *Facts About Fountain Solution* | Feb. 1990 | p 120 |
| Graphic Arts Monthly | *Proper Complaint Documentation* | May 1990 | p 156 |
| Graphic Arts Monthly | *Facts About Quick Release Blankets* | July 1990 | p 124 |
| Graphic Arts Monthly | *The Best Press for Print Testing* | Sept. 1990 | p 197 |
| Graphic Arts Monthly | *Ink And Water: A Balancing Act* | Nov. 1990 | p 127 |
| Graphic Arts Monthly | *Backtrap Mottle* | Jan. 1991 | p 125 |
| Graphic Arts Monthly | *Water Sensitivity Mottle* | March 1991 | p 124 |
| Graphic Arts Monthly | *Ink Gloss Mottle* | May 1991 | p 122 |
| Graphic Arts Monthly | *Statistical Process Control* | Aug. 1991 | p 168 |
| Graphic Arts Monthly | *Picking, Pick Outs, and Piling* | | |
| Graphic Arts Monthly | *What Is Paper Coating?* | | |
| Graphic Arts Monthly | *Why Coated Paper?* | | |
| Graphic Arts Monthly | *Gloss Calandered Papers* | March 1992 | p 115 |
| Graphic Arts Monthly | *What Creates A Ghost* | May 1992 | p 124 |
| Graphic Arts Monthly | *Exorcising The Varnish Ghost* | July 1992 | p 102 |
| Graphic Arts Monthly | *Ink Setting Vs. Ink Drying* | Sept. 1992 | p 162 |
| Graphic Arts Monthly | *Testing Ink Drying Characteristics* | Nov. 1992 | |
| Graphic Arts Monthly | *Ink Setting Tests, Part 1* | Jan. 1993 | p 89 |
| Graphic Arts Monthly | *Coating Adhesion Problems* | March 1993 | p 101 |
| Graphic Arts Monthly | *Ink Setting Tests, Part 2: Stain Tests* | June 1993 | p 103 |
| Graphic Arts Monthly | *Defining Volatility* | July 1993 | p 96 |
| Graphic Arts Monthly | *The pH of Fountain Solutions* | Sept. 1993 | p 100 |
| Graphic Arts Monthly | *Are Aqueous Coatings Permeable?* | Dec. 1993 | p 88 |
| Graphic Arts Monthly | *Identifying Print Mottle* | Feb. 1994 | p 94 |
| Graphic Arts Monthly | *Ink, Water, and Paper: A Delicate Balance* | March 1994 | p 104 |
| Graphic Arts Monthly | *Paper and Ink, Up Close and Personal* | May 1994 | p 96 |
| Graphic Arts Monthly | *Successfully Applying Gloss Coatings* | July 1994 | p 105 |
| Graphic Arts Monthly | *A Call for Standardization* | Dec. 1994 | p 100 |
| Converting Magazine | *Materials Testing Procedures* | July 1997 | |
| Converting Magazine | *INK TACK: Will reducing the tack of my inks correct surface picking problems on press?* | August, 1997 | |
| Converting Magazine | *What happens to printing tack in the press when ink film thickness is changed?* | October, 1997 | |
| Converting Magazine | *Water Pick-Up Values of Inks; How is this measured?* | December, 1997 | |
| Converting Magazine | *Remember to take the scientific approach* | January, 1998 | |
| Converting Magazine | *Do all inks set and dry in the same way? Part I* | February, 1998 | |
| Converting Magazine | *Do all inks set and dry in the same way? Part II* | April, 1998 | |
| Converting Magazine | *How do Heat Set Offset Inks Set and Dry?* | June, 1998 | |
| Converting Magazine | *Lack of Communication costs time, money and materials.* | July, 1998 | |
| The Pressman | *The Color Story* | March, 2002 | |
| The Pressman | *Offset Blankets* | April, 2002 | |

Published Paper in the June, 1994 TAPPI Journal "Predicting Print Mottle: A Method of Predicting Three Different Types of Print Mottle."

President, 1994-1995 - The Boston Lithographers Club

4

Member Printing & Imaging Committee -TAPPI (Technical Association of the Pulp & Paper Industry)

Recognized expert in the printing/paper field, speaking at the following events/organizations:

→ RIT (Rochester Institute of Technology) Special Presentations and Teaching courses in the T&E Center, Rochester, N.Y.
→ GATF (Graphic Arts Technical Foundation) Special presentations at Technical Conferences
→ TAPPI (Technical Assoc. of the Pulp & Paper Industry):
  Presented:
  A Technical Paper in 1994 - 1994 Coating Conference, San Diego, CA
  A Technical Paper in 1994 - International Printing & Graphic Arts Conference, Halifax, Nova Scotia, Canada

  Moderated a Panel on Printing Technology - 1996 Conference
  Instructor - The Printing System at TAPPI Coated Board Short Course, 1992 (Rochester, N.Y.) and 1994 (Akron, OH.).
  Instructor/Panel Member - TAPPI - Fall Coating Conference, 1991 in Columbus GA, 1993 in Columbus, OH, 1996 in Columbus, GA.

→ RPTA : Recycled Paper Trade Association: Speaker and Instructor at Coating Courses and Coating Applications Committee Meetings. in Boston and Chicago.

→ NAPIM: National Association of Printing Ink Manufacturers: Presented a paper at the 1994 Technical Meeting in Miami, FLA.

→ TAPPI (Technical Assoc. of the Pulp & Paper Industry):
  A Technical Paper in 1996 - International Printing & Graphic Arts Conference, Minneapolis, MN
  "The Impact of Aqueous Coatings on Paper Properties."

→ TAPPI (Technical Assoc. of the Pulp & Paper Industry):
  Symposium Planner and Narrator - International Printing & Graphic Arts Conference, Minneapolis, MN
  "New Printing Technologies Symposium"

→ Research & Engineering Council of the Graphic Arts Industry:
  Progress in the Pressroom Seminar, Chicago, IL.
  Speaker - Pressroom Materials Testing Procedures

→ Member, TAPPI Technical Program Committee for 2000 Coating & Graphic Arts Conference, Washington, DC. May 2000.

→ Member, TAPPI Technical Program Committee for 2001 Coating & Graphic Arts Conference, San Diego, CA May 2001.

→ Member, TAPPI Technical Program Committee for 2002 Coating & Graphic Arts Conference, Orlando, FL. May 2002.

→ Instructor for TAPPI Coated Board Short Courses, 1994, 1996, 1998, 1999, 2001, 2002
→ TAPPI - Selected as one of the "Excellent Instructors" for 1996, 1997, 1998, 1999, 2000, 2001, 2002
→ PTS, Munich, Germany – Published paper for PTS, 2001 on print mottle. September 19th, 2001. Unable to attend to present due to attack on America.
→ Intertech 1998 - Presented Mottle Workshop
→ IPGAC – Bordeaux, France, 2002 - International Printing and Graphic Arts Conference – CoAuthor or technical paper on paper pigments and printing mottle.

January, 1997 - Selected as the AGFA NALC Local Member of the Year for the Boston Litho Club.

June, 1997 - Selected as the NALC National Litho Club Member of the Year.

May, 2001 - Awarded Special Achievement Award from TAPPI at the 2001 Coating Conference, San Diego, CA.

May, 2002 - Awarded Special Achievement Award from TAPPI at the 2001 Coating Conference, Orlando, FL.

*********